DAVID B. GOLUBCHIK (SBN 185520)
dbg@lnbrb.com
KRIKOR J. MESHEFEJIAN (SBN 255030)
kjm@lnbrb.com
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | ) Case No. 2:09-bk-36434-ER |
| | ) |
| SONA, LLC, | ) Chapter 11 |
| | ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S EMERGENCY MOTION FOR** |
| | ) **AN ORDER (1) AUTHORIZING THE USE** |
| | ) **OF CASH COLLATERAL ON AN** |
| | ) **INTERIM BASIS PENDING A FINAL** |
| | ) **HEARING; AND (2) TURNOVER OF** |
| | ) **PROPERTY OF THE ESTATE;** |
| | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT THEREOF;** |
| | ) **DECLARATIONS OF RYAN FLOYD AND** |
| | ) **DAVID MYERS IN SUPPORT THEREOF** |
| | ) |
| | ) Hearing: |
| | ) DATE:  To be set |
| | ) TIME:   To be set |
| | ) PLACE: Courtroom 1568 |
| | )            255 E. Temple Street |
| | )            Los Angeles, CA 90012 |

TO THE HONORABLE ERNEST M., ROBLES UNITED STATES BANKRUPTCY JUDGE:

## SUMMARY

Pursuant to L.B.R. 2081-1 and 11 U.S.C. §§ 105, 363, 542 AND 543, Sona, LLC, LLC, the debtor and debtor in possession in the above-referenced Chapter 11 case (the "Debtor"), hereby moves, on an emergency basis, for an interim order authorizing the Debtor to use cash collateral pending a final hearing ordering turnover of property of the estate (the "Motion").

The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. on September 30, 2009. The Debtor is the creation of David Myers, one of the top chefs and restauranteurs in the United States. The Debtor is the owner and operator of one of the top French restaurants in Los Angeles. Its food has won national and international acclaim year after year. Its wine list contains one of the best selections of domestic and imported offerings. The Debtor employs three (3) full time persons and 17-21 part-time servers.

In January 2009, the Debtor obtained a $1,000,000 loan ("Loan") from GemCap Lending I, LLC ("GemCap"). The Loan, which bears interest at rate of 18% per annum, was secured by substantially all assets of the Debtor.

Throughout the Loan term, the Debtor remained current on all of its payments to GemCap. On or about September 1, 2009, GemCap was advised that one of the principals of the Debtor's managing member (Basil Schmid) was leaving to Switzerland and would not be involved in ongoing operations. Based on the foregoing, on September 2, 2009, GemCap declared the loan in default and accelerated the amount due. On the same day, GemCap unilaterally took possession of the Debtor's wine inventory, valued at approximately $1.5 million, maintained in a wine storage facility across from the restaurant and changed the locks,

but failed to give the Debtor access to the facility.   Additionally, GemCap seized wine inventory belonging to Comme Ca, LLC ("Comme Ca"), a separate entity that operates a completely different restaurant in a different location.  While GemCap initially allowed Comme Ca to remove some needed inventory on September 2, 2009, it denied to Comme Ca all access to its inventory after this date.  To date, GemCap has refused to allow Comme Ca access to its wine inventory notwithstanding the fact that Comme Ca provided GemCap's counsel with invoices and cancelled checks evidencing that the wine is owned by Comme Ca.

Although the Debtor was suffering from  its inability to operate its restaurant successfully without access to its wine inventory, the Debtor continued to negotiate a resolution with GemCap.  Although foreclosure sales were noticed, GemCap repeatedly advised the Debtor and persons affiliated with the Debtor (including Walter Schild) that it would not move forward with the foreclosure sale pending negotiations to restructure the debt and provide for its repayment.

On September 29, 2009, at approximately 2:38 pm, GemCap's counsel sent an email to the Debtor and interested parties advising them that an auction sale will be held on September 30, 2009 at 10:00 a.m., which was less than 24-hours notice.  When the "sale" was attended, interested parties were advised that the highest bid was received via telephone at 10:10 a.m. and the auction was completed.  This case was commenced only 13 minutes later on September 30, 2009 at 10:23 a.m.  The Debtor has determined that the alleged sale was improper and, therefore, all assets are property of the Debtor's bankruptcy estate.

The Debtor requires the immediate use of cash collateral so that it can maintain operations and going concern value while it effectuate a reorganization for the benefit of all creditors.  The Debtor believes that adequate basis exists to allow the Debtor to use cash collateral to maintain and preserve the value of its business.  As set forth in the Memorandum

of Points and Authorities and the Declaration of Ryan Floyd ("Floyd Declaration") in support thereof filed concurrently herewith, the Debtor believes that the Debtor's only secured creditor, GemCap, is adequately protected by an equity cushion in the approximate amount of approximately 75%. GemCap will be further protected by continuation of the Debtor's business and preservation of its going concern value. Based on the foregoing, the Debtor respectfully request that the Court enter an order authorizing the Debtor to use cash collateral pursuant to the budget attached to the Floyd Declaration as Exhibit "C" (the "Budget") on an interim basis pending a final hearing, except that the Debtor seeks Court authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15% to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed the Debtor's budgeted expenses by a small amount. Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carry over to the following months.

In addition to the foregoing, the Debtor requires access to its inventory, which GemCap has refused to turn over notwithstanding the commencement of this case. Pursuant to this Motion, and consistent with Sections 542 and 543 of the Bankruptcy Code, Debtor respectfully requests that the Court order GemCap and/or GemCap Asset Holding, LLC ("GAH") to immediately release all of the Debtor's assets and account for al such assets.

## **ADDITIONAL INFORMATION**

Pursuant to L.B.R. 2081-1(c), the Debtor submits that the proposed order authorizing the Debtor's use of cash collateral on an interim basis pending a final hearing will not contain the following provisions:

| **Provision** | **Paragraph** |
|---|---|
| Cross-collateralization clauses | No |

| Provision | Paragraph |
|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of | No |

| Provision | Paragraph |
|---|---|
| cash collateral authorized under the applicable cash collateral order. | |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

The Motion is based on the Motion, the attached Memorandum of Points and Authorities and Declarations of David Myer and Ryan Floyd filed concurrently herewith, the statements, arguments and representations of counsel to be made at the hearing on the Motion, if any, and any other admissible evidence properly presented to the Court.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served by overnight mail a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, GemCap's counsel, the Debtor's 20 largest unsecured creditors and all of those parties who have requested special notice.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order:

(a)     affirming the adequacy of the notice given;

(b)     authorizing the Debtor to use cash collateral pursuant to the terms of the Budget and this Motion on an interim basis pending a final hearing on the Motion;

(c)     compelling GemCap and GAH to turn over and release all of the Debtor's assets;

(d)     setting a final hearing to consider approval of the Motion; and

///

///

///

1      (e)      granting such other and further relief as the Court deems just and proper.

2   Dated:  October 5, 2009                    LEVENE, NEALE, BENDER, RANKIN
                                                    & BRILL, L.L.P.
3

4                                            By: ___/S/ David B. Golubchik_____
                                                 DAVID B. GOLUBCHIK
5                                                KRIKOR J. MESHEFESHIAN
                                                 Proposed Attorneys for Debtor and
6                                                Debtor in Possession

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF RELEVANT FACTS

Sona, LLC, debtor and debtor in possession herein ("Debtor") commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. ("Bankruptcy Code") on September 30, 2009 (the "Petition Date").  The Debtor a California limited liability company.  Its sole member is FoodArt Ventures, Inc., a California corporation ("FAVI").  The operations of Sona are managed through FoodArt Group, Inc., a California corporation ("FAGI").

**A.      Background**

The Debtor is the creation of David Myers, one of the top chefs and restauranteurs in the United States.  Attached hereto as Exhibit "A" is a true and correct copy of a "Press Kit" for Mr. Myers, identifying his accomplishments.  The Debtor is the owner and operator of one of the top French restaurants in Los Angeles.  Its food has won national and international acclaim year after year.  The Debtor employs three (3) full time persons and 17-21 part-time servers.

**B.      GemCap Financing and Foreclosure Efforts**

When the Debtor required operating capital, it turned to GemCap Lending I, LLC ("GemCap").  On or about January 16, 2009, GemCap, a hard money lender, charged the Debtor a 3% fee for the $1,000,000 credit facility and 18% per annum.  Despite such onerous terms, the Debtor was current on the loan up until Mid-September 2009.

Throughout the Loan term, the <u>Debtor remained current on all of its payments to GemCap</u>.  On or about September 1, 2009, GemCap was advised that one of the principals of the Debtor's managing member (Basil Schmid) was leaving to Switzerland and would not be involved in the ongoing operations of the Debtor.  Based on the foregoing, on September 2,

2009, GemCap declared the loan in default and accelerated the amount due. On the same day, GemCap unilaterally took possession of the Debtor's wine inventory, valued at approximately $1.5 million, maintained in a wine storage facility near the restaurant. GemCap changed the locks at the facility, and barred the Debtor's access to the facility. Additionally, GemCap seized wine inventory belonging to Comme Ça, LLC ("Comme Ca"), a separate entity that operates a completely different restaurant in a different location. While GemCap initially allowed Comme Ça to remove some needed inventory on September 2, 2009, it denied Comme Ça all access to its inventory after this date. To date, GemCap has refused to allow Comme Ça access to its wine inventory notwithstanding the fact that Comme Ça provided GemCap's counsel with invoices and cancelled checks evidencing that the wine is owned by Comme Ça..

Although the Debtor was suffering from its inability to operate its restaurant successfully without access to its wine inventory, the Debtor continued to attempt to negotiate a resolution with GemCap. Although GemCap purported to notice multiple foreclosure sales, GemCap repeatedly advised the Debtor and persons affiliated with the Debtor (including Walter Schild[1]) that it would not move forward with the foreclosure sale pending negotiations to restructure the debt and provide for its repayment.

On September 29, 2009, at approximately 2:38 pm, GemCap's counsel sent an email to the Debtor and interested parties advising them that an auction sale would be held on September 30, 2009 at 10:00 a.m., which was less than 24-hours notice. At the "sale", interested parties were advised that the highest bid was received via telephone at 10:10 a.m. and the auction was completed. The Debtor's case was commenced only 13 minutes later on September 30, 2009 at 10:23 a.m.

**C.** **Sham Foreclosure Sale To Related Party and Violation of Automatic Stay**

Although not disclosed originally, it was later learned that the "successful buyer" was a company related to GemCap – known as GemCap Asset Holding, LLC ("GAH") – which allegedly bid $800,000 cash for the assets.   No proof of the payment of such cash purchase has been offered in this proceeding, or any time before its commencement, by GAH.

In the ensuing days, after the commencement of this case, representatives of GemCap and/or GAH repeatedly entered the storage facility and unilaterally removed wines from the storage facility.   Additionally, on October 3, 2009, representatives of GemCap and/or GAH were seen taking the Debtor's furnishings from the storage facility, destroying and dumping them in the trash bin located in an alley behind the storage facility.

**D.     Debtor's Asset Base**

The Debtor's assets consist primarily of cash, food and alcohol inventory and furnishings, fixtures and equipment.   Attached hereto as Exhibit "B" is a true and correct copy of the Debtor's latest balance sheet, as of August 31, 2009.   As set forth on the balance sheet, as of August 31, 2009, the total value of the Debtor's assets was approximately $1,765,223.70.

On the Petition Date, as reflect in the cash flow projections attached hereto as Exhibit "C", the Debtor's assets consisted of the following:

| | | |
|---|---|---|
| Cash | - | $   6,707 |
| Food inventory | - | $   7,039 |
| Wine inventory | - | $1,090,830[2] |
| Other inventory | - | $  12,453 |
| Prepaids | - | $  10,795 |
| Fixed Assets | - | $ 455,669 |
| Other Assets | - | $ 168,058 |
| TOTAL | | $1,751,551 |

---

[1] Mr. Schild is the managing member of Dilson & Walter, LLC ("D&W"). D&W is the majority owner of Comme Ca, LLC ("Comme Ca").  D&W is also the managing member of David Myers Group, LLC ("DMG"), which is manager of Comme Ca.

[2] This amount is at cost.  Market value of the wine inventory is substantially higher and the Debtor believes that the fair market value is approximately $1.3 million.

**E.      Budget**

The Debtor has formulated a realistic Budget based upon its actual current operating performance, and projects improved sales as the winter holiday season approaches. Wine is the strongest sales of most fine dining restaurants. Debtor has three (3) private events already reserved in October and December.  The Debtor has reduced expenses as much as possible. The Budget reflects that the Debtor's operations immediately will be cash positive going forward, establishing that the Debtor can remain profitable while, at the same time, maintain the value of its asset base.

A true and correct copy of the Budget is attached hereto as Exhibit "C".  The Budget has been prepared on a weekly basis for the first month to provide the Debtor's estimated weekly revenues and expenses.  Thereafter, the Budget has been prepared on a monthly basis. However, since the attached are only pro-forma projections, it is not a certainty that such income and expenses will occur in the specific weeks designated therein.  Based on the foregoing, the Debtor seeks authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15% to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed the Debtor's budgeted expenses by a small amount.  Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carry over to the following months.

The Budget also includes a collateral base analysis for the periods of the Budget.  The collateral base analysis includes wine inventory at cost basis ($1,099,830) although the market value is approximately $1.3 million.  As set forth therein, the collateral is expected to remain substantially higher than the secured debt, with an equity cushion of approximately 75%. Moreover, the Debtor's plan is to replace its wine inventory as the wine is used in operations. As a result of the foregoing, the Debtor anticipates that the cost basis of the wine inventory will

remain relatively stable during the period in the Budget.

In addition, to provide GemCap with adequate protection, the Debtor proposes to grant to GemCap a replacement lien in collateral and proceeds derived therefrom with the same validity, extent and priority as GemCap was entitled to on the Petition Date.

Based on the foregoing, the Debtor submits that use of cash collateral is appropriate in this case.

II.

## DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

**A.**     **Requested Relief.**

By way of this Motion, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to use Cash Collateral pursuant to the Budget attached to the Floyd Declaration as Exhibit "C" on an interim basis pending a final hearing, except that the Debtor seeks Court authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15% to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed the Debtor's budgeted expenses by a negligible amount. Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carryover to the following months.

**B.**     **The Debtor Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve its Business.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

12

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The only source of revenue available to the Debtor to use to operate its business is the revenue generated from restaurant operations.  As a result, the Debtor has no ability to continue to operate its business and maintain the going concern value of its business unless the Debtor has immediate access to and use of its Cash Collateral to pay the Debtor's ordinary operating

expenses, including, but not limited to, payroll, rent, utilities, inventory supplies, etc. The expenses which the Debtor must be able to pay are set forth in the Budget. The Debtor's inability to pay those expenses would cause immediate and irreparable harm to the Debtor and its business. The inability of the Debtor to use its Cash Collateral would likely result in the immediate closure of the Debtor's restaurant and liquidation of the Debtor's Assets, to the detriment of all of the Debtor's creditors.

Therefore, the Debtor should be authorized to use cash collateral to operate, maintain and preserve its business. GemCap and/or GAH are in possession of the Debtor's wine inventory. Debtor respectfully requests that the Court order GemCap and GAH to turn over, and account for, such inventory to the Debtor.

**C.      GemCap And Any Other Alleged Creditors With An Interest In The Debtor's Cash Collateral Will Be Adequately Protected By The Debtor's Continued Use Of Cash Collateral.**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984). See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988).

Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630. See also McCombs, at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e.,

the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." McCombs, at 266.

The Ninth Circuit made clear in Mellor, at 1401, that in the case of an oversecured creditor, an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral. See also In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa.1980) [holding a 10% cushion is sufficient to be adequate protection]; In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E.D. Va.1980) [court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property.]

The Debtor believes that GemCap is the only entity that has an interest in the Debtor's Cash Collateral.  In this case, there cannot be any serious question as to whether GemCap is oversecured and adequately protected.  A review of the Budget shows that below the cash flow projections, the Debtor has included a collateral base analysis.  Based on such data, Lender will be protected by an equity cushion of approximately 75%%, well within the Mellor standard.

Moreover, the law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.  In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988); see also In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization.  In In re O'Connor, the Tenth Circuit stated:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to

15

1    the Debtors to achieve that end.  Thus, while interests of the secured
2    creditor whose property rights are of concern to the court, the
     interests of all other creditors also have bearing upon the question of
3    whether use of cash collateral shall be permitted during the early
     stages of administration.

4
In re O'Connor, 808 F.2d at 1937.
5
6          GemCap is adequately protected by an equity cushion of approximately 75%.  Use of
7    cash collateral to allow the Debtor to operate as a going concern is in the best interest of the
8    Debtor and all other creditors of this estate.

9          In addition to the equity cushion that exists in the GemCap's favor, as additional
10   adequate protection, the Debtor proposes to provide GemCap and any other creditor who
11   asserts an interest in the Debtor's Cash Collateral with a replacement lien against the Debtor's
12   assets, with such replacement lien to have the same extent, validity, and priority as the pre-
13   petition lien held by such creditor.
14
15   **D.    The Procedural Requirements Regarding Approval of the Motion Have Been**
16   **Satisfied.**

17         Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtor is required to serve a copy of
18   the Motion on any entity with an interest in the Debtor's Cash Collateral, any committee
19   appointed or on the twenty largest unsecured creditors if not committee has been appointed, and
20   any other entity that the Court directs.  The Debtor has complied with the foregoing by serving
21   a copy of the Motion by overnight mail to all of the foregoing plus the United States Trustee
22   and those parties who have requested special notice.  The Debtor also served a copy of the
23   Motion by email to counsel for GemCap.
24
25   ///
26   ///
27   ///
28

# III.

## **TURNOVER OF ASSETS**

Section 542 of the Bankruptcy Code provides, in relevant part, that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

Section 543 of the Bankruptcy Code provides, in relevant part, as follows:

> (b) A custodian shall—
> (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
> (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C. § 543(b).

GemCap and/or GAH are in possession of the Debtor's very valuable wine inventory, which is property of the estate pursuant to 11 U.S.C. § 541. As set forth in Exhibit "D" hereto, the Debtor's has a market value of over $1.5 million. It is indisputable that GemCap and GAH are well aware of the Debtor's bankruptcy filing. Pursuant to Sections 542 and 543 of the Bankruptcy Code, GemCap and GAH are required to turn over property of the estate to the Debtor. Unfortunately, they have refused to do so. Pursuant to this Motion, the Debtor respectively requests that the Court order GemCap and GAH to turnover and release all assets of the Debtor and provide an accounting to the Debtor.

# IV.

## CONCLUSION

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

(a)    affirming the adequacy of the notice given;

(b)    authorizing the Debtor to use Cash Collateral pursuant to the terms of the Budget and the Motion on an interim basis pending a final hearing on the Motion;

(c)    compelling GemCap and GAH to turn over and release all of the Debtor's assets;

(d)    setting a final hearing to consider approval of the Motion; and

(e)    granting such other and further relief as the Court deems just and proper.

Dated: October 5, 2009                                 LEVENE, NEALE, BENDER, RANKIN
                                                                      & BRILL, L.L.P.


                                                    By: ___*/S/ David B. Golubchik*_____
                                                           DAVID B. GOLUBCHIK
                                                           KRIKOR J. MESHEFESHIAN
                                                           Proposed Attorneys for Debtor and
                                                           Debtor in Possession

1

## DECLARATION OF RYAN FLOYD

2

3

I, Ryan Floyd, declare as follows:

4

1.    Except as otherwise indicated, I have personal knowledge of the facts set forth

5

herein, and if called as a witness, could and would testify competently with respect thereto. I

6

make this declaration is support of motion for use of cash collateral filed by Sona, LLC, the

7

debtor and debtor in possession in this case ("Debtor").

8

9

2.    I was hired by FoodArt Group, Inc., a California corporation ("FAGI") as

10

Director of Finance in March 2009. I implemented financial and operational processes and

11

procedures which were non-existent before I arrived; worked to put in place management and

12

financial reporting for the entire group (FAVI, FAGI, Debtor, Boule, Comme Ca Melrose,

13

Comme Ca SCP, Pizzeria Ortica, Comme Ci Bakery). I created a very detailed reforecast of the

14

budget while working for FAGI. I was "laid off" from FAGI on August 21, 2009. I was then

15

hired by Dilson & Walter, LLC ("D&W"), which owns a majority interest in Comme Ca, LLC

16

and Pizzeria Ortica, LLC, as its Chief Financial Officer.

17

18

3.    In early September 2009, when the Schmids determined they would no longer be

19

managing the restaurants, I took over responsibility for the day-to-day finances of the Debtor, at

20

the request of FAVI. I have sufficiently familiarized myself with the sales, sales projections

21

and expense obligations of the Debtor. to understand its financial needs and "break-even"

22

calculations. I am very familiar with the Debtor's operations and can certify Debtor's numbers

23

from March 2009. Additionally, I worked closely with the outside accountant for the group,

24

Dee Steine.

25

26

4.    Attached hereto as Exhibit "B" is a true and correct copy of the Debtor's latest

27

balance sheet, as of August 31, 2009. As set forth on the balance sheet, as of August 31, 2009,

28

the total value of the Debtor's assets was approximately $1,765,223.70. I believe that the attached balance sheet accurately reflects the Debtor's position as of the date thereof.

5.    In connection with preparing this Motion, I reviewed the Debtor's historical operations, which fluctuate based on seasonality. Based on such review, I prepared the Debtor's cash flow projections (the "Budget"), true and correct copy of which are attached hereto as Exhibit "C". I believe that the Budget is realistic based upon the Debtor's actual current operating performance, and projected sales as the winter holiday season approaches. The Budget reflects that the Debtor's operations immediately will be cash positive going forward, establishing that the Debtor can remain profitable while, at the same time, maintain the value of its asset base.

6.    The Budget has been prepared on a weekly basis for the first month to provide the Debtor's estimated weekly revenues and expenses. Thereafter, the Budget has been prepared on a monthly basis. However, since the attached are only pro-forma projections, it is not a certainty that such income and expenses will occur in the specific weeks designated therein. Based on the foregoing, I believe it is necessary and appropriate to obtain authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15% to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed the Debtor's budgeted expenses by a small amount. Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carry over to the following months.

7.    The Budget also includes a collateral base analysis for the periods of the Budget. The collateral base analysis includes wine inventory at cost basis ($1,099,830) although, I have been advised and understand that, the market value is approximately $1.3 million. My projections expect the collateral to remain substantially higher than the secured debt.

1  Moreover, the Debtor's plan is to replace its wine inventory as the wine is used in operations.

2  As a result of the foregoing, I anticipate that the cost basis of the wine inventory will remain

3  relatively stable during the period in the Budget.

4       8.      Attached hereto as Exhibit "D" is a true and correct schedule of the Debtor's

5  wine inventory as of the end of June 2009.  While the inventory has changed between that time

6  and the time that GemCap seized it, the inventory is relatively close to that set forth in Exhibit

7  "D" hereto.

8

9       I declare under penalty of perjury pursuant to the laws of the United States of America

10  that the foregoing is true and correct.

11       Executed this 5th day of October 2009 at Los Angeles, California.

12

13

14                                      RYAN FLOYD

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DAVID B. GOLUBCHIK (SBN 185520)
dbg@lnbrb.com
2   KRIKOR J. MESHEFEJIAN (SBN 255030)
kjm@lnbrb.com
3   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
4   Los Angeles, California 90067
5   Telephone: (310) 229-1234
Facsimile:  (310) 229-1244
6
Proposed Attorneys for Chapter 11
7   Debtor and Debtor in Possession

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11                         **LOS ANGELES DIVISION**

12

13   In re                                )   Case No. 2:09-bk-36434-er
                                          )
14   SONA, LLC,                           )   Chapter 11
                                          )
15           Debtor and Debtor in Possession.   )   Adv No. 2:09-ap-02262-ER
                                          )
16   _____      )
                                          )
17   GEMCAP ASSET HOLDING, LLC, a         )   **DECLARATION OF DAVID MYERS IN**
     Delaware limited liability company,  )   **SUPPORT OF DEBTOR'S EMERGENCY**
18                                         )   **MOTION FOR AN ORDER (1)**
19   v.                                    )   **AUTHORIZING THE USE OF CASH**
                                          )   **COLLATERAL ON AN INTERIM BASIS**
20   SONA, LLC, et al.                     )   **PENDING A FINAL HEARING; AND (2)**
                                          )   **TURNOVER OF PROPERTY OF THE**
21                                         )   **ESTATE**
                                          )
22                                         )   Hearing:
                                          )   DATE:   To be set
23                                         )   TIME:   To be set
                                          )   PLACE: Courtroom 1568
24                                         )           255 E. Temple Street
25                                         )           Los Angeles, CA 90012

26

27

28

1  I, David Myers, declare:

2  1.    I am the Executive Chef of Sona and created the concept for the Sona restaurant.  I am

3  also an officer of FoodArt Ventures, Inc. ("FAVI"), the sole member of Sona, LLC, the debtor.

4  The facts contained in this declaration are known by me personally and if called to testify, I

5  could and would testify competently to the truth thereto.

6

7  2.    Shortly after obtaining my culinary degree, I worked in some of the most prestigious

8  restaurants in the world and under some of the most successful restaurateurs, including Charlie

9  Trotter's from 1995 to 1996 in Chicago, Les Crayeres in Reims, France, which had the coveted

10  Michelin 3 star rating.  In August 1998, I was hired as the Executive Sous Chef of the Patina

11  Group and helped in the re-launch of its brand, assisting it to obtain the Michelin 3 star rating.

12  In 2001, I left Patina to join Raffles at L'Ermitage in BeverlyHills.  There, I was the Executive

13
   Chef and conceived the concept behind their JAAN restaurants, opening such restaurants in
14

15  Beverly Hills and Singapore.  The JAAN restaurants were both critical and financial successes

16  for Raffles.

17  3.    In 2002, I created the Sona concept.  The word comes from the latin word "sono" which

18  means to make music and sounds and to celebrate.  The concept was that my cooking is very

19  jazz-like and artistic and celebratory.  I take the freshest ingredients available in Southern

20
   California and make artistic plates based upon these fresh ingredients.
21

22  4.    The Schmids agreed to provide the financial backing for the restaurant and it was

23  opened in November 2002 to critical acclaim.  The Los Angeles Times reported that there was

24  nothing else like it.  The awards and accolades that followed were numerous.  Attached hereto

25  as Exhibit A are just some of the press on the restaurant since it was opened.

26  5.    Since the opening, we have developed a very staunch and loyal clientele.  In fact,

27
   despite the Los Angeles Times reporting last week on the foreclosure sale of the wine inventory
28

1  and other assets and essentially making it sound as if we had closed, many of our long-term

2  guests phoned and came by and expressed their support for our staying open. Even our vendors

3  have rallied around us and many have pledged their commitment to work with us and assist us

4  through this time, including our landlord.

5

6  6.     It is my intention and desire to continue to operate the restaurant through the

7  bankruptcy, despite the decisions of Otto and Basil Schmid. Based upon my greater than 14-

8  year career in high-end restaurants, I am certain that Sona can operate at a profit during the

9  bankruptcy. We have gotten many of our costs in line and I have had active discussions with

10  Ryan Floyd about his projections, which are part of his declaration. I am confident that we can

11  meet the revenue and expenses identified. Traditionally, the holiday season, which comprises

12  nearly the total of the last quarter of the year, is our strongest quarter from a revenue

13
standpoint. We already have holiday parties booked and expect that if we stay open, there will
14
be several others.
15

16  7.     The restaurant is open for dinner 5 days a week (Tuesday through Saturday). The

17  restaurant employs 20 to 23 people at any given time, including 3 salaried persons. I am not on

18  the payroll. We generally have approximately 80 guests from Tuesday through Thursday and

19  115 on Saturday and Sunday. This amount averages out to approximately 195 persons per

20  week. The average check amount per guest is $140.

21

22  8.     On September 30, 2009 at approximately 12:45 p.m., I was apprised that David and

23  Richard Ellis had come to the restaurant with a truck and were looking to remove all of the

24  furniture, fixtures and equipment. I then came to the restaurant and personally observed them

25  and their actions. When we denied the Ellises access to the restaurant, they became very

26  abusive verbally and were quite intimidating to the staff. They did not leave for a protracted

27

28

3

1  period of time and once they did, they had someone posted at the restaurant taking pictures of

2  the comings and goings, including our guests.

3  9.     GemCap representatives became more aggressive on Friday and the CFO of the

4  company, along with another unidentified person, posted themselves outside the front door.

5  They similarly approached and intimidated guests.

6
7  10.    On Saturday, October 3, 2009, GemCap agents cleared out Sona property from the

8  storage facility where the wine is also stored.  They threw a significant amount of the furniture

9  away.  Attached hereto as Exhibit 9 are true and correct copies of pictures of the property they

10  threw out.  I am fairly certain that a good deal of the wine has also been removed.

11       I declare under penalty of perjury under the laws of the United States that the foregoing

12  is true and correct and that this declaration was executed on October 5, 2009.

13

14

15

16  _____

17  David Myers

18

19

20

21

22

23

24

25

26

27

28