DAVID B. GOLUBCHIK (SBN 185520)
dbg@lnbrb.com
CARMELA T. PAGAY (SBN 195603)
ctp@lnbrb.com
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:   (310) 229-1244

Attorneys for Chapter 11
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:09-bk-36434-ER |
| SONA, LLC, | Chapter 11 |
| Debtor and Debtor in Possession. | **NOTICE OF MOTION AND MOTION OF DEBTOR FOR ORDER ESTABLISHING SALE PROCEDURES FOR SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID MYERS SUBMITTED IN SUPPORT THEREOF** |
| | **HEARING** |
| | Date:  June 16, 2010 |
| | Time:  10:00 a.m. |
| | Place:  255 E. Temple St. |
| | Courtroom 1568 |
| | Los Angeles, CA  90012 |

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE TOP TWENTY UNSECURED CREDITORS, SECURED CREDITOR, PARTIES REQUESTING SPECIAL NOTICE, AND ALL OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, on June 16, 2010, at 10:00 p.m., before the Honorable Ernest Robles, United States Bankruptcy Judge, Sona, LLC, Chapter 11 debtor and debtor in possession (the "Debtor") will move the Bankruptcy Court for an order establishing procedures for the sale of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Procedures Motion").

**PLEASE TAKE FURTHER NOTICE** that the Sale Procedures Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of David Myers submitted herewith, Local Bankruptcy Rule 6004-1, the records and files in this Chapter 11 case, and such additional evidence and argument as may be presented at or before the hearing on the Sale Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 6004-1(b)(4), any party wishing to respond to the Sale Procedures Motion must file with the Bankruptcy Court and serve on counsel for the Debtor a written response at least one (1) day before the hearing. Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve a response in accordance with the Local Bankruptcy Rules may be

///

///

1    deemed by the Bankruptcy Court to be consent to the granting of the relief requested in

2    the Sale Procedures Motion.

3

4    Dated: January 26, 2010              LEVENE, NEALE, BENDER,
                                          RANKIN & BRILL, L.L.P.

5
                                          By:    /s/ David B. Golubchik
6                                             DAVID B. GOLUBCHIK
                                              KRIKOR J. MESHEFEJIAN
7                                         Attorneys for Debtor in Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**JURISDICTION AND VENUE**

Sona, LLC, debtor and debtor in possession herein (the "Debtor"), commenced its bankruptcy case by filing a Voluntary Petition under Chapter 11 of the Bankruptcy Code on September 30, 2009 ("Petition Date").  The Debtor continues to manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Sale Procedures Motion are Section 105, 363 and 365 of the United States Code (the "Bankruptcy Code"), and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure ("FRBP").

**II.**

**FACTUAL BACKGROUND**

**A.    Background**

The Debtor is the creation of David Myers, one of the top chefs and restaurateurs in the United States.  The Debtor is the owner and operator of Sona, one of the top restaurants in Los Angeles.  Its food has won national and international acclaim year after year.  The Debtor operated from an approximate 3,000 square foot location at 401 La Cienega Blvd, Los Angeles, California pursuant to a nonresidential real property lease (the "Lease").  In connection with its business operations, the Debtor owned all necessary restaurant equipment and supplies (the "Restaurant Assets"), as well as intellectual property (the "IP") necessary for the operation of the Sona restaurant.  Additionally, the Debtor owned a substantial wine inventory ("Wine") related to such operations.  The Restaurant Assets, IP and Wine

(collectively, the "Sona Assets") were pledged as collateral to secure an obligation due and owing by the Debtor to GemCap Lending I, LLC ("GemCap"), its pre-petition lender, in the principal amount of $1,000,000.

**B.    Significant Events During Bankruptcy**

On September 30, 2009, the date of the instant bankruptcy filing, GemCap allegedly held a foreclosure sale of the Sona Assets to GemCap Asset Holdings, LLC ("GAH"), which the Debtor disputed.  Based on the fact that the Debtor disputed the validity of the alleged foreclosure sale, and to preserve the value of the business, the Debtor continued operating the restaurant.

Shortly after commencement of this case, GAH commenced an adversary proceeding against the Debtor and other third parties, bearing Adversary No. 2:09-ap-02262-ER, seeking a restraining order enjoining the operations of the restaurant and a writ of possession over the assets of the estate and asserting claims for damages.  The Debtor opposed the motions and was joined in the oppositions by the remaining defendants.

Ultimately, the Debtor, GemCap, and GAH entered into a settlement agreement (the "Settlement Agreement") to resolve their disputes.  The Court approved that settlement agreement pursuant to a Court order entered on December 16, 2009.  The Debtor also sought additional relief from the Court in the form of authority to obtain post-petition financing (the "Financing Transaction") and enter into an asset leasing transaction (the "Lease Transaction") so that the Debtor would be able to continue the operation of its restaurant.  The Court has also approved the Financing Transaction and the Lease Transaction.  The Settlement Agreement, Financing Transaction and Lease Transaction had, among other, the following primary effects upon the Debtor's estate:

1.      The pre-petition foreclosure sale of the Debtor's assets (the "Sona Assets") by GemCap to GAH in the amount of was deemed valid and enforceable;

2.      GAH sold the Sona Assets to Kuda Group, LLC ("Kuda");

3.      Kuda and the Debtor entered into an agreement pursuant to which the Debtor will be able to continue utilizing the Sona Assets for operations;

4.      Kuda extended a $100,000 post-petition credit line to the Debtor.

Meanwhile, the Debtor discovered that there is group of assets consisting of various restaurant equipment (the "Remaining Equipment") and wine inventory (and "Remaining Wine") that has not been released to Kuda or the Debtor. Since Kuda purchased essentially all of the Sona Assets (except for the lease and liquor license), Kuda was entitled to obtain the Remaining Equipment and Remaining Wine, and the Debtor is entitled to utilize the Remaining Equipment and Remaining Wine in the course of its business operations pursuant to the Settlement Agreement and Lease Transaction.

The Remaining Equipment was found to be in the possession of Mehdi Iloulian ("Iloulian") who is the owner of certain real property located at 418 La Cienega Blvd., Los Angeles, California, a location where FAVI had authorized and directed the storage of certain of the Debtor's equipment, including the Remaining Equipment. As for the Remaining Wine, they were found to be stored in a separate location, in Marina Del Rey, controlled by Otto Schmid ("Schmid"), former Chairman of FAVI. This Court granted the Debtor's motion to compel release of the Remaining Equipment from Iloulian and the Remaining Wine from Schmid at the hearing held on such motion on January 20, 2010.

## C.      Cessation of Operations and Negotiation of Purchase Agreement

The Debtor's restaurant operations ceased in April 2010. The remaining assets of the Debtor included the Lease as well as its liquor license related to its operations (the "Liquor

License" and collectively with the Lease, the "Assets").  In order to maximize the value of its estate for the benefit of all creditors, the Debtor sought a potential purchaser for its below-market Lease and valuable Liquor License.

After extensive efforts, KBKW, LLC ("Purchaser") provided the Debtor with the highest and best offer for the purchase of the Assets.  After extensive negotiations, the Debtor and Purchaser entered into that certain Purchase Agreement (the "APA"), a true and correct copy of which is attached as Exhibit "A" to the accompanying Declaration of David Myers. The salient terms of the APA are as follows:

1.    The Debtor will assume and assign the Lease to Purchaser, including all rights thereunder;

2.    The Debtor will transfer the Liquor License to Purchaser; and

3.    Purchaser shall pay to the estate $150,000 in consideration of transfer of the foregoing Assets.

One of the Purchaser's requirements, as set forth in Section 6.6 of the APA, is for the Debtor to obtain the following bid procedures in connection with the proposed sale transaction:

1.    Any interested overbidder must submit a $50,000 deposit to the Debtor pending the sale hearing, which shall become nonrefundable if the bidder is the winning bidder; and

2.    In the event that the Court determines that someone other than the Purchaser is the winning bidder, Purchaser will be entitled to  break-up fee of $25,000.

The Debtor believes that the proposed bid procedures required by the Purchaser are fair and reasonable.  Purchaser has incurred fees and costs in connection with its due diligence efforts and negotiation and documentation of the transaction.  In addition to the foregoing

required provisions, the Debtor suggests that the following additional procedures be implemented:

1.   Any interested party must provide to Debtor, in addition to the $50,000 deposit, an asset purchase agreement substantially in the form as the APA with its proposed changes, as well as pro of funds, not later than 14 days before the sale hearing; and

2.   To the extent that qualified overbids are timely submitted, an auction will take place in Debtor's bankruptcy counsel's office two (2) business days before the scheduled sale hearing, allowing the Debtor an opportunity to report the result of the auction to the Court by the time of the sale hearing.

## III.

## DISCUSSION

Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Bankr. R. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long

recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate.  Therefore, the objective is 'to maximize bidding, not restrict it.'"  Id.

A corollary to these principles is that the court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment.  At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business.  In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions relating to a breakup fee and a requirement that overbids be at least $500,000.  In responding to objections to other provisions of the agreement, the court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11.  Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al., 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

The Debtor believes that its efforts were intended to, and indeed resulted in, insuring that the highest price was obtained for the Assets.  Purchaser's agreement to serve as a locked-in buyer and to permit its offer to be subject to overbid during the Debtor's bankruptcy case.  However, Purchaser's willingness to do so is conditioned upon all of the terms of the APA being approved by the Court, including the sales procedures set forth therein.

Besides being necessary for the Debtor's estate to obtain the substantial benefits afforded by the APA, the sale procedures serve numerous legitimate purposes.  The sale procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate

from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate the transaction; (iii) insure that the highest possible price is obtained for the Assets; and (iv) compensate Purchaser for Purchase's time, effort, costs and expenses incurred in this transaction as well as the benefit that Purchaser has provided to the Debtor's estate by agreeing to serve as a locked-in buyer subject to overbid. Faced with the options available in this case, it is absolutely clear that the APA, including the sale procedures, is in the best interests of the Debtor's estate and its creditors.

A breakup fee such as the one which will be paid to Buyer in the event of a successful overbid has been approved by numerous other courts. In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction." In re Financial News Network, Inc., 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); see also In re Integrated Resources, Inc., 147 B.R. 650, 653 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993) ["[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction"]. Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse' which attracts more favorable offers. In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the bidding. In re S.N.A. Nut Co., 186 B.R. at 102. In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." Cottle v. Storer Communication Inc., 849 F.2d 570, 578 (11th Cir. 1988); In re 995 Fifth Ave., supra, 96 B.R. at 28. Generally speaking, whether the payment of a break-up

fee is appropriate is evaluated under the "business judgment rule."  In re S.N.A. Nut Co., supra, 186 B.R. at 102.  Under this rule, there is a presumption that, in making a business decision, the principals of the debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.  Therefore, procedures utilized by a corporate debtor with respect to a proposed sale should be approved when the Court determines that such procedures are fair and do not violate any of the debtor's fiduciary duties.  Id.

In evaluating the appropriateness of a breakup fee, the appropriate question for the court to consider is "whether the break-up fee served any of three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  In re Integrated Resources, Inc., 147 B.R. 650, 662 (S.D.N.Y. 1992).  Additionally, so long as the break-up fee or overbid increment is not (1) the product of self-dealing by the debtor or the trustee, (2) likely to hamper or chill, rather than encourage, bidding on the assets to be sold, or (3) unreasonably large in relation to the proposed purchase price, courts have approved the proposed procedures.  See, e.g., In re Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F. 3d 49 (2nd Cir. 1993) (a break-up fee is permissible if reasonably related to the bidder's efforts and the transaction's magnitude); see also Cottle v. Storer Communication, 849 F.2d 570, 578-79 (11th Cir. 1988); CRTF Corp. v. Federated Dept. Stores, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); In re Crowthers McCall Pattern, Inc., supra at 879.

The breakup fee to be paid to Purchaser in the event of a successful overbid comports with both the "business judgment rule" and is in the best interests of the Debtor's estate and its creditors.  The breakup fee was required by Purchaser, and agreed to by the Debtor in the course of negotiations, for several reasons: (1) having invested significant time and financial resources in this transaction, including by conducting due diligence prior to submitting an offer,

in the event of a successful overbid, Purchaser wanted to recoup its time, effort, costs and expenses and ensure that it would not lose money as a result of its efforts to acquire the Debtor's assets; (2) to the extent other bidders extend qualifying bids, it was Purchaser's belief that such qualifying bids would be premised, in large measure, upon Purchaser's completion of its due diligence and expressed satisfaction with the results thereof; therefore, Purchaser has, by performing its due diligence and agreeing to proceed with the sale, conferred a benefit upon the estate herein by "legitimizing" the sale and Purchaser should be compensated in the event a qualifying bid other than Purchaser's bid is rendered a successful bid; and (3) the Debtor, and Purchaser were concerned about unqualified or unserious bidders upsetting the proposed sale to obtain a competitive advantage or some other economic benefit at the Debtor's (and Purchaser's) expense; the breakup fee was therefore designed to ensure that only serious, financially qualified potential bidders would participate in the bidding process.   Thus, the breakup fee was designed to ensure that Buyer would not retract its offer, establish a bid standard and attract qualified additional bidders.   The Debtor believes that this fee constitutes a "fair and reasonable percentage of the purchase price, and [is] reasonably related to the risk, effort, and expenses of the prospective purchaser."   In re Integrated Resources, Inc., supra at 662; In re 995 Fifth Ave. Assoc., L.P., supra at 28.

///

///

///

///

///

///

///

12

1

## IV.

2

## CONCLUSION

3

    **WHEREFORE**, the Debtor respectfully requests that the Court enter an order (i)

4

finding that notice of the Motion was adequate and appropriate; (ii) granting the Motion in its

5

entirety; (iii) approving the sale procedures as set forth hereinabove; (iv) authorizing the

6

Debtor to conduct a sale of the Assets as set forth hereinabove; and (v) granting such other and

7

further relief as may be necessary or appropriate under the circumstances.

8

Dated: June __, 2010                 SONA, LLC,

9

By:____*/s/ David B. Golubchik*_____
DAVID B. GOLUBCHIK

10

KRIKOR J. MESHEFEJIAN
LEVENE, NEALE, BENDER, RANKIN

11

& BRILL L.L.P.
Attorneys for Debtor and Debtor in

12

Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF DAVID MYERS</u>

I, DAVID MYERS, HEREBY DECLARE AS FOLLOWS:

1.      Until cessation of operations, I was the Executive Chef of Sona and created the concept for the Sona restaurant.  I am also an officer of FoodArt Ventures, Inc. ("FAVI"), the sole member of Sona, LLC, the debtor and debtor in possession herein ("Debtor").  The facts contained in this declaration are known by me personally and if called to testify, I could and would testify competently to the truth thereto.

**A.      Background**

2.      On September 30, 2009, the date of the instant bankruptcy filing, GemCap allegedly held a foreclosure sale of the Sona Assets to GemCap Asset Holdings, LLC ("GAH"), which the Debtor disputed.  Based on the fact that the Debtor disputed the validity of the alleged foreclosure sale, and to preserve the value of the business, the Debtor continued operating the restaurant.

3.      Shortly after commencement of this case, GAH commenced an adversary proceeding against the Debtor and other third parties, bearing Adversary No. 2:09-ap-02262-ER, seeking a restraining order enjoining the operations of the restaurant and a writ of possession over the assets of the estate and asserting claims for damages.  The Debtor opposed the motions and was joined in the oppositions by the remaining defendants.

4.      Ultimately, the Debtor, GemCap, and GAH entered into a settlement agreement (the "Settlement Agreement") to resolve their disputes.  The Court approved that settlement agreement pursuant to a Court order entered on December 16, 2009.  The Debtor also sought additional relief from the Court in the form of authority to obtain post-petition financing (the "Financing Transaction") and enter into an asset leasing transaction (the "Lease Transaction") so that the Debtor would be able to continue the operation of its restaurant.  The Court has also

approved the Financing Transaction and the Lease Transaction.  The Settlement Agreement, Financing Transaction and Lease Transaction had, among other, the following primary effects upon the Debtor's estate:

5.    The pre-petition foreclosure sale of the Debtor's assets (the "Sona Assets") by GemCap to GAH in the amount of was deemed valid and enforceable;

a.    GAH sold the Sona Assets to Kuda Group, LLC ("Kuda");

b.    Kuda and the Debtor entered into an agreement pursuant to which the Debtor will be able to continue utilizing the Sona Assets for operations;

c.    Kuda extended a $100,000 post-petition credit line to the Debtor.

6.    Meanwhile, the Debtor discovered that there is group of assets consisting of various restaurant equipment (the "Remaining Equipment") and wine inventory (and "Remaining Wine") that has not been released to Kuda or the Debtor.  Since Kuda purchased essentially all of the Sona Assets (except for the lease and liquor license), Kuda was entitled to obtain the Remaining Equipment and Remaining Wine, and the Debtor is entitled to utilize the Remaining Equipment and Remaining Wine in the course of its business operations pursuant to the Settlement Agreement and Lease Transaction.

7.    The Remaining Equipment was found to be in the possession of Mehdi Iloulian ("Iloulian") who is the owner of certain real property located at 418 La Cienega Blvd., Los Angeles, California, a location where FAVI had authorized and directed the storage of certain of the Debtor's equipment, including the Remaining Equipment.  As for the Remaining Wine, they were found to be stored in a separate location, in Marina Del Rey, controlled by Otto Schmid ("Schmid"), former Chairman of FAVI.  This Court granted the Debtor's motion to compel release of the Remaining Equipment from Iloulian and the Remaining Wine from Schmid at the hearing held on such motion on January 20, 2010.

**B.      Cessation of Operations and Negotiation of Purchase Agreement**

8.      The Debtor's restaurant operations ceased in April 2010.  The remaining assets of the Debtor included the Lease as well as its liquor license related to its operations (the "Liquor License" and collectively with the Lease, the "Assets").  In order to maximize the value of its estate for the benefit of all creditors, the Debtor sought a potential purchaser for its below-market Lease and valuable Liquor License.

9.      After extensive efforts, KBKW, LLC ("Purchaser") provided the Debtor with the highest and best offer for the purchase of the Assets.  After extensive negotiations, the Debtor and Purchaser entered into that certain Purchase Agreement (the "APA"), a true and correct copy of which is attached hereto as Exhibit "A".  The salient terms of the APA are as follows:

   a.   The Debtor will assume and assign the Lease to Purchaser, including all rights thereunder;

   b.   The Debtor will transfer the Liquor License to Purchaser; and

   c.   Purchaser shall pay to the estate $150,000 in consideration of transfer of the foregoing Assets.

10.     One of the Purchaser's requirements, as set forth in Section 6.6 of the APA, is for the Debtor to obtain the following bid procedures in connection with the proposed sale transaction:

   a.   Any interested overbidder must submit a $50,000 deposit to the Debtor pending the sale hearing, which shall become nonrefundable if the bidder is the winning bidder; and

   b.   In the event that the Court determines that someone other than the Purchaser is the winning bidder, Purchaser will be entitled to  break-up fee of $25,000.

11.    I believe that the proposed bid procedures required by the Purchaser are fair and reasonable.  I understand that Purchaser has incurred fees and costs in connection with its due diligence efforts and negotiation and documentation of the transaction.  In addition to the foregoing required provisions, the Debtor suggests that the following additional procedures be implemented:

a.    Any interested party must provide to Debtor, in addition to the $50,000 deposit, an asset purchase agreement substantially in the form as the APA with its proposed changes, as well as pro of funds, not later than 14 days before the sale hearing; and

b.    To the extent that qualified overbids are timely submitted, an auction will take place in Debtor's bankruptcy counsel's office two (2) business days before the scheduled sale hearing, allowing the Debtor an opportunity to report the result of the auction to the Court by the time of the sale hearing.

12.    I believe that the Debtor's efforts n seeking a purchaser of the Assets were intended to, and indeed resulted in, insuring that the highest price was obtained for the Assets. Purchaser's agreement to serve as a locked-in buyer and to permit its offer to be subject to overbid during the Debtor's bankruptcy case.  However, Purchaser's willingness to do so is conditioned upon all of the terms of the APA being approved by the Court, including the sales procedures set forth therein.

13.    Besides being necessary for the Debtor's estate to obtain the substantial benefits afforded by the APA, I believe that the sale procedures serve numerous legitimate purposes.  The sale procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate the transaction; (iii) insure that the highest possible

17

price is obtained for the Assets; and (iv) compensate Purchaser for Purchase's time, effort, costs and expenses incurred in this transaction as well as the benefit that Purchaser has provided to the Debtor's estate by agreeing to serve as a locked-in buyer subject to overbid. Faced with the options available in this case, I believe that it is absolutely clear that the APA, including the sale procedures, is in the best interests of the Debtor's estate and its creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of June, 2010, at Los Angeles, California.


_____
DAVID MYERS

price is obtained for the Assets; and (iv) compensate Purchaser for Purchase's time, effort, costs and expenses incurred in this transaction as well as the benefit that Purchaser has provided to the Debtor's estate by agreeing to serve as a locked-in buyer subject to overbid. Faced with the options available in this case, I believe that it is absolutely clear that the APA, including the sale procedures, is in the best interests of the Debtor's estate and its creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 1st day of June, 2010, at Los Angeles, California.

DAVID MYERS

18

**EXHIBIT A**

# PURCHASE AGREEMENT

## by and between

## KBKW, LLC., Purchaser

## and

## SONA, LLC., Seller

Dated as of May 22, 2010

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (this "***Agreement***") is made and entered into as of the 22nd day of May, 2010 (the "***Effective Date***"), by and between KBKW, LLC, a California limited liability company, as debtor-in-possession ("***Purchaser***"), and SONA, LLC, a California limited liability company ("***Seller***"; and collectively with Purchaser, the "***Parties***", each being a "***Party***")).  Capitalized terms used but not otherwise defined in this Agreement are used as defined on Exhibit A hereto.

## RECITALS

**WHEREAS**, Seller is the debtor in possession in Case No. 2:09-bk-36434-ER (the "***Bankruptcy Case***") filed on September 30, 2009 under Chapter 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "***Bankruptcy Court***");

**WHEREAS,** Seller, in its own capacity and as debtor in possession in the Bankruptcy Case, currently operates a restaurant business (the "***Restaurant***") located at 401 North La Cienega Blvd, Los Angeles, California (the "***Premises***");

**WHEREAS**, Seller occupies the Premises pursuant to that certain lease agreement dated June 10, 2005, entered into by and between Glick, Glick and Lewis, as lessor ("***Lessor***"), and Seller, as lessee (the "***Lease***");

**WHEREAS**, in connection with the operation of the Restaurant, Seller holds (i) a California Department of Alcohol Beverage Control ("***CDABC***") Type 47 On-Sale General Eating Place liquor license, License No. 47-389042, and (ii) a CDABC Type 58  Caterer Permit liquor license, License No. 58-389042 (collectively, the "***Liquor Licenses***");

**WHEREAS**, Purchaser desires to acquire from Seller, and Seller desires to sell to Purchaser, an assignment of the Lease and an assignment or transfer of the Liquor Licenses, on the terms and subject to the conditions set forth herein;

**WHEREAS**, the transactions contemplated by this Agreement (collectively, the "***Transaction***") require the approval of the Bankruptcy Court; and

**WHEREAS**, Purchaser intends to operate a new restaurant business on the Premises, and it is not the intent of the Parties that Seller sell all or any part of its business operations or good will to Purchaser or that Purchaser succeed to or continue all or any part of Seller's business;

**NOW, THEREFORE**, in consideration of the representations, warranties and covenants contained herein, and for other good and valuable consideration the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# AGREEMENT

## ARTICLE 1. THE TRANSACTION

**1.1    Assigned Assets.**  Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, transfer, convey, assign and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in, to and under:  (i) the Lease (including all renewal options, rights of first refusal and other rights of Seller thereunder), together with all of Seller's right, title and interest in and to all land, buildings, structures, easements, appurtenances, improvements (including construction in progress) and fixtures located thereon (the "*Leased Real Property*"); (ii) the Liquor Licenses; and (iii) all of Seller's liquor to the extent Purchaser's purchase of such inventory is required by Legal Requirements in connection with, or can reasonably be expected to facilitate, the transfer of the Liquor Licenses to Purchaser (the "*Purchased Inventory*"; and collectively with the Lease and the Liquor Licenses, the "*Assigned Assets*").

**1.2    No Liabilities Assumed.**  Purchaser shall not assume and shall not be liable or responsible for any Liability of Seller, other than obligations under the Lease to the extent arising from or after the Closing Date ("*Post-Closing Lease Obligations*").  Seller shall retain and remain responsible for all of Seller's Liabilities, other than Post-Closing Lease Obligations.

## ARTICLE 2. CONSIDERATION FOR TRANSFER

**2.1    Assignment Price.**

(a) Subject to the terms of this Agreement, the price payable by Purchaser for the Assigned Assets shall be $150,000 (the "*Assignment Price*").

(b) Not later than three (3) Business Days following the Effective Date, Purchaser shall deliver the Assignment Price, by bank or certified check or wire transfer of immediately available funds, to D & G Escrow Corporation, 17327 Ventura Boulevard, Suite 300, Encino, CA 91316, as escrow agent (the "*Escrow Agent*" or "*Escrow Holder*"), to be held in trust and disbursed on the Closing Date by the Escrow Agent as provided in Section 2.3.

**2.2    Allocation of Assignment Price.**  The Parties agree to allocate the Assignment Price among the Assigned Assets as specified on Exhibit 2.2.  The allocation of the Assignment Price set forth on such Exhibit is intended to comply with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended.  The Parties acknowledge that such allocation was determined in an arm's length negotiation and agree that neither Party shall take a position on any Tax Return, before any Tax Authority or in any judicial proceeding that is in any way inconsistent with such allocation, other than with the written consent of the other Party or unless specifically required pursuant to a determination by an applicable Tax Authority.

**2.3    Escrow Provisions.**

(a) The provisions set forth on Exhibit 2.3 (the "**Escrow Provisions**") are hereby incorporated herein by reference as if set forth in full herein.

(b) If there is any conflict between the Escrow Provisions and the other provisions of this Agreement, the other provisions of this Agreement shall prevail.

(c) In the event that any condition to the release of the Assignment Price is not satisfied on or before August 31, 2010, or in the event that this Agreement is terminated pursuant to Section 8.1 hereof, then in either such event, the entire amount of the Assignment Price shall immediately be released from escrow and returned to Purchaser, and Seller hereby agrees to execute any instructions to Escrow Agent reasonably requested by Purchaser in order to effect such release.

(d) Seller and Purchaser shall each be responsible for and shall pay fifty percent (50%) of the fees and expenses of the Escrow Agent.

## ARTICLE 3. CLOSING AND CLOSING DELIVERIES

**3.1    Closing; Time and Place.**  The closing of the purchase and sale provided for in this Agreement (the *"Closing"*) shall, subject to the satisfaction of all of closing conditions specified in Article 7, occur at the offices of Michelman & Robinson, LLP, 15760 Ventura Boulevard, Encino, California or such other place as the Parties may agree, at 10:00 A.M. on (i) July 15, 2010; or (ii) if earlier, as soon as practicable following the satisfaction of the closing conditions specified in Article 7; or (iii) such other date as the Parties may agree (in any such case, the *"Closing Date"*).

**3.2    Deliveries by Seller.**  At the Closing, Seller shall deliver the following items, duly executed by Seller as applicable, all of which shall be in form and substance reasonably acceptable to Purchaser and Purchaser's counsel:

(a) Lease Assignment.  An Assignment and Assumption of Lease, substantially in the form attached hereto as Exhibit 3.2(a), executed by Seller, assigning the Lease to Purchaser (the *"Lease Assignment"*).

(b) Liquor License Assignment.  Such instruments of transfer and assignment as Purchaser may reasonably request in order to transfer and assign the Liquor Licenses to Purchaser;

(c) Bill of Sale.  A Bill of Sale, substantially in the form attached hereto as Exhibit 3.2(c), covering the Purchased Inventory;

(d) Other Conveyance Instruments.  Such other specific instruments of sale, transfer, conveyance and assignment as Purchaser may reasonably request; and

(e) Certificate of Representations and Warranties.  A Certificate executed on behalf of Seller by its Chief Executive Officer, certifying as to the matters in Section 7.1(a).

**3.3    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver: (i) instructions to the Escrow Agent to release and deliver the Assignment Price to Seller; *provided, however*, that notwithstanding any other provision of this Agreement, including, without limitation, the Escrow Provisions, Purchaser shall not be required to deliver such instructions, and the

3

Assignment Price shall remain in escrow, until such time as the Liquor Licenses have been issued to Purchaser by the CDABC or the CDABC has unconditionally approved in writing the transfer of the Liquor Licenses to Purchaser), the Lease has been duly and validly assigned to Purchaser, and Seller has delivered actual possession of the Leased Real Property and the Purchased Inventory to Purchaser; and, (ii) to Seller (x) the Lease Assignment, executed by Purchaser, and (y) a Certificate, executed on behalf of Purchaser by its Chief Executive Officer, certifying as to the matters in Section 7.2(a), which Certificate shall be in form and substance reasonably acceptable to Seller and Seller's counsel.

**3.4    Delivery by Purchaser and Seller.**  At the Closing, Purchaser and Seller shall each deliver such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise necessary or appropriate to transfer the Assigned Assets in accordance with the terms hereof and to vest in Purchaser and its successors and assigns full, complete, absolute, legal and equitable title to the Assigned Assets, free and clear of all Encumbrances.

**3.5    Rent.**  Rent under the Lease shall be prorated through the Closing Date.

**3.6    Transfer Taxes.**  Notwithstanding any Legal Requirements to the contrary, Seller shall be responsible for and shall pay when due any Transfer Taxes, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes; *provided, however,* that, if required by any Legal Requirement, Purchaser will join in the execution of any such Tax Returns and other documentation.

**ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as specifically set forth on Exhibits and Schedules attached to this Agreement, Seller hereby represents and warrants to Purchaser as follows:

**4.1    Authority; Binding Nature of Agreements.**  Seller is a limited liability company duly organized and validly existing under the laws of the State of California and has all requisite power and authority to execute and deliver this Agreement and all other Transaction Agreements to which it is a party and, subject to receipt of Bankruptcy Court Approval (as defined in Section 7.1(b) below), to carry out the provisions of this Agreement and the other Transaction Agreements. The execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements have been approved by all requisite action on the part of Seller, subject only to receipt of Bankruptcy Court Approval. This Agreement has been duly and validly executed and delivered by Seller. Each of this Agreement and the other Transaction Agreements constitutes, or upon execution and delivery, will constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**4.2    No Conflicts; Required Consents.**  The execution, delivery and performance of this Agreement or any other Transaction Agreement by Seller do not and will not (with or without notice or lapse of time):

(a)  give any Governmental Authority or other Person the right to (i) challenge the Transaction; or (ii) revoke, suspend or modify the Liquor Licenses or either of them; or

4

(b) cause Purchaser to become subject to, or to become liable for the payment of, any Tax.

**4.3    Title to Assigned Assets.**  Seller has good and marketable title to, is the exclusive legal and equitable owner of, and has the power and right to sell, assign and deliver the Assigned Assets pursuant to the terms of this Agreement and subject to approval of the Bankruptcy Court. The Assigned Assets are free and clear of all Encumbrances of any kind or nature, except for any Encumbrances that will be removed and released at or prior to Closing.  Upon Closing, Purchaser will acquire exclusive, good and marketable title to the Assigned Assets, free and clear of all Encumbrances, and no restrictions will exist on Purchaser's right to use, resell, license or otherwise dispose of any of the Assigned Assets.

**4.4    Lease.**

(a)  Seller has been in lawful possession of the Premises since the commencement of the original term of the Lease.  Except for the Lessor's interest in the Lease and except for the assignment of the Lease to Purchaser pursuant to this Agreement, Seller has not granted or created any right, title or interest (including without limitation any security interest or mortgage, lien or collateral assignment) in, to or under the Lease or Seller's leasehold interests in the Premises.

(b) An accurate, correct and complete copy of the Lease, including all amendments and supplements thereto, is attached hereto as Exhibit 4.4(b).

(c) Seller has heretofore delivered to Purchaser accurate, correct and complete copies of existing title insurance policies, title reports, surveys, environmental reports, if any, for the real property subject to Lease.

(d) Except as described on Exhibit 4.4(d), the Lease is in good standing and is valid, effective and enforceable against the Lessor in accordance with its terms, and there exists no default thereunder, and no event has occurred, and no condition exists, which (with or without the giving of notice, lapse of time or the happening or occurrence of any other event) would constitute or could result in a default thereunder or termination thereof.  In the event that such Exhibit discloses any default (or event or condition which, (with or without the giving of notice, lapse of time or the happening or occurrence of any other event, would constitute or could result in a default), then such Exhibit also sets forth an estimate of the amounts required to cure all such defaults (or events or conditions) under the Lease so as to permit the assignment of the Lease pursuant to Section 365 of the Bankruptcy Code (as ultimately determined by the Bankruptcy Court, the "*Cure Costs*").  In connection with the assignment and assumption of the Lease, Seller shall pay all Cure Costs on or before the Closing, and to the extent that any portion thereof remains unpaid at the Closing, then such unpaid amount shall be paid over to Purchaser out of the escrowed funds and the Assignment Price shall be reduced accordingly.

(e) All rent and other charges required currently to be paid under the Lease have been duly paid and no rent or other charges under the Lease have been paid more than one month in advance.

(f) Immediately following the closing hereunder, Purchaser shall be the lessee under the Lease, with all of the rights thereunder as are currently enjoyed thereunder by Seller, including, without limitation, the right to exercise the extension option therein permitting Purchaser to extend the term of the Lease for three five-year extension periods on the terms set forth in the Lease (Rider 1 to the Lease) and the right of first refusal set forth in the Lease (Rider 2 to the Lease).

**4.5    Liquor Licenses.**  Each of the Liquor Licenses is valid and in full force and effect, and there is not pending or, to the Knowledge of Seller, threatened any Proceeding which could result in the suspension, termination, revocation, cancellation, limitation or impairment of either Liquor License.  No violations have been recorded in respect of either of the Liquor Licenses, and Seller knows of no meritorious basis therefor.  No fines or penalties are due and payable in respect either Liquor License or any violation thereof.

**4.6    Brokers.**  Seller has not retained any broker or finder, nor has Seller incurred any liability or obligation to any other broker or finder for any brokerage fees, commissions or finders fees with respect to this Agreement or the Transaction.  As between Seller and Purchaser, Seller shall be solely responsible for all fees and other amounts due or payable to Pegasus Investments, which has been retained by Purchaser.

**4.7    No Other Agreement.**  Other than for sales of assets in the ordinary course of business, neither Seller, nor any of its Representatives, has entered into any Contract with respect to the sale, assignment or other disposition of any of the Assigned Assets.

## ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**5.1    Authority; Binding Nature of Agreements.**  Purchaser is a limited liability company duly organized and validly existing under the laws of the State of California and has all requisite power and authority to execute and deliver this Agreement and all other Transaction Agreements to which it is a party and to carry out the provisions of this Agreement and the other Transaction Agreements.  The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements have been approved by all requisite action on the part of Purchaser.  This Agreement has been duly and validly executed and delivered by Purchaser.  Each of this Agreement and the other Transaction Agreements constitutes, or upon execution and delivery, will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

**5.2    No Conflicts; Required Consents.**  The execution, delivery and performance of this Agreement or any other Transaction Agreement by Purchaser do not and will not give any Governmental Authority or other Person the right to (i) challenge the Transaction.

**5.3    Brokers.**  Purchaser has not retained any broker or finder or incurred any liability or obligation for any brokerage fees, commissions or finders fees with respect to this Agreement or the Transaction.

6

**ARTICLE 6. COVENANTS**

**6.1    Insurance Coverage to be Maintained Prior to Closing.**  From the Effective Date until the Closing Date, Seller shall, and shall cause its officers, directors and employees, to maintain insurance coverage in amounts adequate to cover the reasonably anticipated risks of Seller with respect to the Assigned Assets.

**6.2    Restrictions on Seller's Conduct of the Business Prior to Closing.**  From the Effective Date until the Closing Date, Seller shall not, and shall cause its officers, directors and employees, not to:

(a) Enter into, create, incur or assume any obligations which would have a Material Adverse Effect on Seller or the Assigned Assets or which would result in any of the Assigned Assets becoming subject to an Encumbrance;

(b) Sell, transfer, lease, license or otherwise encumber, or remove from the Premises, any of the Assigned Assets;

(c) Enter into any agreements or commitments with another Person with respect to, or which could have an impact, on the Assigned Assets or on the Transaction;

(d) Violate or breach the Lease, any other Contract to which Seller is a party, or any Legal Requirement applicable to Seller, as such Contract and Legal Requirement apply to or may affect the Assigned Assets;

(e) Violate, terminate or amend the Liquor Licenses or any other Governmental Approval affecting the Liquor Licenses; or

(f) Enter into any Contract or agree, in writing or otherwise, to take any of the actions described above in this Section 6.2, or any action that would make any of its representations or warranties contained in this Agreement untrue or incorrect in any material respect or prevent it from performing or cause it not to perform its covenants hereunder.

**6.3    Certain Notifications.**  From the Effective Date until the Closing, Seller shall promptly notify Purchaser in writing regarding any:

(a) Fact, circumstance, event, or action by Seller (i) which, if known on the Effective Date, would have been required to be disclosed in or pursuant to this Agreement; or (ii) the existence, occurrence, or taking of which would result in any of the representations and warranties of Seller contained in this Agreement or in any Transaction Agreement not being true and correct when made or at Closing;

(b) Breach of any covenant or obligation of Seller hereunder; and

(c) Circumstance or event which will result in, or could reasonably be expected to result in, the failure of Seller to timely satisfy any of the closing conditions specified in Article 7.

**6.4**    **Access to Premises.**  During the period commencing on the Effective Date and ending on the Closing Date, Seller shall permit Purchaser and its Representatives to such access to the Premises as is contemplated by the Kuda Purchase Agreement in order to permit Purchaser to conduct due diligence as contemplated by the Kuda Purchase Agreement.

**6.5**    **Best Efforts.**  From the Effective Date until the Closing, each of Seller and Purchaser shall use their respective best efforts to cause to be fulfilled and satisfied all of the other Party's conditions to Closing set forth in Article 7.

**6.6**    **Bankruptcy Court Bidding Procedure.**  Without limiting the generality of Section 6.5, not later than seven (7) days following the Effective Date, Seller shall seek from the Bankruptcy Court an order (the "***Overbid Procedures Order***") providing for the procedure for the Parties to follow in the event that Seller receives, in writing, any offer or proposal relating to the sale of the Assets other than the transactions contemplated by this Agreement (a "***Competing Proposal***").  Seller agrees that the proposed Overbid Procedures Order shall be in a form reasonably acceptable to Purchaser.  Such Overbid Procedure Order shall include, *inter alia*, a requirement that a Competing Proposal must include a minimum of $50,000 deposit, which shall become nonrefundable in the event that such bidder is determined to be the winning bidder for the Assigned Assets.  If Seller terminates this Agreement because Purchaser's bid is not the high bid, regardless of whether Seller consummates a transaction with the successful bidder, then Purchaser shall be paid a breakup fee equal to $25,000.00 (the "***Breakup Fee***").  The Breakup Fee shall be paid from the deposit paid by the successful bidder as part of such successful bidder's qualifying competing proposal, free and clear of all claims of creditors.  Until such Breakup Fee is paid in full, the unpaid Breakup Fee (or any unpaid portion thereof) shall constitute an allowed administrative expense claim against Seller's bankruptcy estate.

**6.7**    **Bankruptcy Court Motion.** 6.7    Not later than seven (7) days following the entry of the Overbid Procedures Order, Seller shall file a motion in the Bankruptcy Court, which motion shall in form and substance be acceptable to Purchaser, seeking Bankruptcy Court Approval of this Agreement and the Transaction, subject to the Overbid Procedures Order (the "***Motion***"), and Seller shall promptly take all actions reasonably necessary in furtherance thereof and in exercising its good faith efforts to secure such Bankruptcy Court Approval.  The date for which a hearing is set on the Motion is hereinafter referred to as the "*Motion Date*."  Seller hereby covenants to cooperate fully with the Bankruptcy Court and with Purchaser to expedite the Bankruptcy Case and to obtain the Bankruptcy Court Oder (as defined in Section 7.1(b)).

**6.8**    **Cooperation.**  After the Closing, upon the request of Purchaser, Seller shall (i) execute and deliver any and all further materials, documents and instruments of conveyance, transfer or assignment as may reasonably be requested by Purchaser to effect, record or verify the transfer to, and vesting in Purchaser, of Seller's right, title and interest in and to the Assigned Assets, free and clear of all Encumbrances, in accordance with the terms of this Agreement; and (ii) cooperate with Purchaser in its efforts to transfer or assign to Purchaser such Contracts with vendors and suppliers as Purchaser may deem beneficial to its business.  Notwithstanding the foregoing, Purchaser shall not be required to assume any Contract of Seller, nor shall Purchaser have any Liability under or with respect to Seller's performance under, or breach of, any such Contract.

**6.9    Press Releases.**  Neither Party will, either before or after the Closing, issue any press release or other public announcement with respect to the Transaction that refers to the other Party, other than with the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

## ARTICLE 7. CONDITIONS TO CLOSING

**7.1    Conditions to Purchaser's Obligation to Close.**  The obligations of Purchaser to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Purchaser in writing:

(a) <u>Representations, Warranties and Covenants.</u>  (i) All of the representations and warranties of Seller in this Agreement shall have been true and correct in all material respects (considered collectively and individually) as of the Effective Date and shall be true and correct in all material respects (considered collectively and individually) as of the Closing Date (or, to the extent such representations and warranties speak only as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and (ii) Seller shall have performed all covenants and obligations in this Agreement required to be performed by Seller as of the Closing Date.

(b) <u>Documents.</u>  Seller shall have delivered to Purchaser all of the documents and agreements set forth in <u>Sections 3.2</u> and <u>3.4</u>.

(c) <u>Bankruptcy Court Approval.</u>  Seller shall have obtained and delivered to Seller an order of the Bankruptcy Court approving this Agreement and the Transaction, including the Bankruptcy Court's approval for the purchase by Purchaser of the Assigned Assets, free and clear of all Encumbrances, which order is not subject to any stay of its effectiveness or motion for reargument or rehearing and (i) as to which the time to appeal or petition for certiorari has expired and as to which no timely appeal or petition for certiorari shall then be pending; or (ii) if a timely appeal or petition for certiorari has been sought, the order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing on remand shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for modification of such order, or move for reargument or rehearing, shall have expired (the "***Bankruptcy Court Approval***").  Without limiting the generality of the foregoing, the Bankruptcy Court Approval shall (i) authorize and/or ratify Seller's execution and delivery of this Agreement, (ii) approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, the sale and assignment of the Assigned Assets to Purchaser on the terms and conditions set forth in this Agreement, free and clear of all liens, claims and encumbrances and the assumption by Seller (if not previously so ordered) and assignment to Purchaser of the Lease, (iii) be substantially in the form of the Sale Order annexed hereto as <u>Exhibit 7.1(c)</u>; (iv) contain, *inter alia*, a finding that Purchaser acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code in connection with such sale; (v) provide that Purchaser shall not be subject to successor liability on account of its purchase and assumption of the Assigned Assets; and (vi) provide that the Bankruptcy Court retains jurisdiction on all matters arising from or relating to the Bankruptcy Court Approval for the benefit of Seller and the Purchaser.

(d) <u>Lease</u>.  Seller shall have delivered to Purchaser a Landlord Estoppel and Consent to Assignment, in form and substance reasonably satisfactory to Purchaser and executed by the Landlord ("***Landlord Consent***"), which shall include, without limitation: (i) the Landlord's consent to the assignment to Purchaser of the Lease, including (x) the extension option permitting Purchaser to extend the term of the Lease for three five-year extension periods on the terms set forth in the Lease (Rider 1 to the Lease); and (y) the right of first refusal (Rider 2 to the Lease); (ii) confirmation by the Landlord that as of the Closing there are no existing defaults under the Lease or events that have occurred which, with the passage of time or the giving of notice, or both, will constitute such a default; (iii) Landlord's consent to (x) Purchaser's use of the Premises as a restaurant, bar and hospitality venue and (y) Purchaser's proposed signage commensurate with such use (each of clauses (i)(x), (i)(y), (ii), (iii)(x) and (iii)(y) being referred to herein as a "***Lease Requirement***", and together, the "***Lease Requirements***"); *provided, however*, that to the extent such the Lessor refuses or otherwise fails to provide any of such consents and confirmations, the requirement for such consent and/or confirmation will be deemed satisfied if such consent(s) and/or confirmation(s), including, without limitation, each of the Lease Requirements, are included in the Bankruptcy Court Approval with the same effect as if the same were provided by Lessor.  The Parties acknowledge that each of the Lease Requirements is material to the Transaction and that Purchaser shall not be required to complete the closing if any Lease Requirement is absent (in whole or in part).

(e) <u>Liquor Licenses</u>.  Each of the Liquor Licenses shall have been assigned or otherwise issued to Purchaser by, or with the approval of, the CDABC and any other applicable Governmental Authorities.  Without limiting the generality of the foregoing, Purchaser shall have received from the CDABC their 226 Form, transferring and/or issuing each of the Liquor Licenses, and their authorization to close this transaction.

(f) <u>Consents</u>.  Seller shall have delivered to Purchaser all other approvals, consents, and authorization (including any Governmental Approval) required for the consummation of the Transaction.

(g) <u>No Proceedings</u>.  Since the Effective Date, no Proceeding shall have been commenced or threatened against Purchaser, or against any Representative of Purchaser (a) involving any challenge to, or seeking damages or other relief in connection with, the Transaction; or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with the Transaction.

(h) <u>No Damage, Destruction or Other Loss</u>.  Since the Effective Date, the Premises has not  suffered any fire, destruction, damage, condemnation (or notice of condemnation) or other loss, whether or not covered by insurance, which could reasonably be expected to have an adverse effect upon the condition or value of the Premises or on the ability of Purchaser to operate its business at the Premises after the Closing.

**7.2    Conditions to Seller's Obligation to Close.**  The obligations of Seller to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Seller in writing:

(a) <u>Representations, Warranties and Covenants</u>. (i) All of the representations and warranties of Purchaser in this Agreement shall have been true and correct in all material respects (considered collectively and individually) as of the Effective Date and shall be true and correct in all material respects (considered collectively and individually) as of the Closing Date (or, to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and (ii) Purchaser shall have performed all covenants and obligations in this Agreement required to be performed by Purchaser as of the Closing Date; and

(b) <u>Deliveries</u>.  Purchaser shall have delivered to Seller all of the documents and agreements set forth in <u>Sections 3.3</u> and <u>3.4</u>.

**7.3    Conditions to Obligations of Each Party to Close.**  The respective obligations of each Party to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following condition(s), any of which may be waived by Purchaser or Seller, as applicable, in writing:

(a) <u>No Legal Impediments to Closing</u>.  There shall not be in effect any Order issued by any Governmental Authority preventing the consummation of the Transaction or seeking any damages as a result of the Transaction, nor shall any Proceeding be pending that seeks any of the foregoing;

(b) <u>Bankruptcy Court Approval</u>.  The Parties shall have received Bankruptcy Court Approval, which shall be in form and substance satisfactory to Purchaser; and

(c) <u>Kuda Transaction</u>.  That certain Asset Purchase Agreement of even date herewith between Kuda and Purchaser (the "***Kuda Purchase Agreement***") shall have been executed, each of the conditions to Purchaser's obligation to complete the transactions contemplated by the Kuda Purchase Agreement shall have been satisfied or waived in writing by Purchaser, and the transactions contemplated under Kuda Purchase Agreement shall have been consummated concurrently with or prior to the Closing hereunder.  The Parties acknowledge that the Kuda Purchase Agreement provides that Purchaser has an absolute right to terminate such agreement if, Purchaser, in its sole discretion, is not satisfied with the results of its due diligence investigation of the assets to be purchased pursuant to such Kuda Purchase Agreement.

**ARTICLE 8. TERMINATION**

**8.1    Circumstances for Termination.**    At any time prior to the Closing, this Agreement may be terminated by written notice:

(a) by the mutual written consent of Purchaser and Seller;

(b) by Purchaser pursuant to <u>Section 6.4</u>;

(c) by either Purchaser or Seller if the non-terminating Party is in material breach of any material provision of this Agreement;

11

(d) by either Purchaser or Seller if the Closing has not occurred on or prior to August 31, 2010 (the "***Outside Closing Date***") for any reason; or

(e) by either Purchaser or Seller if satisfaction of a closing condition of the terminating Party in <u>Article 7</u> is or prior to the Closing becomes impossible, including by reason of the termination for any reason of the Kuda Purchase Agreement.

**8.2    Effect of Termination.** If this Agreement is terminated in accordance with <u>Section 8.1</u>, all obligations of the Parties hereunder shall terminate, other than any obligations that are expressly stated herein to survive the termination of this Agreement; *provided, however,* that nothing herein shall relieve either Party from liability for the breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

## ARTICLE 9. SURVIVAL OF REPRESENTATIONS AND WARRANTIES

**9.1    Survival of Representations and Warranties.** All representations and warranties of the Parties in this Agreement shall terminate upon the Closing or, if later, upon the Escrow Agent's release of the Assignment Price to Seller, except for any such representations or warranties that by their terms are to survive for a longer period. If the Closing does not occur and this Agreement is terminated pursuant to <u>Section 8.1</u>, then the representations and warranties of the Parties in this Agreement shall survive for one (1) year following the date that this Agreement is so terminated. The representations and warranties contained in this Agreement (and any right to indemnification for breach thereof) shall not be affected by any investigation, verification or examination by either Party or by any Representative of either Party or by any such Party's Knowledge of any facts with respect to the accuracy or inaccuracy of any such representation or warranty.

**9.2    Remedies Cumulative.** The remedies provided in this Agreement shall be cumulative and shall not preclude either Party from asserting any other right, or seeking any other remedies, against the other Party.

## ARTICLE 10. MISCELLANEOUS PROVISIONS

**10.1    Expenses.** Whether or not the Transaction is consummated, and except as expressly otherwise provided herein, each Party shall pay it own costs and expenses in connection with this Agreement and the Transaction (including the fees and expenses of its advisers, accountants and legal counsel).

**10.2    Further Assurances.** Each Party agrees (a) to furnish upon request to each other Party such further information, (b) to execute and deliver to each other Party such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

**10.3    Amendments and Waivers.** This Agreement may not be amended, supplemented or modified except by an agreement in writing signed by each of the Parties. No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver. Neither the failure nor any delay on the part of either Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any

single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.

**10.4    Notices.**   All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received (i) when delivered personally, (ii) one (1) Business Day following the day when deposited with a reputable, established overnight courier service for delivery to the intended addressee, or (iii) three (3) Businesses Days following the day when deposited with the United States Postal Service as registered or certified mail, postage prepaid, return receipt requested and addressed as set forth below:

      (a)    If to Purchaser:

            KBKW, LLC
            c/o Michelman & Robinson, LLP
            15760 Ventura Boulevard, 5th Floor
            Encino, CA 91436
            Attention:  Jordan R. Bernstein, Esq.

      (b)    If to Seller:

            _____

            _____

            Attention:  _____

Either Party may alter its notice address by notifying the other Party of such change of address in conformity with the provisions of this section.

**10.5    Governing Law.**   This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California.

**10.6    Assignments Prohibited; Successors and Assigns.**   Neither Party may assign this Agreement or such Party's rights or obligations hereunder, other than with the prior written consent of the other Party, and any purported assignment without such consent shall be void and of no force or effect.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

**10.7    No Third-Party Beneficiaries.**   The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and except as otherwise expressly provided herein, the Parties do not intend to confer third-party beneficiary rights upon any other Person.

**10.8  Counterparts.**  This Agreement may be executed (including by facsimile signature) in one or more counterparts, with the same effect as if the Parties had signed the same document.  Each counterpart so executed shall be deemed to be an original, and all such counterparts shall be construed together and shall constitute one agreement.

**10.9  Severability.**  If any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**10.10  Entire Agreement.**  This Agreement contains the entire understanding between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written

**10.11  Interpretation.**  Unless otherwise indicated herein, any reference in this Agreement to a Section, Article, Subsection, Paragraph, Subparagraph, Clause, Exhibit or Schedule shall be a reference to a section, article, subsection, paragraph, subparagraph, or clause of, or an exhibit or schedule to, this Agreement.  Any article, section, subsection, paragraph or subparagraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed, as the context indicates, to be followed by the words "but (is/are) not limited to."  The words "herein," "hereof," "hereunder" and words of like import shall refer to this Agreement as a whole (including its Schedules and Exhibits), unless the context clearly indicates to the contrary. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.  Where specific language is used to clarify or illustrate by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict the construction of the general statement which is being clarified or illustrated.

**10.12  Construction.**  The construction of this Agreement shall not take into consideration the Party who drafted or whose Representative drafted any portion of this Agreement, and no canon of construction shall be applied that resolves ambiguities against the drafter of a document.  The Parties are sophisticated and have been represented by lawyers throughout this transaction who have carefully negotiated the provisions hereof.  As a consequence, the Parties do not believe the presumption of California Civil Code Section 1654 and similar laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied in this case and therefore waive its effects.

**10.13  Jurisdiction; Service of Process.**  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties only in the courts of the State of California, County of Los Angeles, or, if it has or can acquire the necessary jurisdiction, in the United States District Court for the Central

14

District of California.  Each of the Parties consents to the jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

**[Signature Page Follows]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the date first written above.

"Purchaser"

KBKW, LLC

By: _____

Name: _____

Title: _____

"Seller"

SONA, LLC, as debtor in possession

By: _____

Name: _____

Title: _____

SIGNATURE PAGE

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the date first written above.

"Purchaser"

KBKW, LLC

By: _____
Name: _____
Title: _____

"Seller"

SONA, LLC, as debtor in possession

By: _DAVID MYERS_____
Name: _DAVID MYERS_____
Title: _President_____

# EXHIBIT A

## CERTAIN DEFINITIONS

"***Business Day***" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of California are authorized or required by law to be closed.

"***Contract***" shall mean any agreement, contract, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied).

"***Encumbrance***" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, interest, claim, preference, encroachment, covenant, Order, community property interest, imperfection of title, condition or restriction of any nature (including any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any attribute of ownership of any asset).

"***Entity***" shall mean any corporation, joint stock company, general or limited partnership, limited liability company or partnership, joint venture, estate, trust, company or other entity.

"***Governmental Approval***" shall mean any: (a) permit, license (including any business license or liquor license), certificate, concession, approval, consent, ratification, permission, exemption, waiver, franchise, certification, registration, variance, qualification, accreditation or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Authority.

"***Governmental Authority***" shall mean any: (a) nation, state, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, officer, official, representative, organization, or Entity and any court or other tribunal, including any bankruptcy court); (d) multijurisdictional organization or body; or (e) individual or Entity exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"***Knowledge***": An individual shall be deemed to have "Knowledge" of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter or (ii) a prudent individual similarly situated would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the truth or existence of such fact or other matter. Seller and Purchaser shall be deemed to have "Knowledge" of a particular fact or other matter if any of their respective directors, officers or management employees has knowledge of such fact or other matter.

"***Kuda***" shall mean Kuda Group, LLC, a Nevada limited liability company.

"***Legal Requirement***" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, Order, proclamation, treaty, convention, rule, regulation, permit, ruling, directive, requirement (licensing or otherwise), specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"***Liability***" shall mean any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles.

"***Material Adverse Effect***" means, with respect to Seller, any event, change or effect that, when taken individually or together with all other adverse events, changes and effects, is or is reasonably likely (a) to be materially adverse to the condition (financial or otherwise) of Seller or the Assigned Assets, or (b) to prevent or materially delay consummation of the Transaction or otherwise to prevent Seller from performing its obligations under this Agreement.

"***Order***" shall mean any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, stipulation, subpoena, writ or award that is or has been issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Authority or any arbitrator or arbitration panel; or (b) Contract with any Governmental Authority that is or has been entered into in connection with any Proceeding.

"***Person***" shall mean any individual, Entity or Governmental Authority.

"***Proceeding***" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation that is, has been or may in the future be commenced, brought, conducted or heard at law or in equity or before any Governmental Authority or any arbitrator or arbitration panel.

"***Representatives***" shall mean officers, directors, employees, attorneys, accountants, advisors, and agents of a Party.

"***Tax***" (and, with correlative meaning, "***Taxes***" and "***Taxable***") means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount and any interest on such penalty, addition to tax or additional amount, imposed by any Tax Authority.

"***Tax Authority***" means a Governmental Authority responsible for the imposition, assessment or collection of any Tax (domestic or foreign).

"*Tax Return*" shall mean any return, statement, declaration, notice, certificate or other document that is or has been filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement related to any Tax.

"*Transaction Agreements*" shall mean this Agreement, the Lease Assignment and all other agreements, certificates, instruments, documents and writings delivered by Purchaser and/or Seller in connection with the Transaction.

"*Transfer Taxes*" shall mean all federal, state, local or foreign sales, use, transfer, real property transfer, mortgage recording, stamp duty, value-added or similar Taxes that may be imposed in connection with the transfer of Assigned Assets, together with any interest, additions to Tax or penalties with respect thereto and any interest in respect of such additions to Tax or penalties.

# EXHIBIT 2.2

## ALLOCATION OF ASSIGNMENT PRICE

Inventory ........................................... $  1,000.00

Liquor License ................................. $50,000.00

Leasehold Interest ........................................ $99,000.00

## EXHIBIT 2.3

### ESCROW PROVISIONS

*[**See Attached Escrow Instructions**]*



# D & G ESCROW CORPORATION

**17327 VENTURA BLVD.,SUITE 300**
**ENCINO, CA  91316**
**(818) 788-5250          FAX: (818) 501-4934**
**Email: Info@DGEscrow.com**
**Website: www.DGEscrow.com**

D & G ESCROW CORPORATION, IS LICENSED BY THE DEPARTMENT OF CORPORATIONS, LICENSE NO. 963-0081.

## BULK SALE ESCROW INSTRUCTIONS

TO:  **D & G Escrow Corporation**

Date: May 22, 2010
Escrow Officer: Lisa E. McGuire
Escrow Number: **7166**

This Agreement made and entered into, at Encino, CA, this Tenth day of May, 2010
Between:                                          *twenty second*

**Sona LLC  (a Ca LLC)**                                    TIN:  35-2165676

   By:  David Myers, President of the Managing Member

**8033 Sunset Boulevard, Suite 877, Los Angeles, CA  90046**          BUS:  (310) 733-3809

hereinafter known and designated as the SELLER(S) and

**KBKW, LLC  (a Ca LLC)**                                    TIN:  27-2399391

   By:  David Koral, Managing Member of
      Real Restaurant Group, LLC, Sole Member

**10430 Wilshire Boulevard, Unit 1901, Los Angeles, CA  90024**        BUS:  (310) 733-3809

hereinafter known and designated as the BUYER(S).

WITNESSETH:  The Seller(s) are the owners of the certain restaurant assets known as and located at:

    **Sona Restaurant**                                    **(310) 659-7708**

    **401 North La Cienega Boulevard**
    **Los Angeles, CA  90048**

And the Seller(s) agree to sell and the Buyer(s) agree to purchase the said assets from the Seller(s) by abiding by  the  following
terms and conditions:

1.  Purchase price of the assets consists of the following:

| | | |
|---|---|---|
| Liquor License(s) | $ | 50,000.00 |
| Leasehold Interest | $ | 99,000.00 |
| Inventory of Stock in Trade | $ | 1,000.00 |
| ** Purchase Price ** | $ | 150,000.00 |
| Plus Buyer(s) expenses & costs, if any, to be approximately | $ | 46,000.00 |
| **Total Purchase Price (approximately)** | $ | **196,000.00** |
| 2.  Buyer(s) deposit in escrow at opening, the amount of | $ | 196,000.00 |
| Total consideration deposited at opening of escrow by Buyer | $ | 196,000.00 |

3.  **TRANSFER OF FUNDS - OUTSIDE OF ESCROW:** The Principals acknowledge, state and agree that there shall be
absolutely no monies transferred between the Principals outside of escrow and all consideration shall be deposited  into  escrow
and disbursed by the Escrow Holder at the proper time, place and to the proper payee.

4.  **TRANSFER OF FUNDS - INTERNALLY:**  Principals hereby authorize and instruct/direct the Escrow Holder  to  transfer

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____                              Buyer Initials: _____



# D & G ESCROW CORPORATION

**17327 VENTURA BLVD.,SUITE 300**
**ENCINO, CA  91316**
**(818) 788-5250        FAX: (818) 501-4934**
Email: Info@DGEscrow.com
Website: www.DGEscrow.com

## AMENDED ESCROW INSTRUCTIONS

Escrow No. _7166_                                               Date _May 1̶9̶, 2010_  22

Re:    Business: **Sona Restaurant**
       Located at: **401 North La Cienega Boulevard, Los Angeles, CA  90048**

---

Previous escrow instructions, in the above numbered escrow, are hereby amended in the following particulars only:

**HOLD OPEN FEE:**  The Principals herein acknowledge and agree that if this escrow is open for an extended length of time, the length of which is to be determined at Escrow Holder's discretion, Escrow Holder is authorized and instructed to charge an additional fee, known as a "Hold-Open Fee", at the rate of $200.00 monthly for each calendar month, or fraction thereof, until said escrow is closed, completed, or cancelled in its entirety.  The Principals herein further acknowledge and agree that NO additional instructions are needed or required, and that said fee shall continue indefinitely until all funds are exhausted, and that this paragraph is irrevocable.  Principals further acknowledge and agree that the Escrow Holder has continuing monthly costs and expenses as a result of keeping escrows ongoing.  As it is detrimental to the Escrow Holder to hold escrows open, the Principals acknowledge being obligated to compensate the Escrow Holder.

Seller Initials: _____                                 Buyer Initials: _____

**CANCELLATION FEE:**  The Principals to this transaction agree that if no additional instructions, to the contrary, are received from any of the Principals to this transaction within 120 days from the estimated date escrow is to close, the Escrow Holder shall consider that the principals intended the escrow cancelled.  Therefore, the Principals hereby authorize and instruct/direct the Escrow Holder to cancel said escrow transaction, to take a cancellation fee in an amount not to exceed $5,200.00 , for basic fees and costs and the Principals further authorize and instruct/direct the Escrow Holder to increase this amount for all additional services rendered, caused, and/or required, and shall disburse any remaining balance of the deposit(s) to the buyer(s) specified in the escrow instructions.  This paragraph supersedes, controls, and take precedence over any other language to the contrary in the original escrow instructions and all amendments.  The estimated closing date and the beginning date of the 120 day period is July 15, 2010.  This paragraph is irrevocable.  The cancellation paragraph shall only be invoked at the option of the Escrow Holder.

Seller Initials: _____                                 Buyer Initials: _____

**INDEMNIFICATION:**  The Principals hereby agree to defend, indemnify, and hold the Escrow Holder harmless from and against any and all liability, financial or otherwise, including but not limited to all claims, damages, costs, expenses or losses that may arise from or in connection with Escrow Holder's compliance with these Escrow Instructions, this amendment and/or any future amendments or instructions hereto.  Should Escrow Holder incur expenses, costs, and/or attorney's fees in compliance with these instructions or this amendment, including without limitation, expenses, costs or attorney's fees in any action or other legal proceeding arising from or related to these instructions, or this amendment, including without limitation, expenses, costs or attorney's fees in any action or other legal proceeding arising from or related to these instructions, or this amendment, or the transaction contemplated hereby involving Escrow Holder and any third party not a Principal to these instructions, the Principals hereby agree to immediately upon demand in writing by Escrow Holder, to reimburse Escrow Holder for said expenses, costs, and attorney's fees.  The Principals also agree to immediately pay to the Escrow Holder any loss of monies due to or for any Judgment and/or Judgment deficiency that may be obtained against the Escrow Holder including all applicable expenses, costs, and attorney's fees, as well as all interest connected with the Judgment and/or Judgment deficiency.  This paragraph supersedes the indemnification wording in the general provisions in the event of a conflict.

ALL OTHER TERMS AND CONDITIONS OF THIS ESCROW SHALL REMAIN THE SAME.    ALL PRINCIPALS SIGNING THIS INSTRUCTION ACKNOWLEDGE RECEIPT OF A COPY OF SAME.

**SELLER(S):**                                                  **BUYER(S):**

Sona LLC                                                        KBKW, LLC

By: _____                                             By: _____
    David Myers, President of the                                  David Koral, Managing Member of
    Managing Member                                                Real Restaurant Group, LLC,
                                                                   Sole Member

## D & G Escrow Corporation

Date: May 1x, 2010
Escrow No.: 7166

and/or receive funds between this business escrow transaction and the real estate escrow transaction at D & G Escrow Corp., Escrow Number 7167, as necessary and/or required.

**5. BALANCE DUE:** Balance due, if any, by either or both Principals, to be immediately deposited upon demand of Escrow Holder.

**6. INVENTORY:** The 'Inventory of Stock in Trade', of salable merchandise at current wholesale prices, shall be transferred and possession of premises shall be granted the Buyer(s) as of **date determined between the Principals.**

**7. PRORATIONS:** The Buyer(s) pay prorate through escrow on the following as of 'Date of Possession':
Insurance  No   Personal Property Taxes  Yes (2009-10) $5,365.89
Rent Yes Amount $9,116.38 Due on the First of the month

**8. PERSONAL PROPERTY TAX BILL:** The Escrow Holder is authorized, instructed and directed to disregard any **WITHHOLD and/or CLAIM/DEMAND** from the County Tax Collector pertaining to the 2010-11 Unsecured (Personal) Property Tax Bill. If the county deposits the actual tax bill, demand and/or claim against the property being sold in this escrow or if either Principal deposits said tax bill into escrow, the Principals hereby authorize, instruct and direct the Escrow Holder to deposit said bill into D & G Escrow No. 7167 for payment in full.

**9. SALES TAX:** None. There shall be no furniture, fixtures and/or equipment transferred through this escrow. Please refer to Escrow No. 7167 for the payment of all sales taxes due, required and/or necessary.

**10. GOVERNMENT RELEASES:** The Seller(s) shall deposit into escrow, prior to, on/or after close of escrow, but prior to final disbursement of Seller(s) proceeds, original releases from State Board of Equalization (A/C# **100-111047**) and State Employment Development Department (A/C# **481-5675-6**). The Principals authorize and instruct/direct the Escrow Holder to accept the State Government Release(s) and/or partial release(s) for the business location only, with a completion date dated after the date of the original opening of escrow. The Principals hereby authorize, instruct, direct and appoint the Escrow Holder as its agent and/or assignee in dealing with said government agencies in order to collect these releases and furthermore the Principals hereby acknowledge and agree to allow the Escrow Holder to provide information and/or escrow documents to said agencies as necessary and/or required.

**11. AUTHORITY TO PAY:** The Principals hereby authorize, instruct and direct the Escrow Holder to pay the State Board of Equalization, an amount that is currently unknown but shall be a bona fide amount per the demand of the Board of Equalization and submitted by them into escrow before the close of escrow. Charge the Seller's account for said payment but use the Buyer's funds because the Board of Equalization has placed a **"STOP HOLD"**on the transfer of the liquor license with the Dept. of ABC in Sacramento, preventing the liquor license from transferring and therefore the escrow from closing. Buyer's funds are being used as Seller has no funds in escrow to make said payment from. Therefore, said payment to the Board of Equalization is a **condition precedent to the transfer of the Alcoholic Beverage License"** which is required to close this escrow transaction.

**12. DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL APPLICATION:** The Principals acknowledge and agree that this escrow requires a liquor license transfer to be conducted by the California State Department of Alcoholic Beverage Control (herein after known as the Dept. of ABC). Seller warrants to be financially responsible to the Dept. of ABC for all renewal fees due, prior to the transfer of the License and further warrants to surrender his license to the Department of Alcoholic Beverage Control (hereinafter referred as the Dept. of ABC) and execute their documents to effect the license transfer upon demand of Escrow Holder. Buyer warrants to timely make his applications, at the Department of Alcoholic Beverage Control on demand of Escrow Holder, and hereby acknowledges and agrees that he shall be financially responsible to the Dept. of ABC for all the costs associated with the transfer of the license at the time of application and any time thereafter through the close of escrow. The Seller warrants to allow the Buyer to immediately post the Dept. of ABC 207B "Public Notice of Application for Ownership Change" document on the business premises, in full view of the public as required by the Dept. of ABC.

**13. ABC LICENSE(S):** The Seller(s) agree to transfer to the Buyer(s) a valid **On-Sale General Easting Place** License No. **47-389042** and a valid **Caterer Permit** License No. **58-389042,** previously issued by the State Department of Alcoholic Beverage Control. This escrow is contingent upon license transfers.

**14. TEMPORARY ABC LICENSE:** The Principals hereby acknowledge and agree that the Buyer(s) may take possession of the business prior to close of escrow, if both Principals are in agreement. In that event, the Principals further agree to apply for a temporary ABC license at the Department of Alcoholic Beverage Control. Buyer(s) further agree(s) to be responsible for the payment of fees charged by the Department of Alcoholic Beverage Control. Escrow Holder is not to be concerned.

**15. TRANSFER OF ABC LICENSE:** The Principals authorize and instruct/direct the Escrow Holder to immediately forward to the Department of Alcoholic Beverage Control their Form 226 in order to transfer the ABC license in the above mentioned escrow.

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____          Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 14, 2010
Escrow No.: 7166

16. **OTHER BUSINESSES:** The Seller(s) warrants that all other business names and addresses used by the Seller(s) within three years last past are: None.

17. **LEASE:** The Seller(s) and/or the Landlord shall furnish the Buyer(s) with a valid **Assignment of Lease** to the business premises for a period of approximately **three (3)** months at a base **starting** monthly rental of **$7,735.18**. The commencement date was October 1, 2005 and the expiration date will be September 30, 2010. The Assignment of Lease is subject to renewal rights. Other provisions, if any, are as follows: **Plus three (3), five (5) year options**

18. **LEASE(S) CONTINGENCY:** This escrow is contingent upon the Buyer(s) receiving a satisfactory 'Lease', 'Assignment of Lease', and/or any other lease document(s) that may be required for the proper transfer of the leasehold interest. Principals warrant to fully cooperate in securing necessary consents of third Parties. This contingency automatically expires and terminates on/or after June 15, 2010.

19. **RENTAL/SECURITY DEPOSIT:** The Buyer(s) agree to reimburse the Seller(s) through escrow the sum of **$32,735.18** as the amount of last months rent on the lease (in the amount of $7,735.18) and the Guarantee of Lease (in the amount of $25,000.00.

20. **ESCROW FEES:** The Principals herein authorize, instruct and direct the Escrow Holder to pay, out of the funds deposited in escrow, any and all escrow fees and charges, including but not limited to; recording and/or filing costs; notary public costs; reimbursement to Escrow Holder for their services, for handling the drawing of documents; publication(s); searches; reports; notices; (and any & all other items in which the Escrow Holder has conducted on behalf of the Principals through an outside vendor which has created expense for the Principals and the Principals hereby authorize, instruct and direct the Escrow Holder to deduct from the monies on deposit, regardless of whose monies are on deposit, the sums necessary and/or required to pay for these outside vendor expenses), legal fees & costs, and to charge same on a basis of fifty (50%) percent to the account of the Seller(s) and fifty (50%) percent to the account of the Buyer(s). Each Principal shall pay to Escrow Holder through the escrow immediately upon demand the reasonable charges for any additional work requested, caused or required by said Principals or either of them. In the event one of the Principals is unable to pay the Escrow Holder their fees and costs, then in that event, the other Principals shall assume said financial obligation to the Escrow Holder. In the event this escrow is not closed according to its terms, reimbursement to Escrow Holder for all escrow fees and costs incurred by the Principals shall be paid from the funds deposited into escrow regardless of the aforementioned basis. In addition to the above escrow fees and costs, the Principals acknowledge and agree that if this escrow does not close or cancel timely, then in that event and at the option of the Escrow Holder, interest on the balance owed to the Escrow Holder for its services rendered and completed, plus its costs and out of pocket expenses may be charged at the rate of ten (10%) per cent per annum from the estimated closing date until date of payment. In the event the Escrow Holder institutes legal action for the collection of any and all monies owed to it, then in that event, the Principals or either of them who is responsible for payment, agrees to immediately pay said sums or monies as awarded, including legal fees & costs, and costs, interest and all costs of collection. Principals acknowledge and agree that the price they were quoted for escrow fees and costs prior to or at the opening of this escrow was for basic services only and does not include additional charges for work requested, caused or required by said Principals or either of them.

21. **RELEASE OF MONIES:** The Principals hereby authorize, instruct and direct the Escrow Holder to release to Seller(s), the monies due Seller(s) on/or after the close of escrow.

22. **COVENANT NOT TO COMPETE:** None

23. **PROCESS:** The Principals hereby authorize and instruct/direct the Escrow Holder to process* this escrow **immediately** * (to process means to prepare documents, record/file, publish, and conduct searches, which incur immediate additional expenses to the Principals).

24. **ESTIMATED CLOSE:** The estimated date of close is **July 15, 2010.**

25. **CLOSE:** This escrow shall close automatically upon Escrow Holder's notification and receipt from the Department of Alcoholic Beverage Control of their 226 Form, transferring and/or issuing the license, and their authorization to close this escrow. In the event the Escrow Holder is not informed by the Dept. of ABC of the license transfer, for any reason whatsoever, then in that event, a receipt of a photocopy of the newly issued license reflecting the ownership of the license in the name of the Buyer(s), shall also automatically close this escrow. Time is of the essence. In the event this escrow is not closed on/or prior to August 31, 2010 for any reason whatsoever, then in that event, the Buyer has the option of having said escrow cancelled and all funds on deposit shall be returned to Buyer upon said cancellation, less any funds paid to the Board of Equalization and less all escrow fees and costs. NOTE: **Any cancellation requires the Escrow Holder to obtain executed cancellation instructions from all Principals.**

26. **ATTACHED DOCUMENTS:** The following described document(s), **Purchase Agreement**, made and entered into between the Principals and dated May 10, 2010, is hereby included, attached hereto, and made a part hereof of these escrow instructions. In the event of any conflict between the terms and conditions of the agreement and the escrow instructions, the terms and conditions of the Escrow instructions shall control and prevail.

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____     Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 21, 2010
Escrow No.: 7166

27. **CONTINGENCY - BANKRUPTCY COURT APPROVAL:** This escrow is contingent upon approval of the Bankruptcy Court, on behalf of the Seller. The Escrow Holder is hereby authorized, instructed and directed to fulfill all court requirements, and provide information and documentation to the court, as needed and/or required. This contingency automatically expires and terminates on June 15, 2010, unless either Principal or their agent and/or assignee, contacts the Escrow Holder for an extension, prior to said date.

28. **COMMISSION:** The Principals hereby authorize, instruct and direct the Escrow Holder to pay on/or after the close of escrow, out of funds deposited into escrow, the sum of $15,000.00, as Broker's Commission due Pegasus Investment or assignee, for services rendered and completed. Charge Seller account. Broker represents Buyer.

29. **LLC RESOLUTION - SELLER:** The Seller(s) shall deposit into escrow, within (2) weeks, an original 'Membership Resolution' or other proper documentation, executed by an authorized Member; authorizing the sale of assets being sold in this escrow; that the Escrow Holder shall be D & G Escrow Corporation, Encino, California; and who is authorized to execute escrow instructions, amendments and any and all document(s) necessary and/or required to accomplish this sale. The Escrow Holder is not liable or responsible for the content or validity of this resolution.

30. **LLC RESOLUTION - BUYER:** The Buyer(s) shall deposit into escrow, within two (2) weeks, an original 'Membership Resolution' or other proper documentation and/or related document, executed by an authorized Member; authorizing the purchase of assets being purchased in this escrow; that the Escrow Holder shall be D & G Escrow Corporation, Encino, California; and who is authorized to execute escrow instructions, amendments, and any and all document(s) necessary and/or required to accomplish this purchase. Escrow Holder is not liable or responsible for the contents or validity of this resolution.

31. **LLC OPERATION AGREEMENT:** The Principals acknowledge and agree that the Escrow Holder shall not prepare, draft and/or be responsible for the modifications to any existing LLC Operating Agreement(s). Said modification(s) shall be handled outside of escrow, directly between the Principals and/or their agents and therefore the Escrow Holder shall not be concerned with said modification(s), whatsoever.

32. **INSPECTIONS:** The Seller(s) warrant(s) that the premises will pass all inspections necessary and/or required to conduct such business at the time physical possession is delivered to Buyer(s).

33. **INDUSTRIAL DISCLAIMER:** The Principals acknowledge and agree that they are aware of the City of Los Angeles, Dept. of Public Works, Bureau of Sanitation matters regarding the fact that the type of business being sold in this escrow transaction engages in food preparation and therefore it may produce certain industrial waste materials including fats, oils, and grease at the business location.

Seller warrants to Buyer that they have qualified, received and currently hold a "Conditional Waiver" from the City of Los Angeles for an "Industrial Wastewater Permit" and/or are currently installing or have installed a "Grease Interceptor" in lieu of the "Conditional Waiver".

Should Seller be operating under said "Conditional Waiver", then in that event, Buyer acknowledges that should Buyer remodel the business with a cost or valuation of $100,000.00 or more, then they must install a "Grease Interceptor" at their expense in order to satisfy the requirements of the City of Los Angeles.

For additional information, please call the City of Los Angeles control program at (323) 342-6118.

As a matter of record only, with which Escrow Holder is not to be responsible, liable or further concerned with whatsoever, the Principals understand and are aware that the Escrow Holder will not follow up on, investigate, and/or verify any of the matters discussed above in this paragraph.

34. **EXECUTED DOCUMENTS:** The Principals hereby acknowledge and agree that they have executed certain documents in escrow, prior to the insertion therein of pertinent information which is not now available. The Principals hereby authorize, instruct and direct the Escrow Holder to complete such documents, in accordance with the escrow instructions, at any time prior to, at, or after close of escrow.

35. **SIGNATURES:** The Principals hereby authorize, instruct and direct the Escrow Holder to accept the signature of one of the Sellers, if more than one, and/or one of the Buyers, if more than one, on any amendment and/or escrow instruction, or cancellation instruction concerning this escrow without liability on the part of the Escrow Holder for doing so, not withstanding anything in the printed instructions, to the contrary, if applicable.

36. **COUNTERPART:** The Principals hereby authorize, instruct and direct the Escrow Holder to accept any and all written escrow instructions executed in counterpart from the Principals to the Escrow Holder. Each of these instructions so executed shall be deemed an original, irrespective of the date of its execution and delivery; and said counterparts together shall constitute one and the same instrument, with the same force and effect as if the signatures were each and all contained in the same instruction(s).

**ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF**
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____

Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 21, 2010
Escrow No.: 7166

37. **GOOD STANDING REPORTS:** The Principals hereby authorize, instruct, and direct the Escrow Holder to order 'Good Standing Reports' from the Karis Corporation, regarding the selling entity in this escrow transaction, from both the California Secretary of State's Office and the Franchise Tax Board.

38. **SEARCHES:** The Principals hereby authorize and instruct/direct the Escrow Holder to immediately obtain both UCC Searches from the **California Secretary of State's Office** and county searches for **Los Angeles County Recorder's Office.** Said county search shall be ordered directly from Karis Corporation. **Search the Seller at any and all locations and search the Trade Name at the business location only .** The Principals acknowledge and agree that no other searches are necessary and/or required and further instruct/direct the Escrow Holder to rely on the information provided by the Principals herein as to the proper names and places to search. The Principals further authorize and instruct/direct the Escrow Holder to order all UCC-1 copy requests, as needed or required.

The Principals acknowledge, agree, and fully understand that these searches shall be ordered at the beginning of escrow (when the escrow is processed), and that these searches shall NOT be reordered prior to the close of escrow. If reordering is necessary and/or required, the Principals shall inform the Escrow Holder, in writing, prior to the close of escrow. The Principals further acknowledge, agree, and fully understand that the Escrow Holder is NOT liable or responsible for the sufficiency or correctness of the searches, nor for any liens which may have been filed and or recorded after the date of said searches, or for liens uncovered on the searches that are for similar names, but not against the business, Seller(s) or any other searched name in this escrow transaction. Therefore, the Principals hereby release the Escrow Holder and the Escrow Holder shall be indemnified and held harmless from any and all liability or responsibility, expressly or implied, for the period of time, from the date of the last search until the date of the close of escrow, and thereafter.

39. **RELEASE/TERMINATION:** The Principals hereby authorize and instruct/direct the Escrow Holder, if necessary and/or required, to prepare, file/record any and all UCC-3 "Terminations", "Reconveyances", "Satisfaction of Judgments", "Release of Tax Liens", and/or any other documents in order to provide clear title to the Buyer prior to, on, or after close of escrow. Charge Seller's account.

40. **NOTICE:** The Principals hereby authorize and instruct/direct the Escrow Holder, to record and publish, in the appropriate County(s) and/or Judicial District(s), a "Notice to Creditors of Bulk Sale and of Intention to Transfer Alcoholic Beverage License(s)", at opening of escrow or at the time of processing, and subsequently as needed and/or required. Said Notice shall be handled by Pacific Corporate & Title Services.

41. **FICTITIOUS BUSINESS NAME STATEMENT:** None

42. **ABANDONMENT OF FICTITIOUS BUSINESS NAME STATEMENT:** None

43. **ACQUAINTANCE & TRAINING PERIOD:** None

44. **INSURANCE:** The Buyer(s) understand(s) and acknowledge(s) that it is their responsibility to provide themselves with adequate insurance coverage in regards to the business and/or assets they are purchasing through this escrow, on/or before date of possession. In the event that the Buyer(s) does/do not procure reasonable insurance coverage, timely, the Buyer(s) warrant(s) that it is solely their liability and responsibility and therefore Buyer(s) warrant to hold the Seller(s) and the Escrow Holder harmless and hereby indemnifies Seller(s) and Escrow Holder from any responsibility and/or financial liability in regards to the compliance of the above instruction.

45. **FACSIMILE TRANSMITTALS:** The Principals acknowledge, agree, state and hereby authorize, instruct and direct the Escrow Holder, themselves, their agent(s), representatives(s), lien holders, creditors and any other interested party to send and accept FACSIMILE TRANSMITTALS (hereinafter referred to as "FAX") on all Escrow Instructions, amendments, escrow documents, letters, other types of instructions, lien holders, claims, received demands and any & all other documents received and/or sent through FAX transmissions and to rely upon said transmission as if it or they are originals sent or delivered by other methods. Said receipt by the Escrow Holder is at the sole option and discretion of the Escrow Holder and the Principals shall replace all facsimiles sent to the Escrow Holder by the Principals with the originals within seventy-two (72) hours of the transmission. The Principals further acknowledge and agree that any document to be recorded with the County Recorders Office and/or filed with the California Secretary of State's Office, must be an originally executed document and may not be a FAX (non-original) copy whatsoever, as these governmental agencies will not except FAX copies for recording and/or filing. Therefore, a FAX will delay the recording/filing and the close of escrow. **Under no circumstances whatsoever, shall the Escrow Holder fund and/or pay any monies from it's Trust Account without an originally executed instruction and/or document acceptable to the Escrow Holder.**

46. **EMAIL TRANSMITTALS:** The Principals acknowledge, agree and hereby authorize, instruct, and direct the Escrow Holder, themselves, their agent(s), representative(s) and creditor(s) to send and accept EMAIL CORRESPONDENCE on all letters, instructions, claims, demand and any & all other documents received and/or sent through the Internet and to rely upon said transmissions as if they are originals sent or delivered by other methods. **Under no circumstances whatsoever, shall the Escrow Holder fund and/or pay any monies from it's Trust Account without an original executed instruction and/or**

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____                                          Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 11, 2010
Escrow No.: 7166

document.

**47. CONFIDENTIALITY:** The Principals hereby acknowledge, state and agree that this escrow transaction is confidential and that neither Principal will make disclosure to any person and/or entity regarding the details of this escrow and/or transaction whatsoever, except on a need to no basis, a matter of which the Escrow Holder is not to be concerned with, whatsoever.

**48. AUTHENTICITY:** The Principals acknowledge and agree that all the documents provided to each other and to the Escrow Holder are originals and/or true, correct, and unaltered copies of the originals and all information provided, written or verbal, used in the creation of these escrow instructions have been provided by the Principals and/or their agent(s), and that NO false, untrue or misleading statements or paragraphs have been made or inserted in this escrow and therefore the Principals hereby certify under penalty of perjury, that the foregoing information provided in these instructions are true and correct to the best of their knowledge and belief(s).

**49. DRAFTING:** Each Principal acknowledges and agrees that they participated in the drafting and preparation of these escrow instruction. Hence, in any construction of these instructions, the same shall not be construed against any Principal and/or the Escrow Holder.

**50. SEVERABILITY:** In the event that any term(s) and/or provision(s) of these escrow instructions, future amendments and/or instructions, are determined and/or held to be invalid, illegal, inoperative, unenforceable and/or incapable of being enforced by a court of competent jurisdiction, the remaining provisions will not be affected whatsoever and therefore nevertheless be given full force and effect.

**51. LEGAL AND/OR ACCOUNTING ADVICE:** It is understood and agreed by the Principals hereto that no legal and/or accounting advice of any kind or nature has been given to any Principal to these instructions, by the Escrow Holder. It is further understood that the Principals hereto have been advised to seek appropriate legal counsel and/or accounting professionals for the explanation, clarification, and/or cancellation of any of the terms and conditions as set forth herein.

**52. INDEMNIFICATION; DISPUTE RESOLUTION; ATTORNEY'S FEES AND COSTS:**

The following paragraphs contain the words or terms of Escrow Holder and Broker(s). In each and every case, the term of Escrow Holder means and is interpreted as the licensed escrow agent and its employees, independent contractors and agents and the word Broker(s) means and is interpreted as the licensed real estate broker and its employees, independent contractors and agents.

**A. INDEMNIFICATION:** The Principals hereby agree to defend, indemnify, and hold the Escrow Holder and/or Broker(s) harmless from and against any and all liabilities, financial or otherwise, including but not limited to all claims, damages, costs, expenses or losses that may arise from or in connection with Escrow Holder's and/or Broker's compliance with these Escrow Instructions and/or any future amendments hereto. Should Escrow Holder and/or Broker(s) incur expenses, costs, and/or attorney's fees in compliance with these Escrow Instructions, including without limitation, expenses, costs, or attorney's fees in any action or other legal proceeding arising from or related to these Escrow Instructions or the transactions contemplated hereby involving Escrow Holder and/or Broker(s) and any third party not a Principal to these Escrow Instructions, the Principals hereby agree, immediately upon demand in writing by Escrow Holder and/or Broker(s), to reimburse Escrow Holder and/or Broker(s) for said expenses, costs and attorney's fees. The Principals also agree to indemnify the Escrow Holder and/or Broker(s) from and against any judgment and/or deficiency judgment that may be obtained against the Escrow Holder and/or Broker(s) by any such third party arising from or in connection with any such action or other legal proceeding, including all applicable costs, expenses, attorney's fees and interest included in or connected with said judgment. In the event that any Principal hereto is a business entity rather then an individual, the individual shareholders, partners, members or other legal owners of any such entity hereby agree to guaranty and assume personal liability to the Escrow Holder and/or Broker(s) for any such entity's obligations, liabilities and duties as set forth in this indemnification provision.

**B. MEDIATION:** The Principals agree that prior to the filing of any action or other legal proceeding by any Principal to enforce or interpret these Escrow Instructions, or to resolve any dispute, controversy, or claim between the Principals or between the Principals and Escrow Holder and/or Broker(s) arising from or in connection with these Escrow Instructions or the transactions contemplated herein (collectively herein "Dispute") that cannot be resolved by mutual agreement of the parties to such Dispute, such Dispute shall be submitted to mediation, subject to the exclusions set forth in sub-paragraph C below. Mediation fees and costs, if any, shall be divided equally among the parties involved in any such mediation. If, in connection with any Dispute, except as provided in sub-paragraph C below, any Principal commences an action or other legal proceeding without first requesting the other party(ies) to such Dispute in writing to resolve the Dispute through mediation, or fails to agree to mediate within thirty (30) days after receipt of a written request to mediate then the Principal(s) so failing or refusing to mediate shall not be entitled to recover attorney's fees even if they would otherwise be available to such Principal(s) in any such action or other legal proceeding. If the parties to a Dispute have not selected a mutually acceptable mediator within thirty (30) days after the parties to such Dispute agree to mediate in accordance with a written notice requesting mediation, then any party to the Dispute may, at that party's election, (i) file with a court having jurisdiction over the Dispute a proceeding requesting that the court appoint a mediator, or (ii) request mediation of the Dispute with either the American Arbitration

**ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF**
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____

Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 11, 2010
Escrow No.: 7166

Association or Alternative Resolution Centers in accordance with their respective rules governing private mediation, including the appointment of a neutral mediator or mediators. The mediator(s), in any mediation hereunder, shall be an attorney or a retired judge, each with at least ten (10) years of experience.

C. **EXCLUSIONS FROM MEDIATION:** The following matters are excluded from the requirement of mediation as set forth in paragraph B above: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code Section 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; (iv) any matter which is within the jurisdiction of a probate or small claims court; (v) an action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil Procedure Section 337.1 or Section 337.15 applies; or (vi) an interpleader action brought by Escrow Holder or any action brought by Escrow Holder for declaratory relief, to enforce the indemnification provisions of sub-paragraph A above, or to collect Escrow Fees and/or costs. Neither the filing of a court action to enable recording of a notice of pending action, for order of attachment, receivership, temporary restraining orders, injunctive relief, nor other provisional remedies without prior compliance with the provisions of paragraph B above shall constitute a violation of paragraph B.

D. **CALIFORNIA LAW AND VENUE:** These Escrow Instructions shall be construed and enforced in accordance with California law. In the event of a mediation or an action or other legal proceeding involving Escrow Holder and/or Broker(s) arising out of or relating to these Escrow Instructions and/or the transactions contemplated herein, venue shall be exclusively in Los Angeles County, California.

E. **ATTORNEY'S FEES AND COSTS:** The prevailing party(ies) in any action or other legal proceeding to enforce or interpret these Escrow Instructions, or to resolve any Dispute between any Principals or between any Principal(s) and the Escrow Holder and/or Broker(s), (i) filed in compliance with the requirements of paragraph B above, or (ii) subject to the provisions of paragraph C above, shall be entitled to an award of his/her/its attorney's fees and costs therein incurred to be awarded either in such action or legal proceeding or in a separate proceeding brought for that purpose.

### GENERAL PROVISIONS

1. Each of the Principals will sign all papers and documents and furnish all records necessary or requisite to the completion of all steps necessary to the consummation of the sale of the above business, promptly and without unnecessary delay.

2. The Principals hereto do hereby agree to open, and do so open, an escrow at the office of D & G Escrow Corporation, 17327 Ventura Boulevard, Suite 300, Encino, CA 91316, for the purpose of completing this sale and purchase in accordance with all of the provisions of Sections 6101-6107 of the Uniform Commercial Code of California, Section 3440 and 3440.1 of the California Civil Code and all laws appertaining to the subject matter of this escrow, including but not limited to Section 24073 Et. Sec. of the California Business and Professions Code.

3. The Seller agrees to hold the Buyer harmless of, and from any liability, claims, demands or causes of action occurring from the operation of said business prior to date of possession, and Seller agrees to indemnify Buyer against all losses resulting from any such claims.

4. The Buyer agrees to hold the Seller harmless of, and from any liability, claims, demands or causes of action occurring from the operation of said business after the date of possession, and Buyer agrees to indemnify Seller against all losses resulting from any such claims.

5. The Principals hereby authorize and instruct/direct the Escrow Holder to deposit all funds into the D & G Escrow Corporation, "Trust Account" at Professional Business Bank, 199 South Los Robles Avenue, Pasadena, California 91101, unless specifically instructed to the contrary. Furthermore, Principals acknowledge that said "Trust Account" will not yield any interest, whatsoever, to any Principal/Party.

6. In the event that there shall be a denial of the transfer of the liquor license herein or a suspension or revocation of the same by the Department of Alcoholic Beverage Control, which shall have been caused by the act or acts of the Seller or Buyer, then in such event this escrow shall be cancelled and the Principal causing such denial, revocation or suspension of said liquor license shall be responsible therefor, and agrees to indemnify the other for all costs, expenses, or damages caused by virtue of the failure of the within escrow to be properly consummated.

7. The Principals agree that in the event any claims are received in escrow for any taxes due as set forth in Section 24049 of The California Business and Professions Code, the Escrow Holder is authorized and instructed to pay the same at close of escrow, or prior to close of escrow, if said payment is a condition precedent to the transfer of an Alcoholic Beverage License, from the funds deposited in escrow, and charge Seller's account. This is your authorization and instruction to make payment without further authority for so doing.

8. In the event a liquor license is being transferred through this escrow, Escrow Holder is hereby authorized and instructed to pay the claims for bona fide creditors of the Seller who file their claims with the Escrow Holder before the Escrow Holder is notified by the Department of Alcoholic Beverage Control of its approval of the transfer of the license, or if the purchase price or consideration is not sufficient to pay the claims in full, the Escrow Holder is authorized and instructed to distribute the consideration in accordance with Section 24074 of the California Business and Professions Code. Principals agree that all claims filed in escrow, prior to notification to you of the transfer of the license, shall be treated as and shall be construed as bona fide claims and you are authorized and instructed to pay the same without any further approval from the Seller herein, unless the Seller notifies you in writing to the contrary, within 10 days from the date you furnish the Seller a list of claims filed in escrow, either by personal delivery to the Seller; or by electronic means such as email or facsimile to the Seller; or by regular mail to the Seller at his last known address.

**ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF**
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____                    Buyer Initials: _____

# D & G Escrow Corporation

Date: May 11, 2010
Escrow No.: 7166

9.  The Principals agree that in the event any portion of the purchase price or consideration is in the form of a Promissory Note in favor of the Seller and the cash consideration is not sufficient to pay the creditors in full, then you are authorized and instructed to retain said note in escrow, and the Buyer agrees upon notice from you to pay said amounts as provided therein, into escrow. You are to pay said amounts prorata from time to time to the bona fide creditors, until such time as the bona fide creditor's claims have been paid in full, or the obligation due the Seller has been fully satisfied, whichever occurs first.

10.  It is understood that the Escrow Holder will not be liable to the Buyer or Secured Party, or any other party, on account of any property included hereunder which is subject to conditional sale or lease contracts or other form of lease, contract or agreement, or Security Agreement or on account of liens of any kind or nature whatsoever, or from defects in title which may exist with respect to any such property. It is understood by the Principals to this escrow that no Security Agreement search is required covering the property involved herein and the Escrow Holder is hereby relieved of all liability for not procuring such Security Agreement search unless specifically provided for in this escrow.

11.  All the Principals and/or Parties hereto further agree, jointly and severally, to pay on demand, as well as to indemnify and hold the Escrow Holder harmless of and from any and all costs, damages, judgments, attorney's fees, expenditures, obligations, expenses and liabilities of any kind or nature, which in good faith, the Escrow Holder may incur and sustain in connection with, or arising out of this escrow. In the event that the Escrow Holder shall initiate a judicial action or any other legal proceeding ("a proceeding") arising from or in connection with this escrow transaction against any Principal and/or Party hereto, or in the event that any Principal and/or Party hereto shall initiate a proceeding arising from or in connection with this escrow transaction against the Escrow Holder, the prevailing Principal and/or Party in any such proceeding shall be entitled to his/her/its attorney's fees & costs of suit incurred in such proceeding to be awarded either in such proceeding or in a separate proceeding brought for that purpose. The Escrow Holder is hereby given a lien upon all of the rights, titles and interests of each of the undersigned in all escrow papers and other property and monies deposited in escrow, to protect the Escrow Holder's rights and to indemnify and reimburse said Escrow Holder under this escrow transaction.

12.  The Escrow Holder is not to be concerned with any unpaid insurance, Municipal, County, State or Federal Tax or taxes, unless otherwise specifically instructed in this escrow.

13.  The Escrow Holder is not to be held liable for the sufficiency or correctness as to form, manner of execution or validity of any instrument deposited in escrow, nor as to the identity, authority or rights of any person executing the same, nor for failure to comply with any of the provisions of any agreement, contract or instrument filed or referred to in said escrow, and its duties hereunder shall be limited to the safekeeping of such money, instruments or other documents received by it as Escrow Holder and of the disposition of same in accordance with the written instruments and instructions accepted in this escrow. You are hereby authorized to destroy, without further notice to the Principals, all documents, papers, instructions and any other material in connection with this escrow five (5) years after termination or completion of same.

14.  No notice, demand or change of instruction shall be of any effect in this escrow unless given in writing by all Principals affected thereby. In event conflicting demands are made or conflicting notices served upon the Escrow Holder with respect to this escrow, the Principals hereto expressly agree that the Escrow Holder shall have the absolute right at its election to do either or all of the following:

Withhold and stop all further proceedings in the performance of this escrow, or file a suit in interpleader and obtain an order from the Court requiring the Principals to interpleaded and litigate in such court their several claims and rights amongst themselves. In the event such interpleader suit is brought, the Escrow Holder shall be fully released and discharged from all obligations to further perform any and all duties or obligations imposed upon it in this escrow, and the Principals jointly and severally agree to pay it all costs, expenses and reasonable attorney's fees expended or incurred by it, the amount thereof to be fixed and judgment therefor to be rendered in such suit.

15.  This Agreement shall inure to the benefit of, and be binding upon, the heirs, executors, administrators and assigns of each of the Principals hereto. Words used in this Agreement in the present tense include the future as well as the present; words used in the masculine gender include the feminine and neuter; the singular number includes the plural, and the plural the singular; and the word "Principal" includes a corporation as well as a natural person.

The foregoing terms, conditions, provisions and instructions have been read and are understood and agreed to by each of the Principals hereto.

**SELLER(S):**                                                              **BUYER(S):**

Sona LLC  (a Ca LLC)                                                KBKW, LLC  (a Ca LLC)

By: _____                       By: _____
David Myers,                                                            David Koral, Managing Member of
President of the Managing Member                         Real Restaurant Group, LLC,
                                                                                  Sole Member


**- - END OF INSTRUCTIONS - -**

## EXHIBIT 3.2(a)

## LEASE ASSIGNMENT

### *[See Attached Assignment & Assumption of Lease]*

## ASSIGNMENT AND ASSUMPTION OF LEASE, ACCEPTANCE AND CONSENT

Location of Property: 401 North La Cienega, Los Angeles California 90048

This Assignment and Assumption of Lease (this "Agreement") is made for reference purposes this 29 th day of May , 2010 (the "Effective Date"), by and between SONA, LLC ("Assignor") and KBKW, LLC, a California limited liability company ("Assignee").

### Recitals

**WHEREAS**, on or about June 10, 2005, Glick, Glick and Lewis (the "Lessor"), as lessor, and Assignor, as lessee executed a lease (as same may have been amended, extended and/or restated, the "Lease ") for the property (the "Premises") commonly referred as 401 North La Cienega, Los Angeles California 90048. A true and complete copy of all documents comprising the entire Lease is attached hereto as Exhibit "A" and incorporated herein;

**WHEREAS**, Assignor now desires to assign the Lease, and all its terms, to Assignee, Assignee desires to accept the assignment of the Lease, effective as of the Effective Date and Assignee shall send written confirmation of the Effective Date to Lessor so that Lessor is advised; and

**NOW, THEREFORE**, Assignor and Assignee agree as follows:

### Assignment

For value received, the receipt and sufficiency of which are hereby acknowledged, and the agreement of Assignee, Assignor assigns and transfers to Assignee all of Assignor's right, title, and interest in and to the Lease, inclusive of those options to extend provided for in Rider 1 to the Lease [and the Guarantee thereunder, in the current amount of $25,000.00], and Assignee does accept the assignment and agree to assume tenant's obligations under the Lease, effective as of the Effective Date. Assignee expressly assumes and agrees to keep, perform, and fulfill all of the terms, covenants, conditions, liabilities, and obligations, required to be kept, performed, and fulfilled by the tenant under the Lease and which accrue from and after the Effective Date, including the making when due and payable of all payments which become due under the Lease from and after the Effective Date. This assignment does not release Assignor from any obligation of tenant under the Lease.

### Acceptance

In consideration for the above assignment and written consent thereto, Assignee hereby assumes all of the obligations of the tenant under the Lease from and after the Effective Date.

### Miscellaneous

This Agreement may not be orally changed or terminated, nor any of its provisions waived, except by an agreement in writing signed by the party against whom enforcement of any change, termination or waiver is sought.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be governed by and in accordance with the laws of the State of California without regard to principles of conflicts of law.

This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.

DATED: _____

LESSEE/ASSIGNOR

SONA, LLC.

By:_____

DATED: **5/22/2020**

ASSIGNEE

KBKW, LLC, a California limited liability company

By:_____

This Agreement may not be orally changed or terminated, nor any of its provisions waived, except by an agreement in writing signed by the party against whom enforcement of any change, termination or waiver is sought.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be governed by and in accordance with the laws of the State of California without regard to principles of conflicts of law.

This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.

DATED: _5-14-10_                    LESSEE/ASSIGNOR

                                    SONA, LLC.


                                    By:_____


DATED: _____              ASSIGNEE

                                    KBKW, LLC, a California limited liability company


                                    By:_____

Exhibit A
Lease

Exhibit B

## Consent to the Assignment and Assumption of Lease

Reference is made to the lease agreement, dated as of June 10, 2005 (the "Lease"), by and between Glick, Glick and Lewis (the "Lessor") and SONA, LLC (the "Assignor") and relating to the property commonly referred to as 401 North La Cienega, Los Angeles California 90048 (the "Lease"). The undersigned hereby consents to the assignment and assumption of the Lease between Assignor and KBKW, LLC. a California limited liability company, (the "Assignee"), effective as of the Effective Date, waiving none of its rights thereunder as to Assignor. Without limiting the generality of the foregoing:

1.     Nothing contained in this Consent or in the Lease shall be construed to:

a)     modify, waive or affect (i) any of the provisions, covenants, or conditions of the Lease, (ii) any of the Assignor's obligations under the Lease, or (iii) any rights or remedies of Lessor under the Lease;

b)     waive any present or future breach or default on the part of any tenant under the Lease; or

c)     release or discharge Assignor from any liability of their obligations under the Lease.

2.     This Consent is not assignable and shall not be construed as a consent to any further assignment of the Lease.

DATED: _____, 2009              LESSOR


                                      GLICK, GLICK & LEWIS


                                      By:_____
                                      Its:_____

4

## EXHIBIT 3.2(c)

**BILL OF SALE**

*[See Attached Bill of Sale]*

# BILL OF SALE

**1.     Sale and Transfer of Purchased Inventory.**     For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by Section 3.2(a) of that certain Purchase Agreement dated as of May 22, 2010 (the "*Purchase Agreement*"), by and between **KBKW, LLC**, a California limited liability company ("*Purchaser*"), and **SONA, LLC**, a California limited liability company ("*Seller*"), Seller hereby sells, transfers, assigns, conveys, grants and delivers to Purchaser, and its successors and assigns forever, all of Seller's right, title and interest in and to all of the Purchased Inventory (as defined in the Purchase Agreement).

**2.     Further Actions.**     Seller covenants and agrees to warrant and defend the sale, transfer, assignment, conveyance, grant and delivery of the Purchased Inventory hereby made against all persons whomsoever, to take all steps reasonably necessary to establish the record of Purchaser's title to the Purchased Inventory and, at the request of Purchaser, to execute and deliver further instruments of transfer and assignment and take such other action as Purchaser may reasonably request to more effectively transfer and assign to and vest in Purchaser each of the Purchased Inventory, all at the sole cost and expense of Seller.

**3.     Terms of the Purchase Agreement.**     All of the terms and provisions of the Purchase Agreement are incorporated herein by this reference. Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

**IN WITNESS WHEREOF,** Seller has executed this Bill of Sale as of _____, 2010.

SONA, LLC.

By: _____
Name: _David Myers_____
Title: _President_____

**EXHIBIT 4.4(b)**

**COPY OF LEASE**

**[*See Attached Copy of the Lease*]**



*PLEASE FILE UNDER SONA YEARS*

**AIR COMMERCIAL REAL ESTATE ASSOC**

**STANDARD INDUSTRIAL/COMME**

**SINGLE-TENANT LEASE – NE**

**(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)**

1. **Basic Provisions ("Basic Provisions").**
   1.1  **Parties.** This Lease ("Lease"), dated for reference purposes only _June 10th_ , _2005_ , is made by and between _Glick, Glick and Lewis_ _____ ("Lessor")
and _Sona LLC_ _____ ("Lessee").
(collectively the "Parties," or individually a "Party").
   1.2  **Premises.** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as _401 La Cienega B_ _____, located in the County of _Los Angeles_ , State of _California_ , and generally described as (describe briefly the nature of the property and, if applicable, the "Project," if the property is located within a Project) _single story structure consisting of approximately 2000 square feet_ _____
   _____ ("Premises"). (See also Paragraph 2)
   1.3  **Term:** _Five (5)_ years and _0_ months ("Original Term") commencing _October 1, 2025_ ("Commencement Date") and ending _September 30, 2010_ ("Expiration Date"). (See also Paragraph 3)
   1.4  **Early Possession:** _____
("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)
   1.5  **Base Rent:** $ _7735.18_ per month ("Base Rent"), payable on the _1st_ day of each month commencing _October 2005_ _____. (See also Paragraph 4)
   ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. *See Rider I*
   1.6  **Base Rent and Other Monies Paid Upon Execution:**
      (a)  **Base Rent:** $ _7735.18_ for the period _of one (1) year_
      (b)  **Security Deposit:** $ _____ ("Security Deposit"). (See also Paragraph 5)
      (c)  **Association Fees:** $ _____ for the period _____
      (d)  **Other:** $ _15,470.00_ for _First and last month's rent is $15,470.36_ _____
      (e)  **Total Due Upon Execution of this Lease:** $ _15,470.36 plus $25,000 Guarantee_
   1.7  **Agreed Use:** _Operation of restaurant and Bar_ _____
   _____ (See also Paragraph 6)
   1.8  **Insuring Party.** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)
   1.9  **Real Estate Brokers.** (See also Paragraph 15)
      (a)  **Representation.** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):
      ☐ _____ represents Lessor exclusively ("Lessor's Broker");
      ☐ _____ represents Lessee exclusively ("Lessee's Broker"); or
      ☐ _____ represents both Lessor and Lessee ("Dual Agency").
      (b)  **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to in their separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.
   1.10  **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _$25,000.00 To be kept in a 3rd party escrow account_ _____ ("Guarantor"). (See also Paragraph 37)
   1.11  **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
   ☐ an Addendum consisting of Paragraphs _____ through _____ ;
   ☐ a plot plan depicting the Premises;
   ☐ a current set of the Rules and Regulations;
   ☐ a Work Letter;
   ☐ other (specify): _Rider I - option to extend    Rider IV Building Permit_
   _Rider II - Right of first refusal       and Releases_
   _Rider III - Guaranty : Letter of Credit   Rider V Authority To Sign_
   _Rider VI  Parking, Deliveries, Valet And Trash Containers_

2. **Premises.**
   2.1  **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. Note: Lessee is advised to verify the actual size prior to executing this Lease.

_____
Initials

_____
Initials

©2002 – AIR Commercial Real Estate Association

FORM STN-7-4/01

**2.2   Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

**2.3   Compliance.** Lessor warrants that the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for such costs pursuant to the provisions of Paragraph 7.1(d); provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

**2.4   Acknowledgements.** Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

**2.5   Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

**3.   Term.**

**3.1   Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

**3.2   Early Possession.** If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period. Any such early possession shall not affect the Expiration Date.

**3.3   Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

**3.4   Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

Initials

Initials

©2002 – AIR Commercial Real Estate Association

FORM STN-7-4/01

4.  **Rent.**

4.1.  **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2  **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States on or before the day on which it is due, without offset or deduction (except as specifically permitted in this Lease). Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Operating Expense Increase, and any remaining amount to any other outstanding charges or costs.

4.3  **Association Fees.** In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.  **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional moneys with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 14 days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and otherwise within 30 days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Depsoit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.  **Use.**

6.1  **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2  **Hazardous Substances.**

(a) **Reportable Uses Require Consent.** The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which

©2002 – AIR Commercial Real Estate Association

result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3   **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4 **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7.   **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1 **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, (vi) clarifiers (vii) basic utility feed to the perimeter of the Building, and (viii) any other equipment, if reasonably required by Lessor. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and if Lessor so elects, Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance at a rate that is commercially reasonable in the judgment of Lessor's accountants. Lessee may, however, prepay its obligation at any time.

7.2   **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.



**7.3   Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term "**Utility Installations**" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

**7.4   Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises, or if applicable, the Project) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.   Insurance; Indemnity.**

**8.1   Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

**8.2   Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000, an "Additional Insured-Managers or Lessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

**8.3   Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain

an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4    **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders' Rating" of at least B+, V, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 30 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    **Exemption of Lessor from Liability.** Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor nor from the failure of Lessor to enforce the provisions of any other lease in the Project. Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/ costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    **Damage or Destruction.**

9.1    **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises which requires repair, remediation, or restoration.

9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to affect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a)    **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)    **Remedies.** If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  **"Commence"** shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8    **Waive Statutes.** Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    **Real Property Taxes.**

10.1    **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located.  Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2    **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date.  If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated.  In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.  Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.  When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments

©2002 – AIR Commercial Real Estate Association    FORM STN-7-4/01

shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

**10.3 Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

**10.4 Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11. Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

**12. Assignment and Subletting.**

**12.1 Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default durable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

**12.2 Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

**12.3 Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor

or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.

(c) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(d) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(e) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph (e) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(g) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    **Inducement Recapture.** Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the



Initials



Initials

©2002 – AIR Commercial Real Estate Association    FORM STN-7-4/01

Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4 **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5 **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14. **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15. **Brokerage Fees.**

15.1 **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2 **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3 **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16. **Estoppel Certificates.**

(a) Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17. **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held

by Lessor. Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

23.    **Notices.**

23.1    **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2    **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 48 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.** No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.    **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

    (a)    When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

    (i)    **Lessor's Agent.** A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

    (ii)    **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

    (iii)    **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

    (b)    Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Lease shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

    (c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is designated by such Party to be confidential.



Initials

Initials

©2002 – AIR Commercial Real Estate Association

FORM STN-7-4/01

26.  **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.  **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.  **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.  **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.  **Subordination; Attornment; Non-Disturbance.**

30.1  **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have its Lease and/or any Option granted hereby superior to the lien of its Security Device  by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2  **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of such new owner, this Lease shall automatically become a new Lease between Lessee and such new owner, upon all of the terms and conditions hereof, for the remainder of the term hereof, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations hereunder, except that such new owner shall not:  (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor.

30.3  **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4  **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.  **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.  **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.  **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.  **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.  **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.  **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.



Initials

©2002 – AIR Commercial Real Estate Association

Initials

FORM STN-7-4/01

**37.    Guarantor.**

**37.1    Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

**37.2    Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38.    Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39.    Options.** If Lessee is granted an Option, as defined below, then the following provisions shall apply:

**39.1    Definition. "Option"** shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

**39.2    Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

**39.3    Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

**39.4    Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40.    Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

**41.    Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**42.    Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

**43.    Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

**44.    Authority; Multiple Parties; Execution.**

(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each party shall, within 30 days after request, deliver to the other party satisfactory evidence of such authority.

(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**45.    Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**46.    Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**47.    Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**48.    Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

**49.    Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

**50.    Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.



Initials

Initials

©2002 – AIR Commercial Real Estate Association

FORM STN-7-4/01

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.  SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.  RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _373 L. Cienega_ | Executed at: _878. N. LA CUENAGA BLVD_ |
| on: _6/10/05_ | on: _06/10/05_ |
| By LESSOR: | By LESSEE: |
| _Angela d. Gilard_ | _OFFICER OF FOONTAGROUP INC_ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Telephone: ( ) _____ | Telephone: ( ) _____ |
| Facsimile: ( ) _____ | Facsimile: ( ) _____ |
| Federal ID No. _____ | Federal ID No. _____ |
| BROKER: | BROKER: |
| _____ | _____ |
| _____ | _____ |
| Attn: _____ | Attn: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Telephone: ( ) _____ | Telephone: ( ) _____ |
| Facsimile: ( ) _____ | Facsimile: ( ) _____ |
| Email: _____ | Email: _____ |
| Federal ID No. _____ | Federal ID No. _____ |

NOTE: These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 So. Flower Street, Suite 600, Los Angeles, California 90017.  (213) 687-8777.  Fax No. (213) 687-8616

©Copyright 2002 – By AIR Commercial Real Estate Association. All rights reserved.
No part of these works may be reproduced in any form without permission in writing.



Initials



Initials

©2002 – AIR Commercial Real Estate Association

FORM STN-7-4/01

Rider 1
Option to Extend

Three (3) five (5) year options to extend the lease all subject to the CPI index which has a floor of 3% and a cap of 7%.  The option to extend is exclusive to "SONA"



### Rider 2

### RIGHT OF FIRST REFUSAL

(a)    Lessor shall not, at any time prior to the expiration of the term of this Lease, or any extension thereof, sell the Premises, or any interest therein, without first giving written notice thereof to Lessee, which notice is hereinafter referred to as "**Notice of Sale**," and otherwise complying with the terms and conditions of this Rider 2.

(b)    If, at the time the Notice of Sale is given, Lessor has entered into or intends to enter into an agreement with a third party to sell the Premises (the "**Sale Agreement**"), the Notice of Sale shall include the exact and complete terms of the proposed sale and shall have attached thereto a photocopy of bona fide offer and counteroffer, if any, duly executed by both Lessor and the prospective purchaser.

(i)    For a period of ten (10) business days after receipt by Lessee of the Notice of Sale pursuant to Section (b) above, Lessee shall have the right to give written notice to Lessor of Lessee's exercise of Lessee's right to purchase the Premises, or the interest proposed to be sold, on the same terms, price and conditions as set forth in the Notice of Sale.  In the event that Lessor does not receive written notice of Lessee's exercise of the right herein granted within said ten (10) day period, there shall be a conclusive presumption that Lessee has elected not to exercise Lessee's right hereunder, and Lessor may sell the Premises, or the interest proposed to be sold, on the same terms set forth in the Notice of Sale.

(ii)    In the event that Lessee declines to exercise its right of first refusal after receipt of the Notice of Sale pursuant to Section (b) above, and, thereafter, Lessor and the prospective purchaser modify by more than 5%, (i) the sale price, (ii) the amount of down payment, or (iii) interest charged, or in the event that the sale is not consummated within one hundred sixty (160) days of the date of the Notice of Sale, then the Right of First Refusal shall reapply to said transaction as of the occurrence of any of the aforementioned events, and Lessor shall provide another Notice of Sale to Lessee pursuant to Section (b) above.

(c)    If, at the time the Notice of Sale is given, Lessor does not have a sale agreement but has decided to sell the Premises, then the Notice of Sale shall include an appraisal of the Premises, completed within the last sixty (60) days by a duly licensed and qualified appraiser ("**Lessor's Appraisal**").

(i)    Within ten (10) business days after Lessee's receipt of the Notice of Sale, pursuant to Section (c) above, Lessee must deliver written notice to Lessor indicating that Lessee (1) is not interested in purchasing the Premises, in which case Lessor may sell the Premises to a third party, (2) will purchase the Premises at the price listed in Lessor's Appraisal, or (3) is interested in purchasing the Premises but does not accept Lessor's Appraisal.



(ii)    Should (c)(i)(3) occur, Lessee shall have thirty (30) days in which to obtain an appraisal. If, for any reason Lessee is unable to obtain an appraisal within thirty (30) days, then Lessee must accept Lessor's Appraisal or decline to exercise the Right of First Refusal. If Lessee's appraisal is completed within thirty (30) days and the two appraisers cannot agree on a reasonable average purchase price for the Premises, they shall immediately select a third mutually acceptable appraiser to provide a third appraisal within the next thirty (30) days. The average of the two appraisals closest in value shall be the new purchase price (the "**New Purchase Price**"). The cost of the third appraisal shall be split equally between the parties. Once the New Purchase Price is established, Lessee shall have ten (10) business days, from its receipt of a notice from Lessor containing the New Purchase Price, to decide whether or not to exercise the Right of First Refusal at the New Purchase Price.

If, on the other hand, the two appraisers/brokers agree on a reasonable average purchase price (the "**Purchase Price**"), Lessee shall have ten (10) business days, from its receipt of a notice from Lessor containing the Purchase Price, to decide whether or not to exercise the Right of First Refusal at the Purchase Price.

(iii)    In the event that Lessee elects to exercise the Right of First Refusal per Section (c) above, within ten (10) days of the determination of the Purchase Price or the New Purchase Price, as applicable, the parties shall sign the standard sale escrow instructions (the "**Sale Instructions**") of a national title company (selected by Lessee) that are in form and substance reasonably satisfactory to Lessee, which Sale Instructions shall provide that:

(1)    Lessee shall deposit five percent (5%) of the applicable purchase price with the title company, which may be retained by Lessor as liquidated damages solely for any breach by Lessee of the terms of this Right of First Refusal or the Sale Instructions;

(2)    The escrow shall close at the end of the then current term or at such earlier date mutually agreed to by the parties, at which time Lessee shall pay the applicable purchase price in cash and Lessor shall deliver title to the Premises, subject only to liens, encumbrances and defects of title in existence as of the date of the Amendment;

(3)    Lessor and Lessee shall each pay one-half (1/2) of the transaction costs; and

(4)    Lessee may elect to cause the conveyance of the Premises to be made by Lessor to an affiliate of Lessee.

Initials _____    Initials _____ 

Rider III

Guaranty;  Letter of Credit

During the term of the Lease, Lessee shall, at its sole option, either (i) provide a Guaranty of Lease in form and substance reasonably satisfactory to Lessor from a Guarantor reasonably satisfactory to Lessor (provided that such Guarantor's maximum liability thereunder shall be $25,000), or (ii) post and maintain with lessor a Letter of Credit in the original face amount of $25,000, in form, and substance, and from a financial institution, reasonably acceptable to Lessor.  Lessee may substitute a Guaranty or a Letter of Credit with the other, from time to time, upon reasonable notice to Lessor.

Rider IV
Building Permit and Releases

If Lessee undertakes any alteration, improvement or addition to the Premises in accordance with the Lease, Lessee shall provide Lessor with copies of all building permits obtained by Lessee in order to perform such alterations or additions, within ten (10) business days of Lessee's receipt thereof.

Should Lessee, in accordance with the provisions of the lease, hire contractors and/or subcontractors to alter, improve or add onto the Premises, Lessee shall provide Lessor with copies of the releases obtained from such contractors and/or subcontractors, as applicable, upon the completion of their work, within ten (1 0) business days of Lessee's receipt there of.

Rider V

All parties agree that Merle S. Glick is a designated signor for the purpose of this lease
for Glick, Glick & Lewis.



Rider VI

Parking, Deliveries, Valet and Trash Containers

Lessee hereby acknowledges that (i) all commercial loading and/or valet parking operations must take place on La Cienega and (ii) no vehicular parking is permitted on Westmount Drive.  Lessee hereby agrees to deliver to Lessor, within ten (10) business days of execution thereof, a copy of any contract Lessee enters into with a valet parking service (the "**Valet**").  Such a contract shall acknowledge that (i) all valet parking operations must take place on La Cienega, and (ii) no vehicular parking is permitted on Westmount Drive.  Lessee further agrees to deliver to Lessor, within ten (10) business days of Lessee's receipt thereof, a copy of the Valet's certificate of insurance.


Lessee acknowledges that no trash containers may be placed on Westmount Drive.

## **EXHIBIT 4.4(d)**

### **LEASE DEFAULTS, ETC.**

### **CURE COSTS**

**None**

## **EXHIBIT 7.1(c)**

## FORM OF SALE ORDER

## [*See Attached Form of Sale of Order*]

DAVID B. GOLUBCHIK (SBN 185520)
dbg@lnbrb.com
KRIKOR J. MESHEFEJIAN (SBN 255030)
kjm@lnbrb.com
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for Chapter 11
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

|  |  |
|---|---|
| In re | Case No. 2:09-bk-36434-ER |
| SONA, LLC, | Chapter 11 |
| Debtor and Debtor in Possession. | **ORDER GRANTING MOTION TO (A) SELL SUBSTANTIALLY ALL ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, AND (B) ASSUME AND ASSIGN UNEXPIRED LEASE** |
|  | Hearing: |
|  | DATE: _____, 2010 |
|  | TIME: ____:00 a.m. |
|  | PLACE: Courtroom 1568 |
|  |           255 E. Temple Street |
|  |           Los Angeles, CA 90012 |

1    A hearing was held on _____, 2010, at __:00 a.m., before the Honorable Ernest M.

2   Robles, United States Bankruptcy Judge, to consider the Motion ("Motion") To (A) Sell

3   Substantially All Assets Outside The Ordinary Course Of Business, and (B) Assume And

4   Assign Unexpired Lease, filed by Sona, LLC ("Debtor"), debtor and debtor in possession in the

5   above-referenced chapter 11 bankruptcy case, pursuant to that certain Purchase Agreement (the

6   "APA"), attached hereto as Exhibit "A", between the Debtor and KBKW, LLC ("Purchaser").

7   Appearances were as set forth on the court's record.

8

9    This court, having considered the Motion and all declarations, supplements and other

10   evidence in support of the Motion, any and all oppositions to the Motion and Debtor's

11   responses thereto, the statements, representations and arguments of counsel at the hearing on

12   the Motion, the entire record in this case, notice of the Motion and the hearing on the Motion

13   having been proper, the court not being aware of any reason to doubt that the parties to the sale

14   transactions are progressing with the transactions in good faith, and other good cause

15   appearing,

16

17   **IT IS HEREBY ORDERED AS FOLLOWS:** [1]

18   1.    The Motion is granted.

19   2.    The terms and conditions of, and the transactions contemplated by, the APA

20   between Debtor and Purchaser are hereby authorized and approved in all respects; and,

21   pursuant to sections 363 and 365 of the Bankruptcy Code, Debtor is hereby fully authorized and

22   empowered to (a) execute, deliver, perform under, consummate, and implement the APA,

23   (b) execute all additional instruments and documents that may be reasonably necessary or

24   desirable to implement the APA and the transactions contemplated thereby, (c) take all further

25   actions as may be necessary or appropriate for the purpose of assigning, transferring, granting

26

27

28   ---
[1]    Capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the Motion.

or conveying its interest in the Assigned Assets, as that term is defined in the APA, to the Purchaser as contemplated by the APA, and (d) take such other and further steps as are contemplated thereby to fulfill its obligations thereunder or as may be necessary to effectuate the terms of this Order.

3.    Pursuant to section 363(f) of the Bankruptcy Code, and Bankruptcy Rule 6004, upon the Closing, the conveyance and assignment of the Assigned Assets pursuant to the APA will be a legal, valid, and effective transfer of the Assigned Assets to the Purchaser, and will vest the Purchaser with all right, title and interest of the Debtor in and to the Assigned Assets free and clear of all Encumbrances, as that term is defined in the APA, and successor liabilties.

4.    Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  A certified copy of this Order shall be accepted by any federal, state or local recording or filing authority as evidence of the discharge of all Encumbrances and claims against the Assigned Assets (the "Claims").

5.    As a result of the foregoing, all persons or entities, including any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), holding any Encumbrances against the Assigned Assets or asserting any Claims against the Debtor are forever barred and estopped from asserting any such Encumbrances or Claims against the Purchaser, the Assigned Assets, or any other assets of the Purchaser.  This Court shall retain exclusive jurisdiction to enforce this Order to bar the enforcement or assertion of any Encumbrances or Claims against the Purchaser or the Assigned Assets.

6.    On and after the Closing (as defined in the APA), the holders of Claims and Encumbrances are directed to execute such documents and take all other actions as may be reasonably necessary to terminate and expunge such Encumbrances and Claims against the

Assigned Assets as such Claims or Encumbrances may have been recorded or may otherwise exist.   To the extent that any holder of Claims or Encumbrances refuses to execute such documents as may be necessary to terminate and expunge any Encumbrances and Claims against the Assigned Assets prior to Closing, the Debtor and the Purchaser are authorized to take such actions unilaterally, including without limitation, filing UCC-3 Termination Statements to release any Lien on the Assigned Assets.

7.    The consideration to be paid by the Purchaser pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or the District of Columbia.   The consideration provided by Buyer for the Assigned Assets under the APA is fair and reasonable and the sale of the Assigned Assets may not be avoided under 11 U.S.C. § 363(n).

8.    Upon the Closing, the secured debt of Kuda Group, LLC ("Kuda") as against the Debtor and the Assigned Assets shall be deemed satisfied in full and extinguished.

9.    The Debtor's assumption and assignment to Purchaser of the Lease is hereby approved, with such assumption and assignment to be effective as of the date of the Closing.

10.    Upon assumption and assignment of the Lease to Purchaser, *inter alia*, the following provisions of the Lease shall be seemed in full force and effect as to the Purchaser and its rights thereunder:

a.    The extension option permitting Purchaser to extend the term of the Lease for three five-year extension periods on the terms set forth in the Lease (Rider 1 to the Lease);

b.    The right of first refusal (Rider 2 to the Lease);

c.    Purchaser's use of the Premises as a restaurant, bar and hospitality venue; and

4

d.     Purchaser's proposed signage commensurate with such use.

11.     Based on the evidence submitted in support of the Motion with respect to "cure" payments in connection with the Lease, the required "cure" amount is $25,000.00, which shall be paid solely by Purchaser upon Closing.

12.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not substantially or materially alter the essential terms therein. The APA, and all transactions contemplated thereby, shall be binding upon any successors in interest, including without limitation any chapter 11 trustee, chapter 7 trustee or other responsible officer appointed for any of the parties thereto. The APA shall not be subject to rejection in this chapter 11 case or in any converted chapter 7 case.

13.     The Purchaser is hereby granted the benefits and protections of section 363(m) of the Bankruptcy Code, as a good faith purchaser and assignee, in connection with the Assigned Assets. No portion of the Assigned Assets to be sold and assigned pursuant to the APA shall be severable for mootness or any other purpose from any other portion of the Assigned Assets, and the sale of the Assigned Assets shall constitute but one nonseverable transaction under section 363 of the Bankruptcy Code.

14.     This Court hereafter shall and does retain exclusive jurisdiction: (a) to interpret, construe, enforce and implement the terms and provisions of the APA and this Order, all amendments thereto, any waivers and consents thereunder, any agreements executed in connection therewith, and any and all disputes that may arise under the APA or this Order as between the Debtor and the Purchaser; (b) to hear and determine any and all disputes between the Debtor and/or the Purchaser, as the case may be, and any third parties relating to the APA;

(c) compel delivery and payment of the consideration provided for under the APA; (d) resolve any disputes, controversies or Claims arising out of or relating to the APA; and (e) interpret, implement, and enforce the provisions of this Order; provided, however, in the event that this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause, or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and, shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

15.    The ten (10) day stay of order provided in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure is hereby waived.

16.    Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order of confirmation confirming any plan of reorganization (or liquidation) shall conflict with or derogate from the provisions of the APA or the terms of this Order.

17.    The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan of reorganization for the Debtor or converting the Debtor's case from chapter 11 to a case under chapter 7 of the Bankruptcy Code.

18.    This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate and creditors, and Purchaser, and its successors and assigns. The Debtor and Purchaser shall be entitled to enforce the terms and provisions of this Order.

19.    All persons or entities that are in possession of some or all of the Assigned Assets on the Closing are hereby directed to surrender possession of the Assigned Assets to Purchaser at Closing.

###

| | |
|---|---|
| In re:<br>SONA, LLC,<br><div align="right">Debtor(s).</div> | CHAPTER  11<br><br>CASE NUMBER  2:09-36434-ER |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as **NOTICE OF MOTION AND MOTION OF DEBTOR FOR ORDER ESTABLISHING SALE PROCEDURES FOR SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID MYERS SUBMITTED IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.   **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 2, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    * Richard Burstein    rburstein@ebg-law.com, ecf@ebg-law.com
    * Daniel H Gill    ecf@ebg-law.com, dgill@ebg-law.com
    * David B Golubchik    dbg@lnbrb.com
    * Dare Law    dare.law@usdoj.gov
    * Krikor J Meshefejian    kjm@lnbrb.com
    * United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

<div align="center">☐  Service information continued on attached page</div>

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On  **June 2, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA U.S. MAIIL**
20 Largest Creditors
(see attached service list)

<div align="center">☒  Service information continued on attached page</div>

(PROOF OF SERVICE CONTINUED ON FOLLOWING PAGE)

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 2, 2010**  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL**

U.S. Trustee
Attn: Dare Law
725 S. Figueroa Street, Ste. 2600
Los Angele,s CA  90017
E-mail: dare.law@usdoj.gov

Walter Schild
E-mail: walter@dilson.com

Counsel for Landlord
Howard Camhi
Ervin Cohen & Jessup LLP
9401 Wilshire Boulevard   , Ninth Floor
Beverly Hills, CA 90212-2974
E-mail:  hcamhi@ecjlaw.com

**VIA ATTORNEY SERVICE**
Hon. Ernest Robles
United States Bankruptcy Court, Central District of California
255 E. Temple Street, Ctrm 1568
Los Angeles, CA  90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| **June 2, 2010** | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*    **F**                                                                                                    **9013-3.1**

In re Sona, LLC.
Case No. 2:09-bk-36434

20 Largest Unsecured Creditors

**SERVICE VIA U.S. MAIL UNLESS
INDICATED AS SERVED VIA NEF (\*)**

Office of the U.S. Trustee \*
725 S. Figueroa Street, Ste. 2600
Los Angeles, CA  90067

Glick, Glick & Lewis
2630 S. Beverly Drive
Los Angeles, CA  90034

Michael Morris
460 Loring Avenue
Los Angeles, CA  90024

Milton Road Trading Company LLC
c/o Cameron Hobel
4209 Van Buren Place
Culver City, CA  90232

Ecolab
PO Box 100512
Pasadena, CA  91189-0512

Worldwide Produce
1661 McGarry Street
Los Angeles, CA  90021

LA County Treasurer
Tax Collector
PO Box 54978
Los Angeles, CA  90054-0978

International Marine Products
500 E. 7th Street
Los Angeles, CA  90014

Epicure Imports, Inc.
c/o Accounting Dept.
PO Box 225
Santa Clara, CA  95052-0225

Wine Warehouse
PO box 910900
Los Angeles, CA  90091

King Valet Parking Inc.
PO Box 545
San Gabriel, CA  91776

SeafoodS.com, Inc.
13310 S. Ridge Drive, Ste. B
Charlotte, NC  28273

Young's Market Company
PO Box 30145
Los Angeles, CA  90030-0145

Micros Systems, Inc.
15302  Pipeline Lane
Huntington Beach, CA  92649

Santa Monica Seafood
18531 S. Broadwick Street
Rancho Dominguez, CA  90220

Newport Meat Company
PO Box 19726
Irvine, CA  92623-9726

Mendez Cleaning
1631 7th Ave.
Los Angeles, CA  90019

Shiverick-Jones Wine Hourglass
1104 Adams Street, Suite 103
St. Helena, CA  94574

Frank-Lin
PO Box 60048
Los Angeles, CA  90060-00048

Elysian Field Farms LLC
844 Craynes Fun Road
Waynesburg, PA  15370

Danko Foods, Inc.
PO Box 7013
Laguna Niguel, CA 92607