1  DAVID B. GOLUBCHIK (SBN 185520)
   dbg@lnbyb.com
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   ctp@lnbyb.com
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
4  10250 Constellation Blvd., Suite 1700
   Los Angeles, California 90067
5  Telephone: (310) 229-1234
   Facsimile:  (310) 229-1244
6
7  Attorneys for Chapter 11
   Debtor and Debtor in Possession
8

9            **UNITED STATES BANKRUPTCY COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
10                **LOS ANGELES DIVISION**

11 | In re | ) Case No. 2:09-bk-36434-ER |

12                                    )
   SONA, LLC,                         ) Chapter 11
13                                    )
          Debtor and Debtor in Possession.  ) **NOTICE OF MOTION AND MOTION**
14                                    ) **AUTHORIZING SALE OF DEBTOR'S**
                                      ) **ASSETS FREE AND CLEAR OF ALL**
15                                    ) **LIENS, CLAIMS, ENCUMBRANCES AND**
                                      ) **OTHER INTERESTS PURSUANT TO**
16                                    ) **SECTIONS 105, 363 AND 365 OF THE**
                                      ) **BANKRUPTCY CODE; MEMORANDUM**
17                                    ) **OF POINTS AND AUTHORITIES;**
                                      ) **DECLARATIONS OF DAVID MYERS,**
18                                    ) **WALTER SCHILD AND DAVID KORAL**
                                      ) **SUBMITTED IN SUPPORT THEREOF**
19                                    )
20                                    )
                                      ) **HEARING**
21                                    ) Date: July 28, 2010
                                      ) Time: 11:00 a.m.
22                                    ) Place: 255 E. Temple St.
                                      )        Courtroom 1568
23                                    )        Los Angeles, CA  90012
24                                    )
25 _____ )
26
27
28

1

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 5

I.   JURISDICTION AND VENUE ........................................................................................ 5

II. FACTUAL BACKGROUND ............................................................................................ 5

    A.   Background .............................................................................................................. 5

    B.   Significant Events During Bankruptcy .................................................................... 6

    C.   Cessation of Operations and Negotiation of Purchase Agreement .......................... 7

    D.   Consent by Secured Creditor ................................................................................... 9

    E.   Assignment of Lease .............................................................................................. 10

III.   DISCUSSION ................................................................................................................ 13

    A.   THE COURT SHOULD AUTHORIZE THE DEBTOR TO SELL
         THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
         INTERESTS AND ENCUMBRANCES ................................................................ 13

    1.   The Debtor Has Complied With All Notice Requirements
        Under the Bankruptcy Code, Federal Rules of Bankruptcy
        Procedure, and Local Bankruptcy Rules Governing the
        Sale of the Property .............................................................................................. 13

    2.   The Motion Should Be Approved Because Good
        Business Reasons Exist to Grant the Motion, the
        Purchase Price for Assets is Fair and Reasonable,
        and the Proposed Sale is in the Best Interests of the
        Creditors and the Estate ....................................................................................... 15

        a.   Sound Business Purpose ......................................................................... 15

        b.   Fair and Reasonable Price ...................................................................... 16

        c.   Adequate Marketing ............................................................................... 17

        d.   Good Faith .............................................................................................. 17

        e.   Accurate and Reasonable Notice ............................................................ 18

3.     The Sale Should be Free and Clear of All Liens,
Claims, Interests and Encumbrances Under 11 U.S.C. §363(f) ............................ 18

        a.     The Sales Should Be Approved Under
11 U.S.C. § 363(f)(2) ................................................................................ 19

B.     THE COURT SHOULD AUTHORIZE DEBTOR TO
ASSUME AND ASSIGN THE LEASE TO PURCHASER ................................ 19

1.     There Are Sound Business Reasons To Support The
Debtor's Decision To Assume The Leases ............................................................. 19

2.     The Debtor Is Able To Provide "Adequate Assurance Of
Future Performance" Under Section 365(b)(1) Of The
Bankruptcy Code For The Lease To Be Assumed ................................................... 21

C.     DEBTOR REQUESTS THE COURT TO WAIVE THE
14-DAY WAITING PERIODS SET FORTH IN
BANKRUPTCY RULES 6004(h) AND 6006(d) .................................................. 22

IV.     CONCLUSION ...................................................................................................................... 22

DECLARATION OF DAVID MYERS ...................................................................................... 24

DECLARATION OF WALTER SCHILD .................................................................................. 28

DECLARATION OF DAVID KORAL......................................................................................... 30

EXHIBIT A............................................................................................................................... 34

EXHIBIT B............................................................................................................................... 105

EXHIBIT C............................................................................................................................... 111

EXHIBIT D............................................................................................................................... 133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

1

2                              **TABLE OF AUTHORITIES**

3                                                                          **Page(s)**

4    **CASES**

5    In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ................................................. 15

6    In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991) ......... 15, 16, 17

7    In re The Landing, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993) ..................................... 15

8    In re Mama's Original Foods, Inc., 234 B.R. 500, 502-505 (C.D. Cal. 1999) .............................. 15

9    Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) ........................... 15

10   In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985) ..................................... 16

11   Big Shanty Land Corp. v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga.
12   1985) ........................................................................................................ 16

13   In re Alpha Industries, Inc., 84 B.R. 703, 705 (Bankr. Mont. 1988) ............................... 16

14   In re Abbotts Dairies, 788 F.2d at 149 ....................................................................... 17

15   In re Karpe, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988) ................................................. 18

16   In re Whittemore, 37 B.R. 93, 94 (Bankr. D. Or. 1984) ............................................... 19

17   In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996) ................................... 19

18   In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995) ............... 19

19   In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) ....................................................... 19

20   Durkin v. Benedor Corp. (In re G.I. Indus., Inc.), 204 F.3d 1276, 1282 (9th Cir. 2000) ............. 19

21   In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990) ..................... 19

22   In re FCX, Inc., 60 B.R. 405, 411 (E.D.N.C. 1986) ................................................... 19, 20

23   In re Chipwich, Inc., 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985) ..................................... 20

24   Comm'l Fin. Ltd. v Hawaii Dimensions, Inc. (In re Hawaii Dimensions, Inc.), 47 B.R.
25   425, 427 (D. Haw. 1985) ....................................................................................... 20

26   In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991) ............................... 20

27   Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310 (Bankr. D.Utah 1981) .......... 20

*In re Embers 86th Street, Inc.*, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995) .................................. 20

*In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1033 (9th Cir. 1997) ............................ 21

**STATUTES**

11 U.S.C. 101(31) ............................................................................................................ 17, 18

11 U.S.C. § 102(1)(A) ............................................................................................................ 13

11 U.S.C. § 363(b)(1) ...................................................................................................... 13, 17

11 U.S.C. § 363(f) ............................................................................................................ 18, 19

11 U.S.C. § 363(f)(2) .............................................................................................................. 19

11 U.S.C. § 365(b) .................................................................................................................. 21

11 U.S.C. § 705 ...................................................................................................................... 14

11 U.S.C. § 1102 .................................................................................................................... 14

11 U.S.C. §§ 1107 and 1108 ................................................................................................... 5

28 U.S.C. §§ 157 and 1334 ...................................................................................................... 5

28 U.S.C. § 157(b)(2)(A), (G), (M) and (O) ........................................................................... 5

28 U.S.C. §§ 1408 and 1409 .................................................................................................... 5

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k) .................................................................. 13

Fed. R. Bankr. P. 6004(a) ..................................................................................................... 13

Fed. R. Bankr. Pro. 6004(a) and 2002(a)(2), (c)(1), (i) and (k) ......................................... 14

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL UNSECURED CREDITORS, SECURED CREDITOR, PARTIES REQUESTING SPECIAL NOTICE, AND ALL OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, on July 28, 2010, at 11:00 p.m., before the Honorable Ernest Robles, United States Bankruptcy Judge, Sona, LLC, Chapter 11 debtor and debtor in possession (the "Debtor") will move the Bankruptcy Court for an order authorizing sale of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Motion").

In summary, the Debtor ceased operations. The Debtor's sole valuable assets include its liquor license (the "Liquor License") and lease for its business premises (the "Lease", and collectively with the Liquor License, the "Assets"). In order to maximize the value of its estate for the benefit of all creditors, the Debtor sought a potential purchaser for its Lease and valuable Liquor License.

KBKW, LLC ("Purchaser") provided the Debtor with the highest and best offer for the purchase of the Assets. After extensive negotiations, the Debtor and Purchaser entered into that certain Purchase Agreement (the "APA"), a true and correct copy of which is attached as Exhibit "A" to the accompanying Declaration of David Myers. The salient terms of the APA are as follows:

1.    The Debtor will assume and assign the Lease to Purchaser, including all rights thereunder;

2.    The Debtor will transfer the Liquor License to Purchaser; and

3.    Purchaser will pay to the estate $150,000 in consideration of transfer of the foregoing Assets.

On June 28, 2010, the Court entered an order (the "Procedures Order"), a copy of which is attached to the Declaration of David Myers as Exhibit "B", granting the Debtor's motion for an order establishing procedures for the sale of the Assets free and clear of all liens, claims, encumbrances and other interests pursuant to Sections 105, 363 and 365 of the Bankruptcy Code. Pursuant to the Procedures Order:

1. Any party interested in bidding on the Assets (the "Interested Party") must provide a \$50,000 deposit to Debtor, which shall be deemed to be nonrefundable in the event that the Court determines that the Interested Party is the successful bidder for the Assets, with such deposit to be received by Debtor's counsel not later than 14 days before the hearing to approve sale of the Assets (the "Sale Hearing");

2. In addition to the foregoing \$50,000 deposit, the Interested Party must submit an asset purchase agreement substantially in the form as that attached to the Motion with its proposed changes, as well as proof of funds to close the transaction, not later than 14 days before the Sale Hearing;

3. In the event that the Debtor receives qualified and timely bids and deposits, as set forth above, an auction for the Assets (the "Auction") will take place in Debtor's bankruptcy counsel's office two (2) business days before the scheduled sale hearing at 10:00 a.m., allowing the Debtor an opportunity to report the result of the auction to the Court by the time of the Sale Hearing, as well as address any other concerns or objections related thereto;

4. At the Auction, the initial overbid will be \$30,000, with \$5,000 increments thereafter; and

5. In the event that the Court determines that someone other than KBKW, LLC ("KBKW") is the winning bidder, KBKW will be entitled to break-up fee of \$25,000, which will be paid upon closing of the transaction with the winning bidder.

3

**PLEASE TAKE FURTHER NOTICE** that the Sale Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of David Myers, Walter Schild and David Koral submitted herewith, Local Bankruptcy Rules 6004-1 and 6006-1, the records and files in this Chapter 11 case, and such additional evidence and argument as may be presented at or before the hearing on the Sale Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 6004-1(b)(4), any party wishing to respond to the Sale Motion must file with the Bankruptcy Court and serve on counsel for the Debtor a written response at least one (1) day before the hearing. Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be consent to the granting of the relief requested in the Sale Procedures Motion.

Dated: July 7, 2010           LEVENE, NEALE, BENDER,
                             YOO & BRILL, L.L.P.

                      By:    */s/ David B. Golubchik*
                              DAVID B. GOLUBCHIK
                              KRIKOR J. MESHEFEJIAN
                              Attorneys for Debtor in Possession

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### JURISDICTION AND VENUE

4      Sona, LLC, debtor and debtor in possession herein (the "Debtor"), commenced its

5   bankruptcy case by filing a Voluntary Petition under Chapter 11 of the Bankruptcy Code on

6   September 30, 2009 ("Petition Date"). The Debtor continues to manage its financial affairs as a

7   debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

8      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334  This

9   matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core

10   proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O). Venue of this case is proper

11   in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief

12   requested in this Sale Motion are Section 105, 363 and 365 of the United States Code (the

13   "Bankruptcy Code"), and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy

14   Procedure ("FRBP").

15

### II.

16

### FACTUAL BACKGROUND

17   **A.     Background**

18      The Debtor is the creation of David Myers, one of the top chefs and restaurateurs in the

19   United States. The Debtor is the owner and operator of Sona, one of the top restaurants in Los

20   Angeles.  Its food has won national and international acclaim year after year.  The Debtor

21   operated from an approximate 3,000 square foot location at 401 La Cienega Blvd, Los Angeles,

22   California pursuant to a nonresidential real property lease (the "Lease"). In connection with its

23   business operations, the Debtor owned all necessary restaurant equipment and supplies (the

24   "Restaurant Assets"), as well as intellectual property (the "IP") necessary for the operation of the

25   Sona restaurant. Additionally, the Debtor owned a substantial wine inventory ("Wine") related

26   to such operations. The Restaurant Assets, IP and Wine (collectively, the "Sona Assets") were

27

28

5

1  pledged as collateral to secure an obligation due and owing by the Debtor to GemCap Lending I,

2  LLC ("GemCap"), its pre-petition lender, in the principal amount of $1,000,000.

3  **B.    Significant Events During Bankruptcy**

4
5      On September 30, 2009, the date of the instant bankruptcy filing, GemCap allegedly held

6  a foreclosure sale of the Sona Assets to GemCap Asset Holdings, LLC ("GAH"), which the

7  Debtor disputed.    Based on the fact that the Debtor disputed the validity of the alleged

8  foreclosure sale, and to preserve the value of the business, the Debtor continued operating the

9  restaurant.

10      Shortly after commencement of this case, GAH commenced an adversary proceeding

11  against the Debtor and other third parties, bearing Adversary No. 2:09-ap-02262-ER, seeking a

12  restraining order enjoining the operations of the restaurant and a writ of possession over the

13
14  assets of the estate and asserting claims for damages.    The Debtor opposed the motions and was

15  joined in the oppositions by the remaining defendants.

16      Ultimately, the Debtor, GemCap, and GAH entered into a settlement agreement (the

17  "Settlement Agreement") to resolve their disputes.    The Court approved that settlement

18  agreement pursuant to a Court order entered on December 16, 2009.  The Debtor also sought

19  additional relief from the Court in the form of authority to obtain post-petition financing (the

20
21  "Financing Transaction") and enter into an asset leasing transaction (the "Lease Transaction") so

22  that the Debtor would be able to continue the operation of its restaurant.    The Court has also

23  approved the Financing Transaction and the Lease Transaction.    The Settlement Agreement,

24  Financing Transaction and Lease Transaction had, among other, the following primary effects

25  upon the Debtor's estate:

26      1.    The pre-petition foreclosure sale of the Debtor's assets (the "Sona Assets") by

27  GemCap to GAH in the amount of was deemed valid and enforceable;

28
6

2.    GAH sold the Sona Assets to Kuda Group, LLC ("Kuda");

3.    Kuda and the Debtor entered into an agreement pursuant to which the Debtor will be able to continue utilizing the Sona Assets for operations;

4.    Kuda extended a $100,000 post-petition secured credit line to the Debtor.

Meanwhile, the Debtor discovered that there is group of assets consisting of various restaurant equipment (the "Remaining Equipment") and wine inventory (and "Remaining Wine' ) that has not been released to Kuda or the Debtor. Since Kuda purchased essentially all of the Sona Assets (except for the lease and liquor license), Kuda was entitled to obtain the Remaining Equipment and Remaining Wine, and the Debtor is entitled to utilize the Remaining Equipment and Remaining Wine in the course of its business operations pursuant to the Settlement Agreement and Lease Transaction.

The Remaining Equipment was found to be in the possession of Mehdi Iloulian ("Iloulian") who is the owner of certain real property located at 418 La Cienega Blvd., Los Angeles, California, a location where FAVI had authorized and directed the storage of certain of the Debtor's equipment, including the Remaining Equipment. As for the Remaining Wine, they were found to be stored in a separate location, in Marina Del Rey, controlled by Otto Schmid ("Schmid"), former Chairman of FAVI. This Court granted the Debtor's motion to compel release of the Remaining Equipment from Iloulian and the Remaining Wine from Schmid at the hearing held on such motion on January 20, 2010.

C.    **Cessation of Operations and Negotiation of Purchase Agreement**

The Debtor's restaurant operations ceased on May 15, 2010. The remaining assets of the Debtor included the Lease, a true and correct copy of which is attached to the Declaration of David Myers as Exhibit "C", as well as its liquor license related to its operations (the "Liquor License" and collectively with the Lease, the "Assets").

7

1    In order to maximize the value of its estate for the benefit of all creditors, the Debtor

2    sought a potential purchaser for its Lease and valuable Liquor License.  Such efforts included

3    numerous discussions with business brokers and real estate brokers, as well as other

4    restauranteurs, who may be interested in the prime location of the Debtor's restaurant.

5

6    After extensive efforts, KBKW, LLC ("Purchaser" or "KBKW") provided the Debtor

7    with the highest and best offer for the purchase of the Assets.  After extensive negotiations, the

8    Debtor and Purchaser entered into that certain Purchase Agreement (the "APA"), a true and

9    correct copy of which is attached as Exhibit "A" to the accompanying Declaration of David

10   Myers.  The salient terms of the APA are as follows:

11       1.      The Debtor will assume and assign the Lease to Purchaser, including all rights
12               thereunder;
13
14       2.      The Debtor will transfer the Liquor License to Purchaser; and

15       3.      Purchaser shall pay to the estate $150,000 in consideration of transfer of the
16               foregoing Assets.

17   One of the Purchaser's requirements, as set forth in Section 6.6 of the APA, was for the

18   Debtor to obtain certain bid procedures in connection with the proposed sale transaction.  On

19   June 28, 2010, the Court entered an order (the "Procedures Order"), a copy of which is attached
20
21   to the Declaration of David Myers as Exhibit "B", granting the Debtor's motion for an order

22   establishing procedures for the sale of the Assets free and clear of all liens, claims,

23   encumbrances and other interests pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

24   Pursuant to the Procedures Order:

25       1.  Any party interested in bidding on the Assets (the "Interested Party") must provide a
26           $50,000 deposit to Debtor, which shall be deemed to be nonrefundable in the event
27           that the Court determines that the Interested Party is the successful bidder for the
28

8

Assets, with such deposit to be received by Debtor's counsel not later than 14 days before the hearing to approve sale of the Assets (the "Sale Hearing");

2. In addition to the foregoing $50,000 deposit, the Interested Party must submit an asset purchase agreement substantially in the form as that attached to the Motion with its proposed changes, as well as proof of funds to close the transaction, not later than 14 days before the Sale Hearing;

3. In the event that the Debtor receives qualified and timely bids and deposits, as set forth above, an auction for the Assets (the "Auction") will take place in Debtor's bankruptcy counsel's office two (2) business days before the scheduled sale hearing at 10:00 a.m., allowing the Debtor an opportunity to report the result of the auction to the Court by the time of the Sale Hearing, as well as address any other concerns or objections related thereto;

4. At the Auction, the initial overbid will be $30,000, with $5,000 increments thereafter; and

5. In the event that the Court determines that someone other than KBKW is the winning bidder, KBKW will be entitled to break-up fee of $25,000, which will be paid upon closing of the transaction with the winning bidder.

## D.     Consent By Secured Creditor

The only secured creditor in this case is Kuda, who asserts a secured claim in the amount of $100,000, who consents to the sale free and clear of its lien, provided that the outstanding amount of the secured claim is paid from sale proceeds. Additionally, as the owner of the Sona Assets previously leased to the Debtor, as discussed above, Kuda was interested in selling such fixtures, equipment and inventory which were located at the Debtor's premises. The Debtor is advised and understands that Kuda entered into an agreement with Purchaser pursuant to which

9

Purchaser has agreed to purchase the Sona Assets from Kuda for $222,500. Provided that such sale occurs, Kuda has agreed to waive $50,000 of its secured claim against the estate. As a result, the net benefit to the estate is an additional $50,000 on top of the $150,000. To the extent that any other interested party is interested in the Sona Assets currently owned by Kuda, the Debtor understands that such parties may contact Kuda directly.

**E.    Assignment of Lease**

Pursuant to the Motion, the Debtor seeks to assume and assign its valuable Lease. Pursuant to the Debtor's records, the Debtor has remained current with respect to all obligations under the Lease. Arguably, the only default is the fact that the Debtor did not fund the $25,000 security deposit to be held in a third-party escrow account pursuant to the terms of the Lease agreement, although the landlord has not demanded such payment and the Debtor submits that this provision was waived or inapplicable based on the doctrine of laches. However, as set forth in the APA, the Purchaser has agreed to fund this amount and, therefore, the Debtor submits that this potential default, which the Debtor disputes is a default, is being cured in connection with the assumption and assignment of Lease.

If there is no default and no cure requirement under Section 365 of the Bankruptcy Code, then adequate assurance of future performance is not required. In an overabundance of caution, Purchaser has provided sufficient evidence to support its adequate assurance of future performance under the Lease.

Management of the Purchaser, who will operate a restaurant at the subject premises, will be headed by the following individuals:

1.    David Koral, Managing Member of Real Restaurant Group ("RRG"), the sole managing member of Purchaser, and CEO of Chosen Hospitality;

2.    Matt Bendik, Managing Member of RRG and President of Chosen Hospitality;

10

3. Michael Kassar, General Manager & Partner of RRG, Director of Operations of Chosen Hospitality, and General Manager of Voyeur; and

4. Micah Wexler, Partner & Executive Chef of RRG.

As CEO of Chosen Hospitality and Managing Member of RRG, Mr. Koral is responsible for overseeing the growth and expansion of all projects and business developments. Mr. Koral has played an instrumental role in the concept and development of the group's first venue, Voyeur. A graduate of UCLA where he was drafted to play football, Mr. Koral played two seasons in the NFL for the Indianapolis Colts and the Tennessee Titans. In addition to his role at Chosen Hospitality and RRG, Mr. Koral currently serves as the President of Big Boom Media and President of the Koral Family Business Group. He resides in Los Angeles, CA.

Mr. Bendik, formerly the Vice President of Development for Andrew Sasson's Light Group in Las Vegas, has a wealth of project management experience, having handled developments both domestically and abroad in Los Angeles, Las Vegas, Hawaii, Dubai, India and Belize. In his roles with Chosen Hospitality and RRG, Mr. Bendik oversees all operations at Voyeur, as well as strategic project development of all RRG's ventures. Born and raised in Los Angeles, Matt Bendik graduated from Palisades Charter High School before attending the prestigious School of Hotel Administration at Cornell University in Ithaca, NY. He resides in Los Angeles, CA.

A New York Native, Michael Kassar has always had a taste for impeccable service. Born and raised on the Upper East Side of Manhattan, Mr. Kassar was selected for admission at Cornell University's School of Hotel Administration where he received his BA. While attending Cornell, Mr. Kassar spent multiple summers working for top New York City restaurateurs including Drew Nieporant, Daniel Bouloud and Danny Meyer. Upon graduation, Mr. Kassar spent time in Europe, training at the prestigious La Taverna Righi in San Marino, and famed

11

three-star Michelin restaurant Martin Berasategui in San Sebastin, Spain, until being recruited to serve as Manager of the renowned Spago in Beverly Hills. While at Spago, he directed all front of house operations and helped the establishment earn two Michelin stars, Zagat's title of Most Popular Restaurant in Los Angeles and a James Beard Award for Outstanding Service. In addition to his role as Director of Operations at Chosen Hospitality, Mr. Kassar serves as General Manager for Voyeur and Real Restaurant Group's ventures, including the planned venture at the former Sona location.

Born and raised in Los Angeles, Chef Micah Wexler brings over 12 years of restaurant industry experience to Real Restaurant Group and Chosen Hospitality. Mr. Wexler got his start working alongside famed Italian chef Gino Angelini at Vincenti restaurant in Los Angeles before attending Cornell University where he earned his BA in Hotel Administration. Mr. Wexler's affinity for cuisine continued to flourish while he worked at several of LA's top dining establishments, including Mellise and Patina. Mr. Wexler then traveled to Europe for jobs at Restaurant Righi in Italy and to shadow Chef Martin Berasategui in Spain before being recruited to be a part of the opening team for Chef Joel Robuchon - the most celebrated Chef in the world. Prior to Chosen Hospitality, Mr. Wexler served as Sous Chef for Tom Colicchio at Craft. He currently is a private chef in Malibu and oversees all in-house catering for Voyeur in West Hollywood. He will be the Executive Chef for the planned venture at the former Sona location.

The foregoing demonstrates that Purchaser has assembled a top-notch management team to operate the restaurant at the current facility successfully. In addition to the foregoing, Purchaser has considered starting costs, both pre-opening and post-opening, to determine whether it will be able to comply with its obligations under the Lease on a going forward basis. Attached to the Declaration of David Koral as Exhibit "A" is a true and correct copy of an Income Statement prepared by the Purchaser with respect to commencing operations at the

12

1    Debtor's location.   The Income Statement includes all obligations due and owing under the

2    Lease, as well as all other operating expenses.   As set forth therein, Purchaser will have

3    absolutely no problems remaining current with respect to its obligations under the Lease. More

4    importantly, the Lease obligations are very modest (only 4.1% of the total expenses). It may be a

5

6    different situation where the Lease obligations are a large portion of expenses. However, under

7    the circumstances of this case, Purchaser is absolutely certain that it will be able to comply with

8    its obligations under the Lease.  Debtor, therefore, believes that adequate assurance of future

9    performance is demonstrated herein.

10                                              **III.**

11                                        **DISCUSSION**

12

13    **A.    THE COURT SHOULD AUTHORIZE THE DEBTOR TO SELL THE ASSETS
          FREE   AND   CLEAR   OF   ALL   LIENS,   CLAIMS,   INTERESTS   AND
14          ENCUMBRANCES**

15          **1.    The Debtor Has Complied With All Notice Requirements Under the
                 Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local**
16          **Bankruptcy Rules Governing the Sale of the Property.**

17          Section 363(b)(1) provides that the Debtor, "after notice and a hearing, may use, sell or

18    lease, other than in the ordinary course of business, property of the estate."   11 U.S.C.

19    § 363(b)(1).   Section 102(1) defines "after notice and a hearing" as after such notice as is

20    appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in

21    the particular circumstances. 11 U.S.C. § 102(1)(A).

22          Rule 6004(a) of the Federal Rules of Bankruptcy Procedure provides in pertinent part that

23    notice of a proposed sale not in the ordinary course of business must be given pursuant to Fed. R

24    Bankr. P. 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with section 363(b)(2)

25    of the Bankruptcy Code. Fed. R. Bankr. P. 6004(a).  Rule 2002(a)(2) requires at least 20 days'

26    notice by mail of a proposed sale of property of the estate other than in the ordinary course of

27    business, unless the Court for cause shown shortens the time or directs another method of giving

28    notice.  Fed. R. Bankr. P. 2002(a)(2).  Rule 2002(c)(1) requires that the notice of a proposed sale

                                              13

1  include the date, time and place of any public sale, the terms and conditions of any private sale

2  and the time fixed for filing objections. It also provides that the notice of sale or property is

3  sufficient if it generally describes the property. Fed. R. Bankr. P. 2002(c)(1). Rule 2002(i)

4  requires that the notice be mailed to committees elected pursuant to 11 U.S.C. § 705 or appointed

5  pursuant to 11 U.S.C. § 1102.[1] Fed. R. Bankr. P. 2002(i). Rule 2002(k) requires that the notice

6  be given to the United States Trustee. Fed. R. Bankr. P. 2002(k).

7      Rule 6004(c) provides that a motion for authority to sell property free and clear of liens or

8  other interests must be made in accordance with Rule 9014 and must be served on the parties

9  who have liens or other interests in the property to be sold. Fed. R. Bankr. P. 6004(c).

10     Local Bankruptcy Rule 9013-1(d)(2) requires that a notice of motion and motion be

11  served at least 21 days before the hearing on the date specified in the notice. L.B.R. 9013-

12  1(d)(2).

13     In addition, Local Bankruptcy Rule 6007-1(f) requires that an additional copy of the

14  Notice be submitted to the Clerk of the Bankruptcy Court together with a document Form 6004-2

15  at the time of filing for purposes of publication. L.B.R. 6007-1(f).

16     The Debtor has complied with all of the above provisions of the Bankruptcy Code, the

17  Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules. The Debtor has

18  complied with Fed. R. Bankr. Pro. 6004(a) and 2002(a)(2), (c)(1), (i) and (k), because the Notice

19  that has been filed contemporaneously herewith, which includes the date time and place of the

20  sale and the deadline for objecting thereto, was served on the United States Trustee, all of the

21  Debtor's known creditors, and all parties requesting special notice. The Debtor has complied

22  with Rule 6004(c), because the Notice and Motion were also served upon the parties who have

23  alleged liens or interests in accordance with the attached preliminary title report. The Debtor has

24  complied with the requirements of Local Bankruptcy Rule 6007-1(f) because the Debtor has

25  filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court.

26  _____

27

28  [1] As of the date of this Motion, no official committee of unsecured creditors has been appointed in this case.

14

2.    **The Motion Should Be Approved Because Good Business Reasons Exist to Grant the Motion, the Purchase Price for Assets is Fair and Reasonable, and the Proposed Sale is in the Best Interests of the Creditors and the Estate.**

As a general matter, a Court considering a motion to approve a sale under Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). In addition, the Court must further find it is in the best interest of the estate. To make this determination, a Court should consider whether:

(1)    the sale is fair and reasonable, i.e., the price to be paid is adequate;

(2)    the property has been given adequate marketing;

(3)    the sale is in good faith, i.e., there is an absence of any lucrative deals with insiders, and

(4)    adequate notice has been provided to creditors.

In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); In re The Landing, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); In re Mama's Original Foods, Inc., 234 B.R. 500, 502-505 (C.D. Cal. 1999). The Debtor submits that the proposed sales of the Property free and clear of liens, claims, and interests satisfy each of these requirements.

a.    **Sound Business Purpose.**

The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).

The facts pertaining to the sale at issue here amply substantiate the Debtor's business decision that the contemplated sale of the Assets serves the best interests of the estate's creditors

15

1    and merits the approval of this Court. As discussed above, the Debtor ceased operations. The

2    Assets have value which can be monetized for the benefit of the estate and all creditors. The

3    Debtor seeks to monetize such assets through the proposed sale transaction. Unless the Assets

4    are sold, the Debtor will be obligated to continue to make payments under the Lease, which will

5
     have the opposite effect on the estate – depletion of assets. A sale clearly makes the most sense
6
7    in this case.

8                      **b.    Fair and Reasonable Price.**

9         In order for a sale to be approved under Section 363(b), the purchase price must be fair

10   and reasonable. See generally, In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985)

11   The trustee (or debtor in possession) is given substantial discretion in this regard. Id. In
12
     addition, Courts have broad discretion with respect to matters under section 363(b). See Big
13
14   Shanty Land Corp. v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). In any

15   sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold

16   Wilde Horse Enterprises, Inc., 136 B.R. at 841 (citing In re Chung King, Inc., 753 F.2d 547 (7th

17   Cir. 1985)), In re Alpha Industries, Inc., 84 B.R. 703, 705 (Bankr. Mont. 1988).

18        As discussed above, the Debtor used best efforts to locate a purchaser for its assets
19
     Based on such efforts, the best offer received was that from Purchaser. The APA was negotiated
20
21   at arms length over an extended period of time, resulting in the Purchaser being a "stalking

22   horse" bidder for the assets.

23        At the bid procedures hearing, a new interested party surfaced. Additionally, the Debtor

24   will provide notice to all creditors and publish notice of the sale with the Clerk of the Court for

25   maximum exposure. Finally, provided that interested parties qualify and submit deposits, a

26   auction will be held two (2) business days before the scheduled hearing. By definition, the
27
     auction will result in the highest price (benefit) to the estate.
28

                                          16

1

#### c.    Adequate Marketing.

2

As discussed above and the accompanying Declarations, the Debtor used best efforts in

3

light of its limited resources to market the Assets for sale. Additional noticing and publication

4

with the Clerk of the Court will result in additional exposure of the Assets.

5

6

#### d.    Good Faith.

7

When a bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is

8

required to make a finding with respect to the "good faith" of the purchaser.  In re Abbotts

9

Dairies, 788 F.2d at 149. Such a procedure ensures that Section 363(b)(1) will not be employed

10

to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of

11

Section 1129 that the Bankruptcy Court independently scrutinizes the debtor's reorganization

12

plan and makes a finding that it has been proposed in good faith.  Id. at 150.  With respect to the

13

Debtor's conduct in conjunction with the sale of the Property, the good faith requirement focuses

14

principally on whether there is any evidence of "fraud, collusion between the purchaser and other

15

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Abbotts

16

Dairies, 788 F.2d at 147; Wilde Horse Enterprises, 136 B.R. at 842.

17

18

As noted above, the Debtor has negotiated the APA at arm's length, and the Purchaser is

19

not an "insider" of the Debtor as that term is defined in the Bankruptcy Code.    11

20

U.S.C. 101(31).  The Debtor will continue to negotiate in the same fashion in connection with

21

the scheduled auction.  There has been no fraud or collusion in connection with the proposed

22

transaction.  The Debtor has sought competitive bids for the Assets.  Based on the foregoing, the

23

Debtor submits that the Purchaser, or any overbidder at the auction, should be deemed to be

24

"good faith" purchaser.

25

26

27

28

17

1          e.     **Accurate and Reasonable Notice.**

2    The purpose of the notice is to provide an opportunity for objections and hearing before

3    the Court if there are objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988). A notice

4    is sufficient if it includes the terms and conditions of the sale and if it states the time for filing

5
     objections. Id.
6

7    As set forth above, the Debtor served the Notice on the United States Trustee, all of the

8    Debtor's known creditors and all parties requesting special notice. The Notice includes the date

9    time and place of the sale and the time fixed for filing objections thereto. The Notice and

10   Motion were served upon the parties who have liens against, or interests in, the Assets, and the

11   Debtor filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court, as required by

12   Local Bankruptcy Rule 6007-1(f), so that the Clerk of the Bankruptcy Court can publish
13
     information regarding the proposed sale. Thus, the Debtor submits that this notice should be
14

15   deemed adequate, accurate and reasonable by the Court.

16       **3.**     **The Sale Should be Free and Clear of All Liens, Claims, Interests and
     Encumbrances Under 11 U.S.C. §363(f).**
17

18   Bankruptcy Code §363(f) provides that a debtor may sell property of the estate "free and

19   clear of any interest in such property" if:

20        (1)    applicable non-bankruptcy law permits the sale of such property free and

21               clear of such interest;

22        (2)    such entity consents;

23        (3)    such interest is a lien and the price at which such property is to be sold is
24
                 greater than the aggregate value of all liens on such property;
25
          (4)    such interest is in bona fide dispute; or
26

27        (5)    such entity could be compelled, in a legal or equitable proceeding, to

28               accept a money satisfaction of such interest.

11 U.S.C. §363(f).  Because Section 363(f) is in the disjunctive, the Debtor must only meet one of the five subsections of Section 363(f) in order to sell the Units free and clear of all liens. claims, interests and encumbrances.  In re Whittemore, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

### a.    The Sales Should Be Approved Under 11 U.S.C. § 363(f)(2).

Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if the interest holder consents to the sale.  In this case, Kuda consents to the proposed sale transactions.

## B.    THE COURT SHOULD AUTHORIZE DEBTOR TO ASSUME AND ASSIGN THE LEASE TO PURCHASER.

### 1.    There Are Sound Business Reasons To Support The Debtor's Decision To Assume The Leases.

Barring exceptions not herein relevant, Sections 365(a) and 1107(a) of the Bankruptcy Code authorize a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts for the benefit of the estate.  In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it.  Durkin v. Benedor Corp. (In re G.I. Indus., Inc.), 204 F.3d 1276, 1282 (9th Cir. 2000) (bankruptcy court applies the business judgment rule to evaluate assumption or rejection decisions); In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415.

A debtor in possession satisfies the "business judgment" test when it decides, in good faith, that the assumption or rejection may benefit the estate.  In re FCX, Inc., 60 B.R. 405, 411

1   (E.D.N.C. 1986); In re Chipwich, Inc., 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985); Comm'l

2   Fin. Ltd. v Hawaii Dimensions, Inc. (In re Hawaii Dimensions, Inc.), 47 B.R. 425, 427 (D. Haw

3   1985) (bankruptcy courts generally approve the debtor in possession's decision on assumption or

4   rejection absent a showing of bad faith, abuse of discretion, or a clear demonstration that the

5   assumption or rejection will not benefit the estate or its creditors). In re FCX, Inc., 60 S.R. at

6   411-12; In re Chipwich, 54 B.R. at 430-31. The business judgment standard requires that the

7   court follow the business judgment of the debtor unless that judgment is the product of bad faith

8   whim, or caprice. In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), *citing*

9   Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert*

10   *denied*, 475 U.S. 1057 (1986).

11        In Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310 (Bankr. D.Utah

12   1981), the bankruptcy court explained why deference is given to the debtor in possession's

13   decision to assume or reject an executory contract or unexpired lease:

14          "**[Court approval under section 365(a),] if required, except in**

15          **extraordinary situations, should be granted as a matter of**
           **course.** To begin, this rule places responsibility for administering

16          the estate with the trustee (debtor in possession), not the court, and
           therefore furthers the policy of judicial independence considered

17          vital by the authors of the Code. Seconds this rule expedites the
           administration of estates, another goal of the Bankruptcy Reform

18          Act. Third, the rule encourages rehabilitation by permitting the
           replacement of marginal with profitable business arrangements.

19          Fourth, the rule is supported by pre-Code cases in this Circuit."

20   Id. at 315 (emphasis added).

21

22        Additionally, the assumption of executory contracts and unexpired leases furthers the

23   goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in

24   maximizing the value of its estate against the contracting party's interest in receiving the benefit

25   of its bargain and being protected against default by the debtor after assumption has occurred. In

26   re Embers 86th Street, Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

27

28

1    The Debtor's decision to assume the Lease is amply supported by sound business

2    reasons. As discussed above, without continuing operations, the Debtor has no use for the Lease

3    Thus, the Debtor can either reject it or monetize it some fashion. Based on the fact that the

4    Lease contains very favorable terms and in a unique location, the Debtor has determined that

5    monetizing it is in the best interest of the estate and all creditors. The Lease can only be

6

7    monetized through the assumption and assignment process. As a result, sound business

8    judgment exists for the relief requested herein.

9        **2.      The Debtor Is Able To Provide "Adequate Assurance Of Future
10       Performance" Under Section 365(b)(1) Of The Bankruptcy Code For The Lease To
         Be Assumed.**

11

12       In general, a debtor must cure all defaults, both monetary and non-monetary, prior to the

13    assumption of an executory contract or unexpired lease. 11 U.S.C. § 365(b); In re Claremont

14    Acquisition Corp., Inc., 113 F.3d 1029, 1033 (9th Cir. 1997). Bankruptcy Code section 365(b)

15    (1) provides, in relevant part, that:

16               if there has been a default in an executory contract or unexpired
                 lease of the debtor, the [debtor in possession] may not assume such
17               contract or lease unless, at the time of assumption of such contract or
                 lease,        the        [debtor        in        possession]        –
18

19               (A)     cures, or provides adequate assurance that the [debtor in
                 possession] will promptly cure, such default ...;

20               (B)     compensates, or provides adequate assurance that the
21               [debtor in possession] will promptly compensate, a party other than
                 the debtor to such contract or lease, for any actual pecuniary loss to
22               such party resulting from such default; and

23               (C)     provides adequate assurance of future performance under
                 such contract or lease."

24    11 U.S.C. § 365(b)(1).

25       As discussed above, arguably, the only default under the Lease is the lack of $25,000
26
      deposit with a third party escrow agent. Pursuant to the APA, Purchaser has agreed to fund such
27
28    amount. As a result, such arguable default is being cured in full.

21

1    Additionally, the Debtor is able to provide "adequate assurance of future performance"

2    for the Lease.  As discussed above, Purchaser has assembled a strong and experienced team to

3    manager restaurant operations at the current location.  Additionally, the projections attached

4    hereto as Exhibit "D" demonstrate that the Lease, which is only 4.1% of expenses, will be kept

5    current by Purchaser.  The fact that landlord will also have a $25,000 security deposit which is

6    not available today further enhances landlord's position herein.

7    Based on the foregoing, the Debtor is able to provide "adequate assurance of future

8    performance" for the Leases.

9

10

11   **C.    DEBTOR REQUESTS THE COURT TO WAIVE THE 14-DAY WAITING**

12   **PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d).**

13

14   Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the sale

15   of property other than cash collateral is stayed until the expiration of 14 days after entry of the

16   Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision

17   with respect to an order approving of a debtor's assumption and assignment of unexpired leases

18   and executory contracts.  In order to facilitate the most expeditious sale closing possible, Debtor

19   requests the Court to waive the 14-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d)

20

21

22   **IV.**

23   **CONCLUSION**

24   **WHEREFORE**, the Debtor respectfully requests that the Court enter an order

25   1.    approving the Motion in its entirety;

26   2.    authorizing the sale of the Assets to Purchaser free and clear of liens, claims and

27   interests, subject to overbid (if any);

28

1    3.    approving Debtor's assumption and assignment of the Lease to Purchaser (or an

2    overbidder) and finding that the estate shall have no ongoing liability with respect to such

3    contracts;

4    4.    waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and

5    6006(d);

6

7    5.    authorizing Debtor to take all necessary and reasonable steps to consummate the

8    sale of the Assets; and

9    6.    granting such other and further relief as the Court deems just and proper under the

10    circumstances.

11    Dated: July 7, 2010                                    SONA, LLC,

12
                                                     By:___/s/ David B. Golubchik_____
13                                                   DAVID B. GOLUBCHIK
                                                     KRIKOR J. MESHEFEJIAN
14                                                   LEVENE, NEALE, BENDER, YOO
                                                     & BRILL L.L.P.
15                                                   Attorneys for Debtor and Debtor in
16                                                   Possession

17

18

19

20

21

22

23

24

25

26

27

28

23

**DECLARATION OF DAVID MYERS**

I, DAVID MYERS, HEREBY DECLARE AS FOLLOWS:

1.      Until cessation of operations, I was the Executive Chef of Sona and created the concept for the Sona restaurant. I am also an officer of FoodArt Ventures, Inc. ("FAVI"), the sole member of Sona, LLC, the debtor and debtor in possession herein ("Debtor"). The facts contained in this declaration are known by me personally and if called to testify, I could and would testify competently to the truth thereto.

**A.      Background**

2.      On September 30, 2009, the date of the instant bankruptcy filing, GemCap allegedly held a foreclosure sale of the Sona Assets to GemCap Asset Holdings, LLC ("GAH"), which the Debtor disputed. Based on the fact that the Debtor disputed the validity of the alleged foreclosure sale, and to preserve the value of the business, the Debtor continued operating the restaurant.

3.      Shortly after commencement of this case, GAH commenced an adversary proceeding against the Debtor and other third parties, bearing Adversary No. 2:09-ap-02262-ER, seeking a restraining order enjoining the operations of the restaurant and a writ of possession over the assets of the estate and asserting claims for damages. The Debtor opposed the motions and was joined in the oppositions by the remaining defendants.

4.      Ultimately, the Debtor, GemCap, and GAH entered into a settlement agreement (the "Settlement Agreement") to resolve their disputes. The Court approved that settlement agreement pursuant to a Court order entered on December 16, 2009. The Debtor also sought additional relief from the Court in the form of authority to obtain post-petition financing (the "Financing Transaction") and enter into an asset leasing transaction (the "Lease Transaction") so that the Debtor would be able to continue the operation of its restaurant. The Court has also

24

approved the Financing Transaction and the Lease Transaction. The Settlement Agreement Financing Transaction and Lease Transaction had, among other, the following primary effects upon the Debtor's estate:

5.    The pre-petition foreclosure sale of the Debtor's assets (the "Sona Assets") by GemCap to GAH in the amount of was deemed valid and enforceable;

  a.    GAH sold the Sona Assets to Kuda Group, LLC ("Kuda");

  b.    Kuda and the Debtor entered into an agreement pursuant to which the Debtor will be able to continue utilizing the Sona Assets for operations;

  c.    Kuda extended a $100,000 post-petition credit line to the Debtor.

6.    Meanwhile, the Debtor discovered that there is group of assets consisting of various restaurant equipment (the "Remaining Equipment") and wine inventory (and "Remaining Wine") that has not been released to Kuda or the Debtor. Since Kuda purchased essentially all of the Sona Assets (except for the lease and liquor license), Kuda was entitled to obtain the Remaining Equipment and Remaining Wine, and the Debtor is entitled to utilize the Remaining Equipment and Remaining Wine in the course of its business operations pursuant to the Settlement Agreement and Lease Transaction.

7.    The Remaining Equipment was found to be in the possession of Mehdi Iloulian ("Iloulian") who is the owner of certain real property located at 418 La Cienega Blvd., Los Angeles, California, a location where FAVI had authorized and directed the storage of certain of the Debtor's equipment, including the Remaining Equipment. As for the Remaining Wine, they were found to be stored in a separate location, in Marina Del Rey, controlled by Otto Schmid ("Schmid"), former Chairman of FAVI. This Court granted the Debtor's motion to compel release of the Remaining Equipment from Iloulian and the Remaining Wine from Schmid at the hearing held on such motion on January 20, 2010.

25

**B.    Cessation of Operations and Negotiation of Purchase Agreement**

8.    The Debtor's restaurant operations ceased on May 15, 2010. The remaining assets of the Debtor included the Lease, a true and correct copy of which is attached hereto as Exhibit"C", as well as its liquor license related to its operations (the "Liquor License" and collectively with the Lease, the "Assets"). In order to maximize the value of its estate for the benefit of all creditors, the Debtor sought a potential purchaser for its Lease and valuable Liquor License.

9.    After extensive efforts, KBKW, LLC ("Purchaser") provided the Debtor with the highest and best offer for the purchase of the Assets. After extensive negotiations, the Debtor and Purchaser entered into that certain Purchase Agreement (the "APA"), a true and correct copy of which is attached hereto as Exhibit "A". The salient terms of the APA are as follows:

> a.    The Debtor will assume and assign the Lease to Purchaser, including all rights thereunder;
>
> b.    The Debtor will transfer the Liquor License to Purchaser; and
>
> c.    Purchaser shall pay to the estate $150,000 in consideration of transfer of the foregoing Assets.

10.    I believe that the Debtor's efforts in seeking a purchaser of the Assets were intended to, and indeed resulted in, insuring that the highest price was obtained for the Assets. Purchaser's agreement to serve as a locked-in buyer and to permit its offer to be subject to overbid during the Debtor's bankruptcy case. However, Purchaser's willingness to do so is conditioned upon all of the terms of the APA being approved by the Court, including the sales procedures set forth therein. The approval was obtained pursuant to a bid procedures order, a true and correct copy of which is attached hereto as Exhibit "B".

1        I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct. Executed this 7th day of July, 2010, at Los Angeles, California.

3

4

                                  /S/ David Myers

5                                    DAVID MYERS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DECLARATION OF WALTER SCHILD**

I, Walter Schild, declare as follows:

1.     Except as otherwise indicated, I have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify competently with respect thereto.

2.     I am the managing member of Dilson & Walter, LLC ("D&W"). D&W is the majority owner of Comme Ca, LLC ("Comme Ca"), which owns a restaurant located at 8479 Melrose, West Hollywood, CA 90069. D&W is also the managing member of David Myers Group, LLC ("DMG"), which is manager of Comme Ca. I also the managing member of Kuda Group, LLC ("Kuda")

3.     I am not an officer, director, shareholder or person in control of Sona, LLC, which I understand is the debtor and debtor in possession in this bankruptcy case ("Debtor"), and I have no affiliation with Food Art Ventures, Inc., the managing member of the Debtor.

4.     Pursuant to an agreement entered into by and between the Debtor and Kuda, the following transaction occurred:

    a.     GAH sold the Sona Assets to Kuda;

    b.     Kuda and the Debtor entered into an agreement pursuant to which the Debtor will be able to continue utilizing the Sona Assets for operations;

    c.     Kuda extended a $100,000 post-petition secured credit line to the Debtor

5.     At this time, the obligation due and owing under the secured credit line is $100,000.

6.     In connection with the Debtor's plan to cease operations at the current facility, based on the fact that David Myers is a friend and that the Sona Assets now owned by Kuda were not generating income for Kuda, I assisted David Myers in searching for a new entity to take over the restaurant premises, as well as someone to purchase the Sona Assets. I personally

spoke to numerous real estate brokers and business brokers in order to attempt to sell the Debtor's real property lease (the "Lease). I have personal knowledge that the Debtor and the landlord also spoke to numerous individuals and brokers. Finally, based on the Debtor's notoriety in the Los Angeles restaurant scene, I believe that the interested public was well aware of the availability of the Debtor's location.

7.    Based on the foregoing efforts, the highest offer received was from Purchaser. Purchaser advised me that it was interested in operating a restaurant at the Debtor's premises. In connection with such operations, Purchaser sought to purchase the Sona Assets owned by Kuda. An agreement was reached pursuant to which Purchaser agreed to purchase the Sona Assets from Kuda for $222,500 and the Debtor's assets for $150,000, as set forth in the APA.

8.    I have agreed, on behalf of Kuda, that provided that the Sona Assets are purchased from Kuda, whether by Purchaser or an overbidder, Kuda will waive $50,000 of the secured obligation owed by the Debtor. The result of the foregoing is that the estate and all creditors benefit by $50,000 in available unencumbered cash. If the Sona Assets are not purchased from Kuda for any reason, then Kuda does not consent to such a discount and the full amount of the secured obligation ($100,000) will be due and owing in connection with the sale closing.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this __7__ day of July 2010 at Los Angeles, California.

WALTER SCHILD

29

## DECLARATION OF DAVID KORAL

I, David Koral, declare as follows:

1.    Except as otherwise indicated, I have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify competently with respect thereto.

2.    I am the CEO of Chosen Hospitality and Managing Member of Real Restaurant Group ("RRG"), which are engaged in the ownership and operation of entertainment and restaurant businesses.

3.    As CEO of Chosen Hospitality and Managing Member of RRG, I am responsible for overseeing the growth and expansion of all projects and business developments. I played an instrumental role in the concept and development of the group's first venue, Voyeur. I am a graduate of UCLA where I was drafted to play football. I played two seasons in the NFL for the Indianapolis Colts and the Tennessee Titans. In addition to my role at Chosen Hospitality and RRG, I currently serve as the President of Big Boom Media and President of the Koral Family Business Group. I reside in Los Angeles, CA.

4.    I am the Managing Member of RRG to the sole managing member of KBKW, LLC ("KBKW"), the proposed purchaser of the assets of Sona, LLC, the Debtor herein ("Debtor").

5.    KBKW intends to operate a restaurant at the Debtor's premises. The management of KBKW and the restaurant operations will include myself, Matt Bendik, President of Chosen Hospitality and also a Managing Member of RRG; Michael Kassar, General Manager & Partner of RRG, Director of Operations of Chosen Hospitality, and General Manager of Voyeur; and Micah Wexler, Executive Chef & Partner of RRG.

6.    Mr. Bendik, formerly the Vice President of Development for Andrew Sasson's Light Group in Las Vegas, has a wealth of project management experience, having handled

30

developments both domestically and abroad in Los Angeles, Las Vegas, Hawaii, Dubai, India and Belize. In his roles with Chosen Hospitality and RRG, Mr. Bendik oversees all operations at Voyeur, as well as strategic project development of all RRG's ventures. Born and raised in Los Angeles, Matt Bendik graduated from Palisades Charter High School before attending the prestigious School of Hotel Administration at Cornell University in Ithaca, NY. He resides in Los Angeles, CA.

7.    A New York Native, Michael Kassar has always had a taste for impeccable service. Born and raised on the Upper East Side of Manhattan, Mr. Kassar was selected for admission at Cornell University's School of Hotel Administration where he received his BA While attending Cornell, Mr. Kassar spent multiple summers working for top New York City restaurateurs including Drew Nieporant, Daniel Bouloud and Danny Meyer. Upon graduation. Mr. Kassar spent time in Europe, training at the prestigious La Taverna Righi in San Marino, and famed three-star Michelin restaurant Martin Berasategui in San Sebastin, Spain, until being recruited to serve as Manager of the renowned Spago in Beverly Hills.  While at Spago, he directed all front of house operations and helped the establishment earn two Michelin stars, Zagat's title of Most Popular Restaurant in Los Angeles and a James Beard Award for Outstanding Service.   In addition to his role as Director of Operations at Chosen Hospitality, Mr. Kassar serves as General Manager for Voyeur and RRG. He will serve as the General Manager of planned restaurant venue at the former Sona location.

8.    Born and raised in Los Angeles, Chef Micah Wexler brings over 12 years of restaurant industry experience to Chosen Hospitality.  Mr. Wexler got his start working alongside famed Italian chef Gino Angelini at Vincenti restaurant in Los Angeles before attending Cornell University where he earned his BA in Hotel Administration.  Mr. Wexler's affinity for cuisine continued to flourish while he worked at several of LA's top dining

31

1    establishments, including Mellise and Patina. Mr. Wexler then traveled to Europe for jobs at

2    Restaurant Righi in Italy and to shadow Chef Martin Berasategui in Spain before being recruited

3    to be a part of the opening team for Chef Joel Robuchon - the most celebrated Chef in the world

4    Prior to Chosen Hospitality, Mr. Wexler served as Sous Chef for Tom Colicchio at Craft. He

5    currently is a private chef in Malibu and is oversees all in-house catering for Voyeur in West

6

7    Hollywood. He will be the Executive Chef for the planned restaurant venue at the former Sona

8    location.

9        9.    I believe that our core group consists of a top-notch management team to operate

10    the restaurant at the current facility successfully. In addition to the foregoing, KBKW has

11    considered starting costs, both pre-opening and post-opening, to determine whether it will be

12    able to comply with its obligations under the Lease on a going forward basis. We took into

13    consideration construction and start-up costs, as well as costs associated with initial operations

14    before the restaurant has been fully exposed to the public to reach optimal operations.

15

16        10.    Attached hereto as Exhibit "A" is a true and correct copy of a projected Income

17    Statement prepared by KBKW with respect to commencing operations at the Debtor's location

18    The Income Statement includes all obligations due and owing under the Lease, as well as all

19    other operating expenses. I am certain that KBKW will have absolutely no problems remaining

20    current with respect to its obligations under the Lease. More importantly, the Lease obligations

21    are very modest (only 4.1% of the total expenses). It may be a different situation where the

22

23    Lease obligations are a large portion of expenses. However, under the circumstances of this

24    case, Purchaser is absolutely certain that it will be able to comply with its obligations under the

25    Lease.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury pursuant to the laws of the United States of America

that the foregoing is true and correct.

Executed this __6__ day of July 2010 at Los Angeles, California.

DAVID KORAL

# EXHIBIT A

**EXHIBIT A**

# Purchase Agreement

## by and between

## KBKW, LLC., Purchaser

## and

## SONA, LLC., Seller

Dated as of May 22, 2010

i

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (this *"Agreement"*) is made and entered into as of the 22nd day of May, 2010 (the *"Effective Date"*), by and between KBKW, LLC, a California limited liability company, as debtor-in-possession (*"Purchaser"*), and SONA, LLC, a California limited liability company (*"Seller"*; and collectively with Purchaser, the *"Parties"*, each being a *"Party"*)).    Capitalized terms used but not otherwise defined in this Agreement are used as defined on Exhibit A hereto.

## RECITALS

**WHEREAS,** Seller is the debtor in possession in Case No. 2:09-bk-36434-ER (the *"Bankruptcy Case"*) filed on September 30, 2009 under Chapter 11 of the United States Bankruptcy Code (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the *"Bankruptcy Court"*);

**WHEREAS,** Seller, in its own capacity and as debtor in possession in the Bankruptcy Case, currently operates a restaurant business (the *"Restaurant"*) located at 401 North La Cienega Blvd, Los Angeles, California (the *"Premises"*);

**WHEREAS,** Seller occupies the Premises pursuant to that certain lease agreement dated June 10, 2005, entered into by and between Glick, Glick and Lewis, as lessor (*"Lessor"*), and Seller, as lessee (the *"Lease"*);

**WHEREAS,** in connection with the operation of the Restaurant, Seller holds (i) a California Department of Alcohol Beverage Control (*"CDABC"*) Type 47 On-Sale General Eating Place liquor license, License No. 47-389042, and (ii) a CDABC Type 58 Caterer Permit liquor license, License No. 58-389042 (collectively, the *"Liquor Licenses"*);

**WHEREAS,** Purchaser desires to acquire from Seller, and Seller desires to sell to Purchaser, an assignment of the Lease and an assignment or transfer of the Liquor Licenses, on the terms and subject to the conditions set forth herein;

**WHEREAS,** the transactions contemplated by this Agreement (collectively, the *"Transaction"*) require the approval of the Bankruptcy Court; and

**WHEREAS,** Purchaser intends to operate a new restaurant business on the Premises, and it is not the intent of the Parties that Seller sell all or any part of its business operations or good will to Purchaser or that Purchaser succeed to or continue all or any part of Seller's business;

**NOW, THEREFORE,** in consideration of the representations, warranties and covenants contained herein, and for other good and valuable consideration the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

**ARTICLE 1. THE TRANSACTION**

**1.1    Assigned Assets.** Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, transfer, convey, assign and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in, to and under: (i) the Lease (including all renewal options, rights of first refusal and other rights of Seller thereunder), together with all of Seller's right, title and interest in and to all land, buildings, structures, easements, appurtenances, improvements (including construction in progress) and fixtures located thereon (the *"Leased Real Property"*); (ii) the Liquor Licenses; and (iii) all of Seller's liquor to the extent Purchaser's purchase of such inventory is required by Legal Requirements in connection with, or can reasonably be expected to facilitate, the transfer of the Liquor Licenses to Purchaser (the *"Purchased Inventory"*; and collectively with the Lease and the Liquor Licenses, the *"Assigned Assets"*).

**1.2    No Liabilities Assumed.** Purchaser shall not assume and shall not be liable or responsible for any Liability of Seller, other than obligations under the Lease to the extent arising from or after the Closing Date (*"Post-Closing Lease Obligations"*). Seller shall retain and remain responsible for all of Seller's Liabilities, other than Post-Closing Lease Obligations.

**ARTICLE 2. CONSIDERATION FOR TRANSFER**

**2.1    Assignment Price.**

(a) Subject to the terms of this Agreement, the price payable by Purchaser for the Assigned Assets shall be $150,000 (the *"Assignment Price"*).

(b) Not later than three (3) Business Days following the Effective Date, Purchaser shall deliver the Assignment Price, by bank or certified check or wire transfer of immediately available funds, to D & G Escrow Corporation, 17327 Ventura Boulevard, Suite 300, Encino, CA 91316, as escrow agent (the *"Escrow Agent"* or *"Escrow Holder"*), to be held in trust and disbursed on the Closing Date by the Escrow Agent as provided in Section 2.3.

**2.2    Allocation of Assignment Price.** The Parties agree to allocate the Assignment Price among the Assigned Assets as specified on Exhibit 2.2. The allocation of the Assignment Price set forth on such Exhibit is intended to comply with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended. The Parties acknowledge that such allocation was determined in an arm's length negotiation and agree that neither Party shall take a position on any Tax Return, before any Tax Authority or in any judicial proceeding that is in any way inconsistent with such allocation, other than with the written consent of the other Party or unless specifically required pursuant to a determination by an applicable Tax Authority.

**2.3    Escrow Provisions.**

(a) The provisions set forth on Exhibit 2.3 (the "**Escrow Provisions**") are hereby incorporated herein by reference as if set forth in full herein.

(b) If there is any conflict between the Escrow Provisions and the other provisions of this Agreement, the other provisions of this Agreement shall prevail.

(c) In the event that any condition to the release of the Assignment Price is not satisfied on or before August 31, 2010, or in the event that this Agreement is terminated pursuant to Section 8.1 hereof, then in either such event, the entire amount of the Assignment Price shall immediately be released from escrow and returned to Purchaser, and Seller hereby agrees to execute any instructions to Escrow Agent reasonably requested by Purchaser in order to effect such release.

(d) Seller and Purchaser shall each be responsible for and shall pay fifty percent (50%) of the fees and expenses of the Escrow Agent.

## ARTICLE 3. CLOSING AND CLOSING DELIVERIES

**3.1    Closing; Time and Place.**  The closing of the purchase and sale provided for in this Agreement (the *"Closing"*) shall, subject to the satisfaction of all of closing conditions specified in Article 7, occur at the offices of Michelman & Robinson, LLP, 15760 Ventura Boulevard, Encino, California or such other place as the Parties may agree, at 10:00 A.M. on (i) July 15, 2010; or (ii) if earlier, as soon as practicable following the satisfaction of the closing conditions specified in Article 7; or (iii) such other date as the Parties may agree (in any such case, the *"Closing Date"*).

**3.2    Deliveries by Seller.**  At the Closing, Seller shall deliver the following items, duly executed by Seller as applicable, all of which shall be in form and substance reasonably acceptable to Purchaser and Purchaser's counsel:

(a) Lease Assignment.  An Assignment and Assumption of Lease, substantially in the form attached hereto as Exhibit 3.2(a), executed by Seller, assigning the Lease to Purchaser (the *"Lease Assignment"*).

(b) Liquor License Assignment.  Such instruments of transfer and assignment as Purchaser may reasonably request in order to transfer and assign the Liquor Licenses to Purchaser;

(c) Bill of Sale.  A Bill of Sale, substantially in the form attached hereto as Exhibit 3.2(c), covering the Purchased Inventory;

(d) Other Conveyance Instruments.  Such other specific instruments of sale, transfer, conveyance and assignment as Purchaser may reasonably request; and

(e) Certificate of Representations and Warranties.  A Certificate executed on behalf of Seller by its Chief Executive Officer, certifying as to the matters in Section 7.1(a).

**3.3    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver: (i) instructions to the Escrow Agent to release and deliver the Assignment Price to Seller; *provided, however*, that notwithstanding any other provision of this Agreement, including, without limitation, the Escrow Provisions, Purchaser shall not be required to deliver such instructions, and the

3

**38**

Assignment Price shall remain in escrow, until such time as the Liquor Licenses have been issued to Purchaser by the CDABC or the CDABC has unconditionally approved in writing the transfer of the Liquor Licenses to Purchaser), the Lease has been duly and validly assigned to Purchaser, and Seller has delivered actual possession of the Leased Real Property and the Purchased Inventory to Purchaser; and, (ii) to Seller (x) the Lease Assignment, executed by Purchaser, and (y) a Certificate, executed on behalf of Purchaser by its Chief Executive Officer, certifying as to the matters in Section 7.2(a), which Certificate shall be in form and substance reasonably acceptable to Seller and Seller's counsel.

**3.4    Delivery by Purchaser and Seller.** At the Closing, Purchaser and Seller shall each deliver such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise necessary or appropriate to transfer the Assigned Assets in accordance with the terms hereof and to vest in Purchaser and its successors and assigns full, complete, absolute, legal and equitable title to the Assigned Assets, free and clear of all Encumbrances.

**3.5    Rent.** Rent under the Lease shall be prorated through the Closing Date.

**3.6    Transfer Taxes.** Notwithstanding any Legal Requirements to the contrary, Seller shall be responsible for and shall pay when due any Transfer Taxes, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes; *provided, however,* that, if required by any Legal Requirement, Purchaser will join in the execution of any such Tax Returns and other documentation.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLER

Except as specifically set forth on Exhibits and Schedules attached to this Agreement, Seller hereby represents and warrants to Purchaser as follows:

**4.1    Authority; Binding Nature of Agreements.** Seller is a limited liability company duly organized and validly existing under the laws of the State of California and has all requisite power and authority to execute and deliver this Agreement and all other Transaction Agreements to which it is a party and, subject to receipt of Bankruptcy Court Approval (as defined in Section 7.1(b) below), to carry out the provisions of this Agreement and the other Transaction Agreements. The execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements have been approved by all requisite action on the part of Seller, subject only to receipt of Bankruptcy Court Approval. This Agreement has been duly and validly executed and delivered by Seller. Each of this Agreement and the other Transaction Agreements constitutes, or upon execution and delivery, will constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**4.2    No Conflicts; Required Consents.** The execution, delivery and performance of this Agreement or any other Transaction Agreement by Seller do not and will not (with or without notice or lapse of time):

(a) give any Governmental Authority or other Person the right to (i) challenge the Transaction; or (ii) revoke, suspend or modify the Liquor Licenses or either of them; or

4

**39**

(b) cause Purchaser to become subject to, or to become liable for the payment of, any Tax.

**4.3    Title to Assigned Assets.** Seller has good and marketable title to, is the exclusive legal and equitable owner of, and has the power and right to sell, assign and deliver the Assigned Assets pursuant to the terms of this Agreement and subject to approval of the Bankruptcy Court. The Assigned Assets are free and clear of all Encumbrances of any kind or nature, except for any Encumbrances that will be removed and released at or prior to Closing. Upon Closing, Purchaser will acquire exclusive, good and marketable title to the Assigned Assets, free and clear of all Encumbrances, and no restrictions will exist on Purchaser's right to use, resell, license or otherwise dispose of any of the Assigned Assets.

**4.4    Lease.**

(a) Seller has been in lawful possession of the Premises since the commencement of the original term of the Lease. Except for the Lessor's interest in the Lease and except for the assignment of the Lease to Purchaser pursuant to this Agreement, Seller has not granted or created any right, title or interest (including without limitation any security interest or mortgage, lien or collateral assignment) in, to or under the Lease or Seller's leasehold interests in the Premises.

(b) An accurate, correct and complete copy of the Lease, including all amendments and supplements thereto, is attached hereto as Exhibit 4.4(b).

(c) Seller has heretofore delivered to Purchaser accurate, correct and complete copies of existing title insurance policies, title reports, surveys, environmental reports, if any, for the real property subject to Lease.

(d) Except as described on Exhibit 4.4(d), the Lease is in good standing and is valid, effective and enforceable against the Lessor in accordance with its terms, and there exists no default thereunder, and no event has occurred, and no condition exists, which (with or without the giving of notice, lapse of time or the happening or occurrence of any other event) would constitute or could result in a default thereunder or termination thereof. In the event that such Exhibit discloses any default (or event or condition which, (with or without the giving of notice, lapse of time or the happening or occurrence of any other event, would constitute or could result in a default), then such Exhibit also sets forth an estimate of the amounts required to cure all such defaults (or events or conditions) under the Lease so as to permit the assignment of the Lease pursuant to Section 365 of the Bankruptcy Code (as ultimately determined by the Bankruptcy Court, the "*Cure Costs*"). In connection with the assignment and assumption of the Lease, Seller shall pay all Cure Costs on or before the Closing, and to the extent that any portion thereof remains unpaid at the Closing, then such unpaid amount shall be paid over to Purchaser out of the escrowed funds and the Assignment Price shall be reduced accordingly.

(e) All rent and other charges required currently to be paid under the Lease have been duly paid and no rent or other charges under the Lease have been paid more than one month in advance.

(f) Immediately following the closing hereunder, Purchaser shall be the lessee under the Lease, with all of the rights thereunder as are currently enjoyed thereunder by Seller, including, without limitation, the right to exercise the extension option therein permitting Purchaser to extend the term of the Lease for three five-year extension periods on the terms set forth in the Lease (Rider 1 to the Lease) and the right of first refusal set forth in the Lease (Rider 2 to the Lease).

**4.5    Liquor Licenses.**  Each of the Liquor Licenses is valid and in full force and effect, and there is not pending or, to the Knowledge of Seller, threatened any Proceeding which could result in the suspension, termination, revocation, cancellation, limitation or impairment of either Liquor License.  No violations have been recorded in respect of either of the Liquor Licenses, and Seller knows of no meritorious basis therefor.  No fines or penalties are due and payable in respect either Liquor License or any violation thereof.

**4.6    Brokers.**  Seller has not retained any broker or finder, nor has Seller incurred any liability or obligation to any other broker or finder for any brokerage fees, commissions or finders fees with respect to this Agreement or the Transaction.  As between Seller and Purchaser, Seller shall be solely responsible for all fees and other amounts due or payable to Pegasus Investments, which has been retained by Purchaser.

**4.7    No Other Agreement.**  Other than for sales of assets in the ordinary course of business, neither Seller, nor any of its Representatives, has entered into any Contract with respect to the sale, assignment or other disposition of any of the Assigned Assets.

## ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**5.1    Authority; Binding Nature of Agreements.**  Purchaser is a limited liability company duly organized and validly existing under the laws of the State of California and has all requisite power and authority to execute and deliver this Agreement and all other Transaction Agreements to which it is a party and to carry out the provisions of this Agreement and the other Transaction Agreements.  The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements have been approved by all requisite action on the part of Purchaser.  This Agreement has been duly and validly executed and delivered by Purchaser.  Each of this Agreement and the other Transaction Agreements constitutes, or upon execution and delivery, will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

**5.2    No Conflicts; Required Consents.**  The execution, delivery and performance of this Agreement or any other Transaction Agreement by Purchaser do not and will not give any Governmental Authority or other Person the right to (i) challenge the Transaction.

**5.3    Brokers.**  Purchaser has not retained any broker or finder or incurred any liability or obligation for any brokerage fees, commissions or finders fees with respect to this Agreement or the Transaction.

6

**41**

**ARTICLE 6. COVENANTS**

**6.1    Insurance Coverage to be Maintained Prior to Closing.** From the Effective Date until the Closing Date, Seller shall, and shall cause its officers, directors and employees, to maintain insurance coverage in amounts adequate to cover the reasonably anticipated risks of Seller with respect to the Assigned Assets.

**6.2    Restrictions on Seller's Conduct of the Business Prior to Closing.** From the Effective Date until the Closing Date, Seller shall not, and shall cause its officers, directors and employees, not to:

(a) Enter into, create, incur or assume any obligations which would have a Material Adverse Effect on Seller or the Assigned Assets or which would result in any of the Assigned Assets becoming subject to an Encumbrance;

(b) Sell, transfer, lease, license or otherwise encumber, or remove from the Premises, any of the Assigned Assets;

(c) Enter into any agreements or commitments with another Person with respect to, or which could have an impact, on the Assigned Assets or on the Transaction;

(d) Violate or breach the Lease, any other Contract to which Seller is a party, or any Legal Requirement applicable to Seller, as such Contract and Legal Requirement apply to or may affect the Assigned Assets;

(e) Violate, terminate or amend the Liquor Licenses or any other Governmental Approval affecting the Liquor Licenses; or

(f) Enter into any Contract or agree, in writing or otherwise, to take any of the actions described above in this Section 6.2, or any action that would make any of its representations or warranties contained in this Agreement untrue or incorrect in any material respect or prevent it from performing or cause it not to perform its covenants hereunder.

**6.3    Certain Notifications.** From the Effective Date until the Closing, Seller shall promptly notify Purchaser in writing regarding any:

(a) Fact, circumstance, event, or action by Seller (i) which, if known on the Effective Date, would have been required to be disclosed in or pursuant to this Agreement; or (ii) the existence, occurrence, or taking of which would result in any of the representations and warranties of Seller contained in this Agreement or in any Transaction Agreement not being true and correct when made or at Closing;

(b) Breach of any covenant or obligation of Seller hereunder; and

(c) Circumstance or event which will result in, or could reasonably be expected to result in, the failure of Seller to timely satisfy any of the closing conditions specified in Article 7.

.

7

**42**

**6.4    Access to Premises.** During the period commencing on the Effective Date and ending on the Closing Date, Seller shall permit Purchaser and its Representatives to such access to the Premises as is contemplated by the Kuda Purchase Agreement in order to permit Purchaser to conduct due diligence as contemplated by the Kuda Purchase Agreement.

**6.5    Best Efforts.** From the Effective Date until the Closing, each of Seller and Purchaser shall use their respective best efforts to cause to be fulfilled and satisfied all of the other Party's conditions to Closing set forth in Article 7.

**6.6    Bankruptcy Court Bidding Procedure.** Without limiting the generality of Section 6.5, not later than seven (7) days following the Effective Date, Seller shall seek from the Bankruptcy Court an order (the **"Overbid Procedures Order"**) providing for the procedure for the Parties to follow in the event that Seller receives, in writing, any offer or proposal relating to the sale of the Assets other than the transactions contemplated by this Agreement (a **"Competing Proposal"**). Seller agrees that the proposed Overbid Procedures Order shall be in a form reasonably acceptable to Purchaser. Such Overbid Procedure Order shall include, *inter alia*, a requirement that a Competing Proposal must include a minimum of $50,000 deposit, which shall become nonrefundable in the event that such bidder is determined to be the winning bidder for the Assigned Assets. If Seller terminates this Agreement because Purchaser's bid is not the high bid, regardless of whether Seller consummates a transaction with the successful bidder, then Purchaser shall be paid a breakup fee equal to $25,000.00 (the **"Breakup Fee"**). The Breakup Fee shall be paid from the deposit paid by the successful bidder as part of such successful bidder's qualifying competing proposal, free and clear of all claims of creditors. Until such Breakup Fee is paid in full, the unpaid Breakup Fee (or any unpaid portion thereof) shall constitute an allowed administrative expense claim against Seller's bankruptcy estate.

**6.7    Bankruptcy Court Motion.** 6.7    Not later than seven (7) days following the entry of the Overbid Procedures Order, Seller shall file a motion in the Bankruptcy Court, which motion shall in form and substance be acceptable to Purchaser, seeking Bankruptcy Court Approval of this Agreement and the Transaction, subject to the Overbid Procedures Order (the **"Motion"**), and Seller shall promptly take all actions reasonably necessary in furtherance thereof and in exercising its good faith efforts to secure such Bankruptcy Court Approval. The date for which a hearing is set on the Motion is hereinafter referred to as the **"Motion Date."** Seller hereby covenants to cooperate fully with the Bankruptcy Court and with Purchaser to expedite the Bankruptcy Case and to obtain the Bankruptcy Court Oder (as defined in Section 7.1(b)).

**6.8    Cooperation.** After the Closing, upon the request of Purchaser, Seller shall (i) execute and deliver any and all further materials, documents and instruments of conveyance, transfer or assignment as may reasonably be requested by Purchaser to effect, record or verify the transfer to, and vesting in Purchaser, of Seller's right, title and interest in and to the Assigned Assets, free and clear of all Encumbrances, in accordance with the terms of this Agreement; and (ii) cooperate with Purchaser in its efforts to transfer or assign to Purchaser such Contracts with vendors and suppliers as Purchaser may deem beneficial to its business. Notwithstanding the foregoing, Purchaser shall not be required to assume any Contract of Seller, nor shall Purchaser have any Liability under or with respect to Seller's performance under, or breach of, any such Contract.

**6.9    Press Releases.** Neither Party will, either before or after the Closing, issue any press release or other public announcement with respect to the Transaction that refers to the other Party, other than with the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

## ARTICLE 7. CONDITIONS TO CLOSING

**7.1    Conditions to Purchaser's Obligation to Close.** The obligations of Purchaser to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Purchaser in writing:

(a) <u>Representations, Warranties and Covenants</u>. (i) All of the representations and warranties of Seller in this Agreement shall have been true and correct in all material respects (considered collectively and individually) as of the Effective Date and shall be true and correct in all material respects (considered collectively and individually) as of the Closing Date (or, to the extent such representations and warranties speak only as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and (ii) Seller shall have performed all covenants and obligations in this Agreement required to be performed by Seller as of the Closing Date.

(b) <u>Documents</u>. Seller shall have delivered to Purchaser all of the documents and agreements set forth in <u>Sections 3.2</u> and <u>3.4</u>.

(c) <u>Bankruptcy Court Approval</u>.  Seller shall have obtained and delivered to Seller an order of the Bankruptcy Court approving this Agreement and the Transaction, including the Bankruptcy Court's approval for the purchase by Purchaser of the Assigned Assets, free and clear of all Encumbrances, which order is not subject to any stay of its effectiveness or motion for reargument or rehearing and (i) as to which the time to appeal or petition for certiorari has expired and as to which no timely appeal or petition for certiorari shall then be pending; or (ii) if a timely appeal or petition for certiorari has been sought, the order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing on remand shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for modification of such order, or move for reargument or rehearing, shall have expired (the "***Bankruptcy Court Approval***"). Without limiting the generality of the foregoing, the Bankruptcy Court Approval shall (i) authorize and/or ratify Seller's execution and delivery of this Agreement, (ii) approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, the sale and assignment of the Assigned Assets to Purchaser on the terms and conditions set forth in this Agreement, free and clear of all liens, claims and encumbrances and the assumption by Seller (if not previously so ordered) and assignment to Purchaser of the Lease, (iii) be substantially in the form of the Sale Order annexed hereto as <u>Exhibit 7.1(c)</u>; (iv) contain, *inter alia*, a finding that Purchaser acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code in connection with such sale; (v) provide that Purchaser shall not be subject to successor liability on account of its purchase and assumption of the Assigned Assets; and (vi) provide that the Bankruptcy Court retains jurisdiction on all matters arising from or relating to the Bankruptcy Court Approval for the benefit of Seller and the Purchaser.

9

(d) <u>Lease</u>. Seller shall have delivered to Purchaser a Landlord Estoppel and Consent to Assignment, in form and substance reasonably satisfactory to Purchaser and executed by the Landlord ("**Landlord Consent**"), which shall include, without limitation: (i) the Landlord's consent to the assignment to Purchaser of the Lease, including (x) the extension option permitting Purchaser to extend the term of the Lease for three five-year extension periods on the terms set forth in the Lease (Rider 1 to the Lease); and (y) the right of first refusal (Rider 2 to the Lease); (ii) confirmation by the Landlord that as of the Closing there are no existing defaults under the Lease or events that have occurred which, with the passage of time or the giving of notice, or both, will constitute such a default; (iii) Landlord's consent to (x) Purchaser's use of the Premises as a restaurant, bar and hospitality venue and (y) Purchaser's proposed signage commensurate with such use (each of clauses (i)(x), (i)(y), (ii), (iii)(x) and (iii)(y) being referred to herein as a "**Lease Requirement**", and together, the "**Lease Requirements**"); *provided, however*, that to the extent such the Lessor refuses or otherwise fails to provide any of such consents and confirmations, the requirement for such consent and/or confirmation will be deemed satisfied if such consent(s) and/or confirmation(s), including, without limitation, each of the Lease Requirements, are included in the Bankruptcy Court Approval with the same effect as if the same were provided by Lessor. The Parties acknowledge that each of the Lease Requirements is material to the Transaction and that Purchaser shall not be required to complete the closing if any Lease Requirement is absent (in whole or in part).

(e) <u>Liquor Licenses</u>. Each of the Liquor Licenses shall have been assigned or otherwise issued to Purchaser by, or with the approval of, the CDABC and any other applicable Governmental Authorities. Without limiting the generality of the foregoing, Purchaser shall have received from the CDABC their 226 Form, transferring and/or issuing each of the Liquor Licenses, and their authorization to close this transaction.

(f) <u>Consents</u>. Seller shall have delivered to Purchaser all other approvals, consents, and authorization (including any Governmental Approval) required for the consummation of the Transaction.

(g) <u>No Proceedings</u>. Since the Effective Date, no Proceeding shall have been commenced or threatened against Purchaser, or against any Representative of Purchaser (a) involving any challenge to, or seeking damages or other relief in connection with, the Transaction; or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with the Transaction.

(h) <u>No Damage, Destruction or Other Loss</u>. Since the Effective Date, the Premises has not suffered any fire, destruction, damage, condemnation (or notice of condemnation) or other loss, whether or not covered by insurance, which could reasonably be expected to have an adverse effect upon the condition or value of the Premises or on the ability of Purchaser to operate its business at the Premises after the Closing.

**7.2    Conditions to Seller's Obligation to Close.** The obligations of Seller to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Seller in writing:

(a) Representations, Warranties and Covenants. (i) All of the representations and warranties of Purchaser in this Agreement shall have been true and correct in all material respects (considered collectively and individually) as of the Effective Date and shall be true and correct in all material respects (considered collectively and individually) as of the Closing Date (or, to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and (ii) Purchaser shall have performed all covenants and obligations in this Agreement required to be performed by Purchaser as of the Closing Date; and

(b) Deliveries. Purchaser shall have delivered to Seller all of the documents and agreements set forth in Sections 3.3 and 3.4.

**7.3     Conditions to Obligations of Each Party to Close.** The respective obligations of each Party to consummate the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following condition(s), any of which may be waived by Purchaser or Seller, as applicable, in writing:

(a) No Legal Impediments to Closing. There shall not be in effect any Order issued by any Governmental Authority preventing the consummation of the Transaction or seeking any damages as a result of the Transaction, nor shall any Proceeding be pending that seeks any of the foregoing;

(b) Bankruptcy Court Approval. The Parties shall have received Bankruptcy Court Approval, which shall be in form and substance satisfactory to Purchaser; and

(c) Kuda Transaction. That certain Asset Purchase Agreement of even date herewith between Kuda and Purchaser (the *"Kuda Purchase Agreement"*) shall have been executed, each of the conditions to Purchaser's obligation to complete the transactions contemplated by the Kuda Purchase Agreement shall have been satisfied or waived in writing by Purchaser, and the transactions contemplated under Kuda Purchase Agreement shall have been consummated concurrently with or prior to the Closing hereunder. The Parties acknowledge that the Kuda Purchase Agreement provides that Purchaser has an absolute right to terminate such agreement if, Purchaser, in its sole discretion, is not satisfied with the results of its due diligence investigation of the assets to be purchased pursuant to such Kuda Purchase Agreement.

**ARTICLE 8. TERMINATION**

**8.1     Circumstances for Termination.** At any time prior to the Closing, this Agreement may be terminated by written notice:

(a) by the mutual written consent of Purchaser and Seller;

(b) by Purchaser pursuant to Section 6.4;

(c) by either Purchaser or Seller if the non-terminating Party is in material breach of any material provision of this Agreement;

11

**46**

(d) by either Purchaser or Seller if the Closing has not occurred on or prior to August 31, 2010 (the "***Outside Closing Date***") for any reason; or

(e) by either Purchaser or Seller if satisfaction of a closing condition of the terminating Party in Article 7 is or prior to the Closing becomes impossible, including by reason of the termination for any reason of the Kuda Purchase Agreement.

**8.2    Effect of Termination.**  If this Agreement is terminated in accordance with Section 8.1, all obligations of the Parties hereunder shall terminate, other than any obligations that are expressly stated herein to survive the termination of this Agreement; *provided, however,* that nothing herein shall relieve either Party from liability for the breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

### ARTICLE 9. SURVIVAL OF REPRESENTATIONS AND WARRANTIES

**9.1    Survival of Representations and Warranties.**  All representations and warranties of the Parties in this Agreement shall terminate upon the Closing or, if later, upon the Escrow Agent's release of the Assignment Price to Seller, except for any such representations or warranties that by their terms are to survive for a longer period. If the Closing does not occur and this Agreement is terminated pursuant to Section 8.1, then the representations and warranties of the Parties in this Agreement shall survive for one (1) year following the date that this Agreement is so terminated. The representations and warranties contained in this Agreement (and any right to indemnification for breach thereof) shall not be affected by any investigation, verification or examination by either Party or by any Representative of either Party or by any such Party's Knowledge of any facts with respect to the accuracy or inaccuracy of any such representation or warranty.

**9.2    Remedies Cumulative.**  The remedies provided in this Agreement shall be cumulative and shall not preclude either Party from asserting any other right, or seeking any other remedies, against the other Party.

### ARTICLE 10. MISCELLANEOUS PROVISIONS

**10.1    Expenses.**  Whether or not the Transaction is consummated, and except as expressly otherwise provided herein, each Party shall pay it own costs and expenses in connection with this Agreement and the Transaction (including the fees and expenses of its advisers, accountants and legal counsel).

**10.2    Further Assurances.**  Each Party agrees (a) to furnish upon request to each other Party such further information, (b) to execute and deliver to each other Party such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

**10.3    Amendments and Waivers.**  This Agreement may not be amended, supplemented or modified except by an agreement in writing signed by each of the Parties. No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver. Neither the failure nor any delay on the part of either Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any

single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.

**10.4 Notices.** All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received (i) when delivered personally, (ii) one (1) Business Day following the day when deposited with a reputable, established overnight courier service for delivery to the intended addressee, or (iii) three (3) Businesses Days following the day when deposited with the United States Postal Service as registered or certified mail, postage prepaid, return receipt requested and addressed as set forth below:

      (a)   If to Purchaser:

          KBKW, LLC
          c/o Michelman & Robinson, LLP
          15760 Ventura Boulevard, 5th Floor
          Encino, CA 91436
          Attention:  Jordan R. Bernstein, Esq.

      (b)   If to Seller:

          _____
          _____
          Attention:  _____

Either Party may alter its notice address by notifying the other Party of such change of address in conformity with the provisions of this section.

**10.5 Governing Law.** This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California.

**10.6 Assignments Prohibited; Successors and Assigns.** Neither Party may assign this Agreement or such Party's rights or obligations hereunder, other than with the prior written consent of the other Party, and any purported assignment without such consent shall be void and of no force or effect. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

**10.7 No Third-Party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and except as otherwise expressly provided herein, the Parties do not intend to confer third-party beneficiary rights upon any other Person.

**10.8 Counterparts.** This Agreement may be executed (including by facsimile signature) in one or more counterparts, with the same effect as if the Parties had signed the same document. Each counterpart so executed shall be deemed to be an original, and all such counterparts shall be construed together and shall constitute one agreement.

**10.9 Severability.** If any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**10.10 Entire Agreement.** This Agreement contains the entire understanding between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written

**10.11 Interpretation.** Unless otherwise indicated herein, any reference in this Agreement to a Section, Article, Subsection, Paragraph, Subparagraph, Clause, Exhibit or Schedule shall be a reference to a section, article, subsection, paragraph, subparagraph, or clause of, or an exhibit or schedule to, this Agreement. Any article, section, subsection, paragraph or subparagraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed, as the context indicates, to be followed by the words "but (is/are) not limited to." The words "herein," "hereof," "hereunder" and words of like import shall refer to this Agreement as a whole (including its Schedules and Exhibits), unless the context clearly indicates to the contrary. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate. Where specific language is used to clarify or illustrate by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict the construction of the general statement which is being clarified or illustrated.

**10.12 Construction.** The construction of this Agreement shall not take into consideration the Party who drafted or whose Representative drafted any portion of this Agreement, and no canon of construction shall be applied that resolves ambiguities against the drafter of a document. The Parties are sophisticated and have been represented by lawyers throughout this transaction who have carefully negotiated the provisions hereof. As a consequence, the Parties do not believe the presumption of California Civil Code Section 1654 and similar laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied in this case and therefore waive its effects.

**10.13 Jurisdiction; Service of Process.** Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties only in the courts of the State of California, County of Los Angeles, or, if it has or can acquire the necessary jurisdiction, in the United States District Court for the Central

14

**49**

District of California.  Each of the Parties consents to the jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

**[Signature Page Follows]**

15

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the date first written above.

"Purchaser"

KBKW, LLC

By: _____

Name: _____

Title: _____

"Seller"

SONA, LLC, as debtor in possession

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed
on its behalf as of the date first written above.

"Purchaser"

KBKW, LLC

By: _____
Name: _____
Title: _____

"Seller"

SONA, LLC, as debtor in possession

By: DAVID MYERS _____
Name: DAVID MYERS _____
Title: President _____

## EXHIBIT A

### CERTAIN DEFINITIONS

"*Business Day*" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of California are authorized or required by law to be closed.

"*Contract*" shall mean any agreement, contract, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied).

"*Encumbrance*" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, interest, claim, preference, encroachment, covenant, Order, community property interest, imperfection of title, condition or restriction of any nature (including any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any attribute of ownership of any asset).

"*Entity*" shall mean any corporation, joint stock company, general or limited partnership, limited liability company or partnership, joint venture, estate, trust, company or other entity.

"*Governmental Approval*" shall mean any: (a) permit, license (including any business license or liquor license), certificate, concession, approval, consent, ratification, permission, exemption, waiver, franchise, certification, registration, variance, qualification, accreditation or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Authority.

"*Governmental Authority*" shall mean any: (a) nation, state, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, officer, official, representative, organization, or Entity and any court or other tribunal, including any bankruptcy court); (d) multijurisdictional organization or body; or (e) individual or Entity exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"*Knowledge*": An individual shall be deemed to have "Knowledge" of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter or (ii) a prudent individual similarly situated would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the truth or existence of such fact or other matter. Seller and Purchaser shall be deemed to have "Knowledge" of a particular fact or other matter if any of their respective directors, officers or management employees has knowledge of such fact or other matter.

"*Kuda*" shall mean Kuda Group, LLC, a Nevada limited liability company.

"*Legal Requirement*" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, Order, proclamation, treaty, convention, rule, regulation, permit, ruling, directive, requirement (licensing or otherwise), specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"*Liability*" shall mean any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles.

"*Material Adverse Effect*" means, with respect to Seller, any event, change or effect that, when taken individually or together with all other adverse events, changes and effects, is or is reasonably likely (a) to be materially adverse to the condition (financial or otherwise) of Seller or the Assigned Assets, or (b) to prevent or materially delay consummation of the Transaction or otherwise to prevent Seller from performing its obligations under this Agreement.

"*Order*" shall mean any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, stipulation, subpoena, writ or award that is or has been issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Authority or any arbitrator or arbitration panel; or (b) Contract with any Governmental Authority that is or has been entered into in connection with any Proceeding.

"*Person*" shall mean any individual, Entity or Governmental Authority.

"*Proceeding*" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation that is, has been or may in the future be commenced, brought, conducted or heard at law or in equity or before any Governmental Authority or any arbitrator or arbitration panel.

"*Representatives*" shall mean officers, directors, employees, attorneys, accountants, advisors, and agents of a Party.

"*Tax*" (and, with correlative meaning, "*Taxes*" and "*Taxable*") means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount and any interest on such penalty, addition to tax or additional amount, imposed by any Tax Authority.

"*Tax Authority*" means a Governmental Authority responsible for the imposition, assessment or collection of any Tax (domestic or foreign).

"*Tax Return*" shall mean any return, statement, declaration, notice, certificate or other document that is or has been filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement related to any Tax.

"*Transaction Agreements*" shall mean this Agreement, the Lease Assignment and all other agreements, certificates, instruments, documents and writings delivered by Purchaser and/or Seller in connection with the Transaction.

"*Transfer Taxes*" shall mean all federal, state, local or foreign sales, use, transfer, real property transfer, mortgage recording, stamp duty, value-added or similar Taxes that may be imposed in connection with the transfer of Assigned Assets, together with any interest, additions to Tax or penalties with respect thereto and any interest in respect of such additions to Tax or penalties.

## EXHIBIT 2.2

### ALLOCATION OF ASSIGNMENT PRICE

Inventory ......................................................... $ 1,000.00

Liquor License ................................................ $50,000.00

Leasehold Interest........................................... $99,000.00

## EXHIBIT 2.3

### ESCROW PROVISIONS

**[*See Attached Escrow Instructions*]**



# D & G ESCROW CORPORATION
**17327 VENTURA BLVD., SUITE 300**
**ENCINO, CA 91316**
**(818) 788-5250        FAX: (818) 501-4934**
**Email: Info@DGEscrow.com**
**Website: www.DGEscrow.com**

D & G ESCROW CORPORATION, IS LICENSED BY THE DEPARTMENT OF CORPORATIONS, LICENSE NO. 963-0081.

## BULK SALE ESCROW INSTRUCTIONS

TO:  D & G Escrow Corporation

Date: May ~~10~~ **22**, 2010
Escrow Officer: Lisa E. McGuire
Escrow Number: 7166

This Agreement made and entered into, at Encino, CA, this ~~Tenth~~ *twenty second* day of May, 2010
Between:

Sona LLC  (a Ca LLC)                                              TIN:  35-2165676

   By: David Myers, President of the Managing Member

8033 Sunset Boulevard, Suite 877, Los Angeles, CA  90046          BUS:  (310) 733-3809

hereinafter known and designated as the SELLER(S) and

KBKW, LLC  (a Ca LLC)                                            TIN:  27-2399391

   By: David Koral, Managing Member of
      Real Restaurant Group, LLC, Sole Member

10430 Wilshire Boulevard, Unit 1901, Los Angeles, CA  90024      BUS:  (310) 733-3809

hereinafter known and designated as the BUYER(S).

WITNESSETH:  The Seller(s) are the owners of the certain restaurant assets known as and located at:

   Sona Restaurant                                          (310) 659-7708

   401 North La Cienega Boulevard
   Los Angeles, CA  90048

And the Seller(s) agree to sell and the Buyer(s) agree to purchase the said assets from the Seller(s) by abiding by  the  following
terms and conditions:

1. Purchase price of the assets consists of the following:

| | | |
|---|---|---:|
| Liquor License(s) | $ | 50,000.00 |
| Leasehold Interest | $ | 99,000.00 |
| Inventory of Stock in Trade | $ | 1,000.00 |
| ** Purchase Price ** | $ | 150,000.00 |
| Plus Buyer(s) expenses & costs, if any, to be approximately | $ | 46,000.00 |
| **Total Purchase Price (approximately)** | **$** | **196,000.00** |
| | | |
| 2. Buyer(s) deposit in escrow at opening, the amount of | $ | 196,000.00 |
| **Total consideration deposited at opening of escrow by Buyer** | **$** | **196,000.00** |

3. TRANSFER OF FUNDS - OUTSIDE OF ESCROW:  The Principals acknowledge, state and agree that there shall be
absolutely no monies transferred between the Principals outside of escrow and all consideration shall be deposited  into  escrow
and disbursed by the Escrow Holder at the proper time, place and to the proper payee.

4.  TRANSFER OF FUNDS - INTERNALLY:  Principals hereby authorize and instruct/direct the Escrow Holder to  transfer

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____                        Buyer Initials: _____

Page 1

**58**



**D & G ESCROW CORPORATION**
17327 VENTURA BLVD.,SUITE 300
ENCINO, CA 91316
(818) 788-5250      FAX: (818) 501-4934
Email: Info@DGEscrow.com
Website: www.DGEscrow.com

<u>AMENDED ESCROW INSTRUCTIONS</u>

Escrow No.  7166                                        Date  May 12, 2010

Re:    Business: Sona Restaurant
       Located at: 401 North La Cienega Boulevard, Los Angeles, CA  90048

Previous escrow instructions, in the above numbered escrow, are hereby amended in the following particulars only:

**HOLD OPEN FEE:** The Principals herein acknowledge and agree that if this escrow is open for an extended length of time, the length of which is to be determined at Escrow Holder's discretion, Escrow Holder is authorized and instructed to charge an additional fee, known as a "Hold-Open Fee", at the rate of $200.00 monthly for each calendar month, or fraction thereof, until said escrow is closed, completed, or cancelled in its entirety. The Principals herein further acknowledge and agree that NO additional instructions are needed or required, and that said fee shall continue indefinitely until all funds are exhausted, and that this paragraph is irrevocable. Principals further acknowledge and agree that the Escrow Holder has continuing monthly costs and expenses as a result of keeping escrows ongoing. As it is detrimental to the Escrow Holder to hold escrows open, the Principals acknowledge being obligated to compensate the Escrow Holder.

Seller Initials: _____                        Buyer Initials: _____

**CANCELLATION FEE:** The Principals to this transaction agree that if no additional instructions, to the contrary, are received from any of the Principals to this transaction within 120 days from the estimated date escrow is to close, the Escrow Holder shall consider that the principals intended the escrow cancelled. Therefore, the Principals hereby authorize and instruct/direct the Escrow Holder to cancel said escrow transaction, to take a cancellation fee in an amount not to exceed $5,200.00 , for basic fees and costs and the Principals further authorize and instruct/direct the Escrow Holder to increase this amount for all additional services rendered, caused, and/or required, and shall disburse any remaining balance of the deposit(s) to the buyer(s) specified in the escrow instructions. This paragraph supersedes, controls, and take precedence over any other language to the contrary in the original escrow instructions and all amendments. The estimated closing date and the beginning date of the 120 day period is July 15, 2010. This paragraph is irrevocable. The cancellation paragraph shall only be invoked at the option of the Escrow Holder.

Seller Initials: _____                        Buyer Initials: _____

**INDEMNIFICATION:** The Principals hereby agree to defend, indemnify, and hold the Escrow Holder harmless from and against any and all liability, financial or otherwise, including but not limited to all claims, damages, costs, expenses or losses that may arise from or in connection with Escrow Holder's compliance with these Escrow Instructions, this amendment and/or any future amendments or instructions hereto. Should Escrow Holder incur expenses, costs or attorney's fees in compliance with these instructions or this amendment, including without limitation, expenses, costs or attorney's fees in any action or other legal proceeding arising from or related to these instructions, or this amendment, including without limitation, expenses, costs or attorney's fees in any action or other legal proceeding arising from or related to these instructions, or this amendment, or the transaction contemplated hereby involving Escrow Holder and any third party not a Principal to these instructions, the Principals hereby agree to immediately upon demand in writing by Escrow Holder, to reimburse Escrow Holder for said expenses, costs, and attorney's fees. The Principals also agree to immediately pay to the Escrow Holder any loss of monies due to or for any Judgment and/or Judgment deficiency that may be obtained against the Escrow Holder including all applicable expenses, costs, and attorney's fees, as well as all interest connected with the Judgment and/or Judgment deficiency. This paragraph supersedes the indemnification wording in the general provisions in the event of a conflict.

ALL OTHER TERMS AND CONDITIONS OF THIS ESCROW SHALL REMAIN THE SAME.  ALL PRINCIPALS SIGNING THIS INSTRUCTION ACKNOWLEDGE RECEIPT OF A COPY OF SAME.

SELLER(S):                                 BUYER(S):

Sona LLC                                   KBKW, LLC

By: _____                        By: _____
David Myers, President of the              David Koral, Managing Member of
Managing Member                            Real Restaurant Group, LLC,
                                           Sole Member

**59**

**D & G Escrow Corporation**

22

Date: May 12, 2010
Escrow No.: 7166

and/or receive funds between this business escrow transaction and the real estate escrow transaction at D & G Escrow Corp.,
Escrow Number 7167, as necessary and/or required.

5. **BALANCE DUE:** Balance due, if any, by either or both Principals, to be immediately deposited upon demand of Escrow
Holder.

6. **INVENTORY:** The 'Inventory of Stock in Trade', of saleable merchandise at current wholesale prices, shall be transferred
and possession of premises shall be granted the Buyer(s) as of date determined between the Principals.

7. **PRORATIONS:** The Buyer(s) pay prorate through escrow on the following as of 'Date of Possession':
Insurance No  Personal Property Taxes  Yes (2009-10) $5,365.89
Rent  Yes  Amount $9,116.38 Due on the First of the month

8. **PERSONAL PROPERTY TAX BILL:** The Escrow Holder is authorized, instructed and directed to disregard any
WITHHOLD and/or CLAIM/DEMAND from the County Tax Collector pertaining to the 2010-11 Unsecured (Personal)
Property Tax Bill. If the county deposits the actual tax bill, demand and/or claim against the property being sold in this
escrow or if either Principal deposits said tax bill into escrow, the Principals hereby authorize, instruct and direct the Escrow
Holder to deposit said bill into D & G Escrow No. 7167 for payment in full.

9. **SALES TAX:** None. There shall be no furniture, fixtures and/or equipment transferred through this escrow. Please refer
to Escrow No. 7167 for the payment of all sales taxes due, required and/or necessary.

10. **GOVERNMENT RELEASES:** The Seller(s) shall deposit into escrow, prior to, on/or after close of escrow, but prior to
final disbursement of Seller(s) proceeds, original releases from State Board of Equalization (A/C# 100-111047) and State
Employment Development Department (A/C# 481-5675-6). The Principals authorize and instruct/direct the Escrow Holder to
accept the State Government Release(s) and/or partial release(s) for the business location only, with a completion date dated
after the date of the original opening of escrow. The Principals hereby authorize, instruct, direct and appoint the Escrow
Holder as its agent and/or assignee in dealing with said government agencies in order to collect these releases and furthermore
the Principals hereby acknowledge and agree to allow the Escrow Holder to provide information and/or escrow documents to
said agencies as necessary and/or required.

11. **AUTHORITY TO PAY:** The Principals hereby authorize, instruct and direct the Escrow Holder to pay the State Board
of Equalization, an amount that is currently unknown but shall be a bona fide amount per the demand of the Board of
Equalization and submitted by them into escrow before the close of escrow. Charge the Seller's account for said payment but
use the Buyer's funds because the Board of Equalization has placed a "STOP HOLD"on the transfer of the liquor license with
the Dept. of ABC in Sacramento, preventing the liquor license from transferring and therefore the escrow from closing.
Buyer's funds are being used as Seller has no funds in escrow to make said payment from. Therefore, said payment to the
Board of Equalization is a condition precedent to the transfer of the Alcoholic Beverage License" which is required to close
this escrow transaction.

12. **DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL APPLICATION:** The Principals acknowledge and agree
that this escrow requires a liquor license transfer to be conducted by the California State Department of Alcoholic Beverage
Control (herein after known as the Dept. of ABC). Seller warrants to be financially responsible to the Dept. of ABC for all
renewal fees due, prior to the transfer of the License and further warrants to surrender his license to the Department of
Alcoholic Beverage Control (hereinafter referred as the Dept. of ABC) and execute their documents to effect the license
transfer upon demand of Escrow Holder. Buyer warrants to timely make his applications, at the Department of Alcoholic
Beverage Control on demand of Escrow Holder, and hereby acknowledges and agrees that he shall be financially responsible to
the Dept. of ABC for all the costs associated with the transfer of the license at the time of application and any time thereafter
through the close of escrow. The Seller warrants to allow the Buyer to immediately post the Dept. of ABC 207B "Public
Notice of Application for Ownership Change" document on the business premises, in full view of the public as required by the
Dept. of ABC.

13. **ABC LICENSE(S):** The Seller(s) agree to transfer to the Buyer(s) a valid On-Sale General Eating Place License No.
47-389042 and a valid Caterer Permit License No. 58-389042, previously issued by the State Department of Alcoholic
Beverage Control. This escrow is contingent upon license transfers.

14. **TEMPORARY ABC LICENSE:** The Principals hereby acknowledge and agree that the Buyer(s) may take possession of
the business prior to close of escrow, if both Principals are in agreement. In that event, the Principals further agree to apply
for a temporary ABC license at the Department of Alcoholic Beverage Control. Buyer(s) further agree(s) to be responsible for
the payment of fees charged by the Department of Alcoholic Beverage Control. Escrow Holder is not to be concerned.

15. **TRANSFER OF ABC LICENSE:** The Principals authorize and instruct/direct the Escrow Holder to immediately forward
to the Department of Alcoholic Beverage Control their Form 226 in order to transfer the ABC license in the above mentioned
escrow.

**ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF**
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____    Buyer Initials: _____

Page 2

**60**

**D & G Escrow Corporation**

22
Date: May 14, 2010
Escrow No.: 7166

16. **OTHER BUSINESSES:** The Seller(s) warrants that all other business names and addresses used by the Seller(s) within three years last past are: None,

17. **LEASE:** The Seller(s) and/or the Landlord shall furnish the Buyer(s) with a valid **Assignment of Lease** to the business premises for a period of approximately **three (3) months** at a base **starting monthly rental of $7,735.18.** The commencement date was **October 1, 2005** and the expiration date will be **September 30, 2010.** The Assignment of Lease is subject to renewal rights. Other provisions, if any, are as follows: **Plus three (3), five (5) year options**

18. **LEASE(S) CONTINGENCY:** This escrow is contingent upon the Buyer(s) receiving a satisfactory 'Lease', 'Assignment of Lease', and/or any other lease document(s) that may be required for the proper transfer of the leasehold interest. Principals warrant to fully cooperate in securing necessary consents of third Parties. This contingency automatically expires and terminates on/after June 15, 2010.

19. **RENTAL/SECURITY DEPOSIT:** The Buyer(s) agree to reimburse the Seller(s) through escrow the sum of **$32,735.18** as the amount of last months rent on the lease (in the amount of $7,735.18) and the Guarantee of Lease (in the amount of $25,000.00.

20. **ESCROW FEES:** The Principals herein authorize, instruct and direct the Escrow Holder to pay, out of the funds deposited in escrow, any and all escrow fees and charges, including but not limited to; recording and/or filing costs; notary public costs; reimbursement to Escrow Holder for their services, for handling the drawing of documents; publication(s); searches; reports; notices; (and any & all other items in which the Escrow Holder has conducted on behalf of the Principals through an outside vendor which has created expense for the Principals and the Principals hereby authorize, instruct and direct the Escrow Holder to deduct from the monies on deposit, regardless of whose monies are on deposit, the sums necessary and/or required to pay for these outside vendor expenses), legal fees & costs, and to charge same on a basis of **fifty (50%)** percent to the account of the Seller(s) and fifty (50%) percent to the account of the Buyer(s). Each Principal shall pay to Escrow Holder through the Escrow immediately upon demand the reasonable charges for any additional work requested, caused or required by said Principals or either of them. In the event one of the Principals is unable to pay the Escrow Holder their fees and costs, then in that event, the other Principal shall assume said financial obligation to the Escrow Holder. In the event this escrow is not closed according to its terms, reimbursement to Escrow Holder for all escrow fees and costs incurred by the Principals shall be paid from the funds deposited into escrow regardless of the aforementioned basis. In addition to the above escrow fees and costs, the Principals acknowledge and agree that if this escrow does not close or cancel timely, then in that event and at the option of the Escrow Holder, interest on the balance owed to the Escrow Holder for its services rendered and completed, plus its costs and out of pocket expenses may be charged at the rate of ten (10%) per cent per annum from the estimated closing date until date of payment. In the event the Escrow Holder institutes legal action for the collection of any and all monies owed to it, then in that event, the Principals or either of them who is responsible for payment, agrees to immediately pay said sums or monies as awarded, including legal fees & costs, and costs, interest and all costs of collection. Principals acknowledge and agree that the price they were quoted for escrow fees and costs prior to or at the opening of this escrow was for basic services only and does not include additional charges for work requested, caused or required by said Principals or either of them.

21. **RELEASE OF MONIES:** The Principals hereby authorize, instruct and direct the Escrow Holder to release to Seller(s), the monies due Seller(s) on/or after the close of escrow.

22. **COVENANT NOT TO COMPETE:** None

23. **PROCESS:** The Principals hereby authorize and instruct/direct the Escrow Holder to process* this escrow **immediately** *
(to process means to prepare documents, record/file, publish, and conduct searches, which incur immediate additional expenses to the Principals).

24. **ESTIMATED CLOSE:** The estimated date of close is **July 15, 2010.**

25. **CLOSE:** This escrow shall close automatically upon Escrow Holder's notification and receipt from the Department of Alcoholic Beverage Control of their 226 Form, transferring and/or issuing the license, and their authorization to close this escrow. In the event the Escrow Holder is not informed by the Dept. of ABC of the license transfer, for any reason whatsoever, then in that event, a receipt of a photocopy of the newly issued license reflecting the ownership of the license in the name of the Buyer(s), shall also automatically close this escrow. Time is of the essence. In the event this escrow is not closed on/or prior to August 31, 2010 for any reason whatsoever, then in that event, the Buyer has the option of having said escrow cancelled and all funds on deposit shall be returned to Buyer upon said cancellation, less any funds paid to the Board of Equalization and less all escrow fees and costs. **NOTE: Any cancellation requires the Escrow Holder to obtain executed cancellation instructions from all Principals.** AC

26. **ATTACHED DOCUMENTS:** The following described document(s), **Purchase Agreement,** made and entered into between the Principals and dated May 10, 2010, is hereby included, attached hereto, and made a part hereof of these escrow instructions. In the event of any conflict between the terms and conditions of the agreement and the escrow instructions, the terms and conditions of the Escrow Instructions shall control and prevail.

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____          Buyer Initials: _____

**D & G Escrow Corporation**

Date: May 11, 2010
Escrow No.: 7166

27. **CONTINGENCY - BANKRUPTCY COURT APPROVAL:** This escrow is contingent upon approval of the Bankruptcy Court, on behalf of the Seller. The Escrow Holder is hereby authorized, instructed and directed to fulfill all court requirements, and provide information and documentation to the court, as needed and/or required. This contingency automatically expires and terminates on June 15, 2010, unless either Principal or their agent and/or assignee, contacts the Escrow Holder for an extension, prior to said date.

28. **COMMISSION:** The Principals hereby authorize, instruct and direct the Escrow Holder to pay on/or after the close of escrow, out of funds deposited into escrow, the sum of **$15,000.00**, as Broker's Commission due Pegasus Investment or assignee, for services rendered and completed. Charge Seller account. Broker represents Buyer.

29. **LLC RESOLUTION - SELLER:** The Seller(s) shall deposit into escrow, within (2) weeks, an original 'Membership Resolution' or other proper documentation, executed by an authorized Member: authorizing the sale of assets being sold in this escrow; that the Escrow Holder shall be D & G Escrow Corporation, Encino, California; and who is authorized to execute escrow instructions, amendments and any and all document(s) necessary and/or required to accomplish this sale. The Escrow Holder is not liable or responsible for the content or validity of this resolution.

30. **LLC RESOLUTION - BUYER:** The Buyer(s) shall deposit into escrow, within two (2) weeks, an original 'Membership Resolution' or other proper documentation and/or related document, executed by an authorized Member: authorizing the purchase of assets being purchased in this escrow; that the Escrow Holder shall be D & G Escrow Corporation, Encino, California; and who is authorized to execute escrow instructions, amendments, and any and all document(s) necessary and/or required to accomplish this purchase. Escrow Holder is not liable or responsible for the contents or validity of this resolution.

31. **LLC OPERATION AGREEMENT:** The Principals acknowledge and agree that the Escrow Holder shall not prepare, draft and/or be responsible for the modifications to any existing LLC Operating Agreement(s). Said modification(s) shall be handled outside of escrow, directly between the Principals and/or their agents and therefore the Escrow Holder shall not be concerned with said modification(s), whatsoever.

32. **INSPECTIONS:** The Seller(s) warrant(s) that the premises will pass all inspections necessary and/or required to conduct such business at the time physical possession is delivered to Buyer(s).

33. **INDUSTRIAL DISCLAIMER:** The Principals acknowledge and agree that they are aware of the City of Los Angeles, Dept. of Public Works, Bureau of Sanitation matters regarding the fact that the type of business being sold in this escrow transaction engages in food preparation and therefore it may produce certain industrial waste materials including fats, oils, and grease at the business location.

Seller warrants to Buyer that they have qualified, received and currently hold a "Conditional Waiver" from the City of Los Angeles for an "Industrial Wastewater Permit" and/or are currently installing or have installed a "Grease Interceptor" in lieu of the "Conditional Waiver".

Should Seller be operating under said "Conditional Waiver", then in that event, Buyer acknowledges that should Buyer remodel the business with a cost or valuation of $100,000.00 or more, then they must install a "Grease Interceptor" at their expense in order to satisfy the requirements of the City of Los Angeles.

For additional information, please call the City of Los Angeles control program at (323) 342-6118.

As a matter of record only, with which Escrow Holder is not to be responsible, liable or further concerned with whatsoever, the Principals understand and are aware that the Escrow Holder will not follow up on, investigate, and/or verify any of the matters discussed above in this paragraph.

34. **EXECUTED DOCUMENTS:** The Principals hereby acknowledge and agree that they have executed certain documents in escrow, prior to the insertion therein of pertinent information which is not now available. The Principals hereby authorize, instruct and direct the Escrow Holder to complete such documents, in accordance with the escrow instructions, at any time prior to, at, or after close of escrow.

35. **SIGNATURES:** The Principals hereby authorize, instruct and direct the Escrow Holder to accept the signature of one of the Sellers, if more than one, and/or one of the Buyers, if more than one, on any amendment and/or escrow instruction, or cancellation instruction concerning this escrow without liability on the part of the Escrow Holder for doing so, not withstanding anything in the printed instructions, to the contrary, if applicable.

36. **COUNTERPART:** The Principals hereby authorize, instruct and direct the Escrow Holder to accept any and all written escrow instructions executed in counterpart from the Principals to the Escrow Holder. Each of these instructions so executed shall be deemed an original, irrespective of the date of its execution and delivery; and said counterparts together shall constitute one and the same instrument, with the same force and effect as if the signatures were each and all contained in the same instruction(s).

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent any agreement and acknowledgment of the foregoing.*

Seller Initials: _____

Buyer Initials: _____

**D & G Escrow Corporation**

22
Date: May 17, 2010
Escrow No.: 7166

**37. GOOD STANDING REPORTS:** The Principals hereby authorize, instruct, and direct the Escrow Holder to order 'Good Standing Reports' from the Karis Corporation, regarding the selling entity in this escrow transaction, from both the California Secretary of State's Office and the Franchise Tax Board.

**38. SEARCHES:** The Principals hereby authorize and instruct/direct the Escrow Holder to immediately obtain both UCC Searches from the California Secretary of State's Office and county searches for Los Angeles County Recorder's Office. Said county search shall be ordered directly from Karis Corporation. Search the Seller at any and all locations and search the Trade Name at the business location only . The Principals acknowledge and agree that no other searches are necessary and/or required and further instruct/direct the Escrow Holder to rely on the information provided by the Principals herein as to the proper names and places to search. The Principals further authorize and instruct/direct the Escrow Holder to order all UCC-1 copy requests, as needed or required.

The Principals acknowledge, agree, and fully understand that these searches shall be ordered at the beginning of escrow (when the escrow is processed), and that these searches shall NOT be reordered prior to the close of escrow. If reordering is necessary and/or required, the Principals shall inform the Escrow Holder, in writing, prior to the close of escrow. The Principals further acknowledge, agree, and fully understand that the Escrow Holder is NOT liable or responsible for the sufficiency or correctness of the searches, nor for any liens which may have been filed and or recorded after the date of said searches, or for liens uncovered on the searches that are for similar names, but not against the business, Seller(s) or any other searched name in this escrow transaction. Therefore, the Principals hereby release the Escrow Holder and the Escrow Holder shall be indemnified and held harmless from any and all liability or responsibility, expressly or implied, for the period of time, from the date of the last search until the date of the close of escrow, and thereafter.

**39. RELEASE/TERMINATION:** The Principals hereby authorize and instruct/direct the Escrow Holder, if necessary and/or required, to prepare, file/record any and all UCC-3 "Terminations", "Reconveyances", "Satisfaction of Judgments", "Release of Tax Liens", and/or any other documents in order to provide clear title to the Buyer prior to, on, or after close of escrow. Charge Seller's account.

**40. NOTICE:** The Principals hereby authorize and instruct/direct the Escrow Holder, to record and publish, in the appropriate County(s) and/or Judicial District(s), a "Notice to Creditors of Bulk Sale and of Intention to Transfer Alcoholic Beverage License(s)", at opening of escrow or at the time of processing, and subsequently as needed and/or required. Said Notice shall be handled by Pacific Corporate & Title Services.

**41. FICTITIOUS BUSINESS NAME STATEMENT:** None

**42. ABANDONMENT OF FICTITIOUS BUSINESS NAME STATEMENT:** None

**43. ACQUAINTANCE & TRAINING PERIOD:** None

**44. INSURANCE:** The Buyer(s) understand(s) and acknowledge(s) that it is their responsibility to provide themselves with adequate insurance coverage in regards to the business and/or assets they are purchasing through this escrow, on/or before date of possession. In the event that the Buyer(s) does/do not procure reasonable insurance coverage, timely, the Buyer(s) warrant(s) that it is solely their liability and responsibility and therefore Buyer(s) warrant to hold the Seller(s) and the Escrow Holder harmless and hereby indemnifies Seller(s) and Escrow Holder from any responsibility and/or financial liability in regards to the compliance of the above instruction.

**45. FACSIMILE TRANSMITTALS:** The Principals acknowledge, agree, state and hereby authorize, instruct and direct the Escrow Holder, themselves, their agent(s), representatives(s), lien holders, creditors and any other interested party to send and accept FACSIMILE TRANSMITTALS (hereinafter referred to as "FAX") on all Escrow Instructions, amendments, escrow documents, letters, other types of instructions, lien holders, claims, received demands and any & all other documents received and/or sent through FAX transmissions and to rely upon said transmissions as if it or they are originals sent or delivered by other methods. Said receipt by the Escrow Holder is at the sole option and discretion of the Escrow Holder and the Principals shall replace all facsimiles sent to the Escrow Holder by the Principals with the originals within seventy-two (72) hours of the transmission. The Principals further acknowledge and agree that any document to be recorded with the County Recorders Office and/or filed with the California Secretary of State's Office, must be an originally executed document and may not be a FAX (non-original) copy whatsoever, as these governmental agencies will not except FAX copies for recording and/or filing. Therefore, a FAX will delay the recording/filing and the close of escrow. Under no circumstances whatsoever, shall the Escrow Holder fund and/or pay any monies from it's Trust Account without an originally executed instruction and/or document acceptable to the Escrow Holder.

**46. EMAIL TRANSMITTALS:** The Principals acknowledge, agree and hereby authorize, instruct, and direct the Escrow Holder, themselves, their agent(s), representative(s) and creditor(s) to send and accept EMAIL CORRESPONDENCE on all letters, instructions, claims, demand and any & all other documents received and/or sent through the Internet and to rely upon said transmissions as if they are originals sent or delivered by other methods. Under no circumstances whatsoever, shall the Escrow Holder fund and/or pay any monies from it's Trust Account without an original executed instruction and/or

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____                Buyer Initials: _____

Page 5

**63**

**D & G Escrow Corporation**

Date: May 21, 2010
Escrow No.: 7166

document.

47.  **CONFIDENTIALITY:** The Principals hereby acknowledge, state and agree that this escrow transaction is confidential and that neither Principal will make disclosure to any person and/or entity regarding the details of this escrow and/or transaction whatsoever, except on a need to no basis, a matter of which the Escrow Holder is not to be concerned with, whatsoever.

48.  **AUTHENTICITY:** The Principals acknowledge and agree that all the documents provided to each other and to the Escrow Holder are originals and/or true, correct, and unaltered copies of the originals and all information provided, written or verbal, used in the creation of these escrow instructions have been provided by the Principals and/or their agent(s), and that NO false, untrue or misleading statements or paragraphs have been made or inserted in this escrow and therefore the Principals hereby certify under penalty of perjury, that the foregoing information provided in these instructions are true and correct to the best of their knowledge and belief(s).

49.  **DRAFTING:** Each Principal acknowledges and agrees that they participated in the drafting and preparation of these escrow instruction. Hence, in any construction of these instructions, the same shall not be construed against any Principal and/or the Escrow Holder.

50.  **SEVERABILITY:** In the event that any term(s) and/or provision(s) of these escrow Instructions, future amendments and/or instructions, are determined and/or held to be invalid, illegal, inoperative, unenforceable and/or incapable of being enforced by a court of competent jurisdiction, the remaining provisions will not be affected whatsoever and therefore nevertheless be given full force and effect.

51.  **LEGAL AND/OR ACCOUNTING ADVICE:** It is understood and agreed by the Principals hereto that no legal and/or accounting advice of any kind or nature has been given to any Principal to these instructions, by the Escrow Holder. It is further understood that the Principals hereto have been advised to seek appropriate legal counsel and/or accounting professionals for the explanation, clarification, and/or cancellation of any of the terms and conditions as set forth herein.

52.  INDEMNIFICATION; DISPUTE RESOLUTION; ATTORNEY'S FEES AND COSTS:

The following paragraphs contain the words or terms of Escrow Holder and Broker(s). In each and every case, the term of Escrow Holder means and is interpreted as the licensed escrow agent and its employees, independent contractors and agents and the word Broker(s) means and is interpreted as the licensed real estate broker and its employees, independent contractors and agents.

A.  **INDEMNIFICATION:** The Principals hereby agree to defend, indemnify, and hold the Escrow Holder and/or Broker(s) harmless from and against any and all liabilities, financial or otherwise, including but not limited to all claims, damages, costs, expenses or losses that may arise from or in connection with Escrow Holder's and/or Broker's compliance with these Escrow Instructions and/or any future amendments hereto. Should Escrow Holder and/or Broker(s) incur expenses, costs, and/or attorney's fees in compliance with these Escrow Instructions, including without limitation, expenses, costs, or attorney's fees in any action or other legal proceeding arising from or related to these Escrow Instructions or the transactions contemplated hereby involving Escrow Holder and/or Broker(s) and any third party not a Principal to these Escrow Instructions, the Principals hereby agree, immediately upon demand in writing by Escrow Holder and/or Broker(s), to reimburse Escrow Holder and/or Broker(s) for said expenses, costs and attorney's fees. The Principals also agree to indemnify the Escrow Holder and/or Broker(s) from and against any judgment and/or deficiency judgment that may be obtained against the Escrow Holder and/or Broker(s) by any such third party arising from or in connection with any such action or other legal proceeding, including all applicable costs, expenses, attorney's fees and interest included in or connected with said judgment. In the event that any Principal hereto is a business entity rather than an individual, the individual shareholders, partners, members or other legal owners of any such entity hereby agree to guaranty and assume personal liability to the Escrow Holder and/or Broker(s) for any such entity's obligations, liabilities and duties as set forth in this indemnification provision.

B.  **MEDIATION:** The Principals agree that prior to the filing of any action or other legal proceeding by any Principal to enforce or interpret these Escrow Instructions, or to resolve any dispute, controversy, or claim between the Principals or between the Principals and Escrow Holder and/or Broker(s) arising from or in connection with these Escrow Instructions or the transactions contemplated herein (collectively herein "Dispute") that cannot be resolved by mutual agreement of the parties to such Dispute, such Dispute shall be submitted to mediation, subject to the exclusions set forth in sub-paragraph C below. Mediation fees and costs, if any, shall be divided equally among the parties involved in any such mediation. If, in connection with any Dispute, except as provided in sub-paragraph C below, any Principal commences an action or other legal proceeding without first requesting the other party(ies) to such Dispute in writing to resolve the Dispute through mediation, or fails to agree to mediate within thirty (30) days after receipt of a written request to mediate then the Principal(s) so failing or refusing to mediate shall not be entitled to recover attorney's fees even if they would otherwise be available to such Principal(s) in any such action or other legal proceeding. If the parties to a Dispute have not selected a mutually acceptable mediator within thirty (30) days after the parties to such Dispute agree to mediate in accordance with a written notice requesting mediation, then any party to the Dispute may, at that party's election, (i) file with a court having jurisdiction over the Dispute a proceeding requesting that the court appoint a mediator, or (ii) request mediation of the Dispute with either the American Arbitration

ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____      Buyer Initials: _____

Page 6

**64**

## D & G Escrow Corporation

**22**
Date: May **31**, 2010
Escrow No.: 7166

---

Association or Alternative Resolution Centers in accordance with their respective rules governing private mediation, including the appointment of a neutral mediator or mediators. The mediator(s), in any mediation hereunder, shall be an attorney or a retired judge, each with at least ten (10) years of experience.

C. **EXCLUSIONS FROM MEDIATION:** The following matters are excluded from the requirement of mediation as set forth in paragraph B above: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code Section 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; (iv) any matter which is within the jurisdiction of a probate or small claims court; (v) an action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil Procedure Section 337.1 or Section 337.15 applies; or (vi) an interpleader action brought by Escrow Holder or any action brought by Escrow Holder for declaratory relief, to enforce the indemnification provisions of sub-paragraph A above, or to collect Escrow Fees and/or costs. Neither the filing of a court action to enable recording of a notice of pending action, for order of attachment, receivership, temporary restraining orders, injunctive relief, nor other provisional remedies without prior compliance with the provisions of paragraph B above shall constitute a violation of paragraph B.

D. **CALIFORNIA LAW AND VENUE:** These Escrow Instructions shall be construed and enforced in accordance with California law. In the event of a mediation or an action or other legal proceeding involving Escrow Holder and/or Broker(s) arising out of or relating to these Escrow Instructions and/or the transactions contemplated herein, venue shall be exclusively in Los Angeles County, California.

E. **ATTORNEY'S FEES AND COSTS:** The prevailing party(ies) in any action or other legal proceeding to enforce or interpret these Escrow Instructions, or to resolve any Dispute between any Principals or between any Principal(s) and the Escrow Holder and/or Broker(s), (i) filed in compliance with the requirements of paragraph B above, or (ii) subject to the provisions of paragraph C above, shall be entitled to an award of his/her/its attorney's fees and costs therein incurred to be awarded either in such action or legal proceeding or in a separate proceeding brought for that purpose.

### GENERAL PROVISIONS

1. Each of the Principals will sign all papers and documents and furnish all records necessary or requisite to the completion of all steps necessary to the consummation of the sale of the above business, promptly and without unnecessary delay.

2. The Principals hereto do hereby agree to open, and do so open, an escrow at the office of D & G Escrow Corporation, 17327 Ventura Boulevard, Suite 300, Encino, CA 91316, for the purpose of completing this sale and purchase in accordance with all of the provisions of Sections 6101-6107 of the Uniform Commercial Code of California, Section 3440 and 3440.1 of the California Civil Code and all laws appertaining to the subject matter of this escrow, including but not limited to Section 24073 Et. Sec. of the California Business and Professions Code.

3. The Seller agrees to hold the Buyer harmless of, and from any liability, claims, demands or causes of action occurring from the operation of said business prior to date of possession, and Seller agrees to indemnify Buyer against all losses resulting from any such claims.

4. The Buyer agrees to hold the Seller harmless of, and from any liability, claims, demands or causes of action occurring from the operation of said business after the date of possession, and Buyer agrees to indemnify Seller against all losses resulting from any such claims.

5. The Principals hereby authorize and instruct/direct the Escrow Holder to deposit all funds into the D & G Escrow Corporation, "Trust Account" at Professional Business Bank, 199 South Los Robles Avenue, Pasadena, CA 91101, unless specifically instructed to the contrary. Furthermore, Principals acknowledge that said "Trust Account" will not yield any interest, whatsoever, to any Principal/Party.

6. In the event that there shall be a denial of the transfer of the liquor license herein or a suspension or revocation of the same by the Department of Alcoholic Beverage Control, which shall have been caused by the act or acts of the Seller or Buyer, then in such event this escrow shall be cancelled and the Principal causing such denial, revocation or suspension of said liquor license shall be responsible therefor, and agrees to indemnify the other for all costs, expenses, or damages caused by virtue of the failure of the within escrow to be properly consummated.

7. The Principals agree that in the event any claims are received in escrow for any taxes due as set forth in Section 24049 of The California Business and Professions Code, the Escrow Holder is authorized and instructed to pay the same at close of escrow, or prior to close of escrow, if said payment is a condition precedent to the transfer of an Alcoholic Beverage License, from the funds deposited in escrow, and charge Seller's account. This is your authorization and instruction to make payment without further authority for so doing.

8. In the event a liquor license is being transferred through this escrow, Escrow Holder is hereby authorized and instructed to pay the claims for bona fide creditors of the Seller who file their claims with the Escrow Holder before the Escrow Holder is notified by the Department of Alcoholic Beverage Control of its approval of the transfer of the license, or if the purchase price or consideration is not sufficient to pay the claims in full, the Escrow Holder is authorized and instructed to distribute the consideration in accordance with Section 24074 of the California Business and Professions Code. Principals agree that all claims filed in escrow, prior to notification to you of the transfer of the license, shall be treated as and shall be construed as bona fide claims and you are authorized and instructed to pay the same without any further approval from the Seller herein, unless the Seller notifies you in writing to the contrary, within 10 days from the date you furnish the Seller with a list of claims filed in escrow, either by personal delivery to the Seller, or by electronic means such us email or facsimile to the Seller; or by regular mail to the Seller at his last known address.

**ADDITIONAL INSTRUCTIONS ATTACHED HERETO AND MADE A PART HEREOF**
*My initials below represent my agreement and acknowledgment of the foregoing.*

Seller Initials: _____     Buyer Initials: _____

Page 7

**65**

**D & G Escrow Corporation**

Date: May 31, 2010
Escrow No.: 7166

9.  The Principals agree that in the event any portion of the purchase price or consideration is in the form of a Promissory Note in favor of the Seller and the cash consideration is not sufficient to pay the creditors in full, then you are authorized and instructed to retain said note in escrow, and the Buyer agrees upon notice from you to pay said amounts as provided therein, into escrow.  You are to pay said amounts prorata from time to time to the bona fide creditors, until such time as the bona fide creditor's claims have been paid in full, or the obligation due the Seller has been fully satisfied, whichever occurs first.

10.  It is understood that the Escrow Holder will not be liable to the Buyer or Secured Party, or any other party, on account of any property included hereunder which is subject to conditional sale or lease contracts or other form of lease, contract or agreement, or Security Agreement or on account of liens of any kind or nature whatsoever, or from defects in title which may exist with respect to any such property.  It is understood by the Principals to this escrow that no Security Agreement search is required covering the property involved herein and the Escrow Holder is hereby relieved of all liability for not procuring such Security Agreement search unless specifically provided for in this escrow.

11.  All the Principals and/or Parties hereto further agree, jointly and severally, to pay on demand, as well as to indemnify and hold the Escrow Holder harmless of and from any and all costs, damages, judgments, attorney's fees, expenditures, obligations, expenses and liabilities of any kind or nature which in good faith, the Escrow Holder may incur and sustain in connection with, or arising out of this escrow.  In the event that the Escrow Holder shall initiate a judicial action or any other legal proceeding ("a proceeding") arising from or in connection with this escrow transaction against any Principal and/or Party hereto, or in the event that any Principal and/or Party hereto shall initiate a proceeding arising from or in connection with this escrow transaction against the Escrow Holder, the prevailing Principal and/or Party in any such proceeding shall be entitled to his/her/its attorney's fees & costs of suit incurred in such proceeding to be awarded either in such proceeding or in a separate proceeding brought for that purpose.  The Escrow Holder is hereby given a lien upon all of the rights, titles and interests of each of the undersigned in all escrow papers and other property and monies deposited in escrow, to protect the Escrow Holder's rights and to indemnify and reimburse said Escrow Holder under this escrow transaction.

12.  The Escrow Holder is not to be concerned with any unpaid insurance, Municipal, County, State or Federal Tax or taxes, unless otherwise specifically instructed in this escrow.

13.  The Escrow Holder is not to be held liable for the sufficiency or correctness as to form, manner of execution or validity of any instrument deposited in escrow, nor as to the identity, authority or rights of any person executing the same, nor for failure to comply with any of the provisions of any agreement, contract or instrument filed or referred to in said escrow, and its duties hereunder shall be limited to the safekeeping of such money, instruments or other documents received by it as Escrow Holder and of the disposition of same in accordance with the written instruments and instructions accepted in this escrow. You are hereby authorized to destroy, without further notice to the Principals, all documents, papers, instructions and any other material in connection with this escrow five (5) years after termination or completion of same.

14.  No notice, demand or change of instruction shall be of any effect in this escrow unless given in writing by all Principals affected thereby.  In event conflicting demands are made or conflicting notices served upon the Escrow Holder with respect to this escrow, the Principals hereto expressly agree that the Escrow Holder shall have the absolute right at its election to do either or all of the following:

Withhold and stop all further proceedings in the performance of this escrow, or file a suit in interpleader and obtain an order from the Court requiring the Principals to interplend and litigate in such court their several claims and rights amongst themselves.  In the event such interpleader suit is brought, the Escrow Holder shall be fully released and discharged from all obligations to further perform any and all duties or obligations imposed upon it in this escrow, and the Principals jointly and severally agree to pay it all costs, expenses and reasonable attorney's fees expended or incurred by it, the amount thereof to be fixed and judgment therefor to be rendered in such suit.

15.  This Agreement shall inure to the benefit of, and be binding upon, the heirs, executors, administrators and assigns of each of the Principals hereto.  Words used in this Agreement in the present tense include the future as well as the present; words used in the masculine gender include the feminine and neuter; the singular number includes the plural, and the plural the singular; and the word "Principal" includes a corporation as well as a natural person.

The foregoing terms, conditions, provisions and instructions have been read and are understood and agreed to by each of the Principals hereto.

**SELLER(S):**                                                    **BUYER(S):**

Sona LLC  (a Ca LLC)                                   KBKW, LLC  (a Ca LLC)

By: _____                By: _____
David Myers,                                              David Koral, Managing Member of
President of the Managing Member          Real Restaurant Group, LLC,
                                                                    Sole Member

- - END OF INSTRUCTIONS - -

## EXHIBIT 3.2(a)

## LEASE ASSIGNMENT

*[See Attached Assignment & Assumption of Lease]*

## ASSIGNMENT AND ASSUMPTION OF LEASE, ACCEPTANCE AND CONSENT

Location of Property: 401 North La Cienega, Los Angeles California 90048

This Assignment and Assumption of Lease (this "Agreement") is made for reference purposes this 22th day of May , 2010 (the "Effective Date"), by and between SONA, LLC ("Assignor") and KBKW, LLC, a California limited liability company ("Assignee").

### Recitals

**WHEREAS**, on or about June 10, 2005, Glick, Glick and Lewis (the "Lessor"), as lessor, and Assignor, as lessee executed a lease (as same may have been amended, extended and/or restated, the "Lease ") for the property (the "Premises") commonly referred as 401 North La Cienega, Los Angeles California 90048. A true and complete copy of all documents comprising the entire Lease is attached hereto as Exhibit "A" and incorporated herein;

**WHEREAS**, Assignor now desires to assign the Lease, and all its terms, to Assignee, Assignee desires to accept the assignment of the Lease, effective as of the Effective Date and Assignee shall send written confirmation of the Effective Date to Lessor so that Lessor is advised; and

**NOW, THEREFORE**, Assignor and Assignee agree as follows:

### Assignment

For value received, the receipt and sufficiency of which are hereby acknowledged, and the agreement of Assignee, Assignor assigns and transfers to Assignee all of Assignor's right, title, and interest in and to the Lease, inclusive of those options to extend provided for in Rider 1 to the Lease [and the Guarantee thereunder, in the current amount of $25,000.00], and Assignee does accept the assignment and agree to assume tenant's obligations under the Lease, effective as of the Effective Date. Assignee expressly assumes and agrees to keep, perform, and fulfill all of the terms, covenants, conditions, liabilities, and obligations, required to be kept, performed, and fulfilled by the tenant under the Lease and which accrue from and after the Effective Date, including the making when due and payable of all payments which become due under the Lease from and after the Effective Date. This assignment does not release Assignor from any obligation of tenant under the Lease.

### Acceptance

In consideration for the above assignment and written consent thereto, Assignee hereby assumes all of the obligations of the tenant under the Lease from and after the Effective Date.

### Miscellaneous

This Agreement may not be orally changed or terminated, nor any of its provisions waived, except by an agreement in writing signed by the party against whom enforcement of any change, termination or waiver is sought.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be governed by and in accordance with the laws of the State of California without regard to principles of conflicts of law.

This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.


DATED: _____          LESSEE/ASSIGNOR

                                  SONA, LLC.


                                  By:_____


DATED: _5/22/2020_                ASSIGNEE

                                  KBKW, LLC, a California limited liability company

                                  By:_____


2

**69**

This Agreement may not be orally changed or terminated, nor any of its provisions waived, except by an agreement in writing signed by the party against whom enforcement of any change, termination or waiver is sought.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be governed by and in accordance with the laws of the State of California without regard to principles of conflicts of law.

This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.

DATED: _5 - 14 - 10_            LESSEE/ASSIGNOR

SONA, LLC.

By:_____

DATED: _____        ASSIGNEE

KBKW, LLC, a California limited liability company

By:_____

2

**70**

Exhibit A
Lease

**71**

Exhibit B

## Consent to the Assignment and Assumption of Lease

Reference is made to the lease agreement, dated as of June 10, 2005 (the "Lease"), by and between Glick, Glick and Lewis (the "Lessor") and SONA, LLC (the "Assignor") and relating to the property commonly referred to as 401 North La Cienega, Los Angeles California 90048 (the "Lease"). The undersigned hereby consents to the assignment and assumption of the Lease between Assignor and KBKW, LLC. a California limited liability company, (the "Assignee"), effective as of the Effective Date, waiving none of its rights thereunder as to Assignor. Without limiting the generality of the foregoing:

1.    Nothing contained in this Consent or in the Lease shall be construed to:

a)    modify, waive or affect (i) any of the provisions, covenants, or conditions of the Lease, (ii) any of the Assignor's obligations under the Lease, or (iii) any rights or remedies of Lessor under the Lease;

b)    waive any present or future breach or default on the part of any tenant under the Lease; or

c)    release or discharge Assignor from any liability of their obligations under the Lease.

2.    This Consent is not assignable and shall not be construed as a consent to any further assignment of the Lease.

DATED: _____, 2009        LESSOR

GLICK, GLICK & LEWIS

By:_____
Its:_____

4

**72**

## EXHIBIT 3.2(c)

## BILL OF SALE

**[*See Attached Bill of Sale*]**

## BILL OF SALE

**1.    Sale and Transfer of Purchased Inventory.**    For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by Section 3.2(a) of that certain Purchase Agreement dated as of May 11, 2010 (the *"Purchase Agreement"*), by and between **KBKW, LLC**, a California limited liability company ("*Purchaser*"), and **SONA, LLC**, a California limited liability company ("*Seller*"), Seller hereby sells, transfers, assigns, conveys, grants and delivers to Purchaser, and its successors and assigns forever, all of Seller's right, title and interest in and to all of the Purchased Inventory (as defined in the Purchase Agreement).

**2.    Further Actions.**    Seller covenants and agrees to warrant and defend the sale, transfer, assignment, conveyance, grant and delivery of the Purchased Inventory hereby made against all persons whomsoever, to take all steps reasonably necessary to establish the record of Purchaser's title to the Purchased Inventory and, at the request of Purchaser, to execute and deliver further instruments of transfer and assignment and take such other action as Purchaser may reasonably request to more effectively transfer and assign to and vest in Purchaser each of the Purchased Inventory, all at the sole cost and expense of Seller.

**3.    Terms of the Purchase Agreement.**    All of the terms and provisions of the Purchase Agreement are incorporated herein by this reference. Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

**IN WITNESS WHEREOF,** Seller has executed this Bill of Sale as of _____, 2010.


SONA, LLC.

By: _____
Name: *David Myers*
Title: *President*

# EXHIBIT 4.4(b)

## COPY OF LEASE

[*See Attached Copy of the Lease*]



**AIR COMMERCIAL REAL ESTATE ASSOC**

**STANDARD INDUSTRIAL/COMME**

**SINGLE-TENANT LEASE – NE**

_PLEASE FILE UNSIGNED SONA LEASE_

**(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)**

1. **Basic Provisions ("Basic Provisions").**

    1.1  **Parties.** This Lease ("Lease"), dated for reference purposes only _June 10_, _2005_, is made by and between _Glick, Glick and Lewis_ ("Lessor").

    and _Sona LLC_ ("Lessee").

    (collectively the "Parties," or individually a "Party").

    1.2  **Premises.** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as _401 La Cienega_
    located in the County of _Los Angeles_, State of _California_
    and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project) _single story structure consisting of approximately 3000 square feet_
    ("Premises"). (See also Paragraph 2)

    1.3  **Term:** _Five (5)_ years and _0_ months ("Original Term") commencing _October 1, 2005_ ("Commencement Date") and ending _September 30, 2010_ ("Expiration Date"). (See also Paragraph 3)

    1.4  **Early Possession:** _____
    ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

    1.5  **Base Rent:** $ _7735.18_ per month ("Base Rent"), payable on the _1st_ day of each month commencing _October 2005_. (See also Paragraph 4)

    ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. _✗ See Rider I_

    1.6  **Base Rent and Other Monies Paid Upon Execution:**

    (a)  Base Rent: $ _7735.18_ for the period _of one (1) year_

    (b)  Security Deposit: $ _____ ("Security Deposit"). (See also Paragraph 5)

    (c)  Association Fees: $ _____ for the period _____

    (d)  Other: $ _15,470.00_ for _____
    _First and last month's rent is $15,470.36_

    (e)  Total Due Upon Execution of this Lease: $ _15,470.36 plus $25,000 Guarantee_

    1.7  **Agreed Use:** _Operation of restaurant and Bar_
    (See also Paragraph 6)

    1.8  **Insuring Party.** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

    1.9  **Real Estate Brokers.** (See also Paragraph 15)

    (a) **Representation.** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

    ☐ _____ represents Lessor exclusively ("Lessor's Broker");

    ☐ _____ represents Lessee exclusively ("Lessee's Broker"); or

    ☐ _____ represents both Lessor and Lessee ("Dual Agency").

    (b) **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to in their separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

    1.10  **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _$25,000.00 To be kept in a 3rd party escrow account_ ("Guarantor"). (See also Paragraph 37)

    1.11  **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

    ☐ an Addendum consisting of Paragraphs _____ through _____ ;

    ☐ a plot plan depicting the Premises;

    ☐ a current set of the Rules and Regulations;

    ☐ a Work Letter;

    ☐ other (specify): _Rider I - option to extend    Rider IV Building Permit_
    _Rider II - Right of first refusal    and Releases_
    _Rider III - Guaranty; Letter of Credit    Rider V Authority To Sign_

2. **Premises.**     _Rider VI Parking, Deliveries, valet and trash Containers_

    2.1  **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. Note: Lessee is advised to verify the actual size prior to executing this Lease.

_Initials_ _____    PAGE 1 of 14    _Initials_ _____

©2002 – AIR Commercial Real Estate Association    FORM STN-7-4/01